**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MARKEL AMERICAN INSURANCE COMPANY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) |
| JASON ULANSKI, ELIASARD ALCAUTER, JACOB BIROS, PAUL BOJAN, LOUIS BONGIORNO, STEVE BOSNIAK, JR., GEORGE BUKOWSKI, CODY CONNELLY, SHARON DEVITA, BRIAN DOBER, SHARON DOBER, JOHN ERNST, JOSE GARCIA, PAUL GESIAKOWSKI, MICHAEL GRIFFIN, DAVID GRIGGS, JOSEPH HOEFLING, TOM HOLLINGSWORTH, CHRISTOPHER IVERSON, TIMOTHY JAROSZ, JENNIFER JONES, JAMES LEFEVOUR, CLAYTON LYONS, KERRY O'BOYLE, ADAM PACHA, LAURA PACKWOOD, JAMES PARISI, JENNY PETERS, JENNIFER PILLON, ANGELICA SANCHEZ, ANTHONY SANDERS, JANICE SINCLAIR, THOMAS SKOWRONSKI, KEVIN TAYLOR, DAWN WAHLGREN, ELINA ZILSKE, KEITH ZILSKE and MARYBETH ZILSKE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**MARKEL AMERICAN INSURANCE COMPANY'S**
**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Markel American Insurance Company, by and through its undersigned counsel, hereby files this action for declaratory relief, and in support thereof avers as follows:

**NATURE OF THE CASE**

1.      This is a dispute between Markel American Insurance Company ("MAIC") and its insured, Jason Ulanski ("Ulanski").

1

2.      On information and belief, from March 12, 2018 through June 2023, Ulanski was a Financial Representative of Penn Mutual Midwest Wealth Strategies, a subsidiary of Penn Mutual Life Insurance Company ("PMLIC").

3.      At issue in this dispute is whether Company Sponsored Life Insurance Agents Professional Liability Master Policy No. MKLM7PLCA00065 (the "Policy")[1] issued by MAIC to PMLIC provides coverage for certain demands for monetary damages made against Ulanski for recommending that his clients invest money with one or more entities owned and controlled by Phillip Galles ("Galles"), including Tyche Asset Management, LLC ("Tyche").

4.      Ulanski's clients' subsequent investments with Tyche – purported commodities futures contracts – were not authorized by, approved by, or processed through Hornor, Townsend & Kent, LLC ("HTK"), PMLIC's wholly-owned broker/dealer.

5.      On May 10, 2023, the U.S. Attorney's Office for the District of New Jersey filed a Criminal Complaint against Galles,[2] it which it alleges, *inter alia*:

> From in or around October 2019 through in or around May 2023, defendant PHILLIP GALLES ("GALLES") defrauded his victims by falsely claiming that he would invest their money in commodity futures through his purported investment company called Tyche Asset Management ("Tyche"), based in Chicago, Illinois. As part of the scheme, GALLES and those working for him falsely told prospective investors that Tyche had a history of success using proprietary trading strategies. But in reality, Tyche made virtually no legitimate investments. And instead of applying investors' funds to commodity futures trades as promised, GALLES used that money to pay back other investors and on his own personal expenses-including high-end clothing, rent on a luxury apartment, and luxury automobiles. In total, through his scheme, GALLES defrauded more than a dozen victims out of more than $2 million.

---

[1] A true and correct copy of the Policy is attached as **Exhibit A**.

[2] A true and correct copy of the Criminal Complaint in *U.S. v. Galles*, No. 2:24-cr-00098-ES-1 (D.N.J. filed May 10, 2023) is attached as **Exhibit B**.

6. On February 16, 2024, the Criminal Complaint against Galles was unsealed and Galles was formally indicted for wire fraud (18 U.S.C. § 1343) and commodities fraud (18 U.S.C. § 1348).[3]

7. On May 11, 2023, the Commodities and Futures Trading Commission ("CFTC") filed a complaint against Galles, Tyche and several related entities in the United States District Court for the Northern District of Illinois (the "*CFTC* Lawsuit"), alleging various violations of the Commodity Exchange Act and Regulations.[4]

8. On November 8, 2023, the Honorable Elaine E. Bucklo entered an Order of Final Judgment by Default in the *CFTC* Lawsuit.[5]

9. On information and belief, on May 11, 2023, the U.S. Department of Justice contacted one of Ulanski's clients, Adam Pacha ("Pacha"), and advised him that Galles had been arrested for wire fraud.

10. On May 19, 2023, Mr. Pacha sent an email to MAIC's third party claims administrator, Lancer Claims Services ("Lancer"), advising that he had hired an attorney to recoup his $500,000 investment with Galles/Tyche plus interest and damages for pain and suffering.[6] Ulanski was copied on the email.

11. Subsequently, numerous other former Ulanski clients reached out to Ulanski and/or Lancer demanding refunds of the amounts invested with Galles and other damages (the "Ulanski Client Demands").

---

[3] A true and correct copy of the Galles Indictment is attached as **Exhibit C**.

[4] A true and correct copy of the Complaint from *Commodity Futures Trading Comm'n v. Galles, et al.,* No. 1:23-cv-029770 (N.D. Ill. filed May 11, 2023) is attached as **Exhibit D**.

[5] See *CTFC v. Galles,* No. 1:23-CV-02970 (N.D. Ill. Nov. 8, 2023), a true and correct copy of which is attached as **Exhibit E**.

[6] A true and correct copy of Mr. Pacha's March 19, 2023 email is attached as **Exhibit F**.

12. To date, no lawsuit has been filed against Ulanski for recommending that his former clients invest with Galles, Tyche or any other related entity or individual.

13. In this action, MAIC seeks a declaration that, under the terms of the MAIC Policy, MAIC has no duty to pay on behalf of Ulanski any amounts that Ulanski becomes legally obligated to pay as Damages or Claims Expenses as a result of any Claim made or that will be made against Ulanski arising out of the Ulanski Client Demands.

14. Specifically, MAIC seeks a declaration that there is no coverage under the Policy for any Claim made or that will be made arising out of the Ulanski Client Demands because any coverage for such a Claim is:

    a. barred by Exclusion R of the Policy, which precludes coverage for any Claim "[a]rising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any Securities (other than variable life insurance, variable annuities and mutual funds) or Private Placements that were not authorized or approved by and actually processed through [HTK]";

    b. barred by Exclusion E of the Policy, which precludes coverage for any Claim "[a]rising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged conversion, commingling, use, handling, entrustment, safeguarding, inability to pay or failure to pay premiums, funds or any form of money";

    c. barred by Exclusion I of the Policy, which precludes coverage for, *inter alia*, any Claim arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the "failure or inability to pay of any company, organization,

entity, vehicle or arrangement of any nature in which an Insured . . . recommended to be placed funds or an investment of any nature";

d. barred by Exclusion U.2 of the Policy, which precludes coverage for any Claim "[a]rising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving . . . [c]ommodities, commodity futures and option contracts, except for option contracts that are covered by ownership of the underlying Securities, cash or cash equivalent, not including margin."

### THE PARTIES

15. Plaintiff, MAIC, is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Glen Allen, Virginia.

16. Defendant Jason Ulanski is a citizen of Cook County, Illinois.

17. Defendant Eliasard Alcauter is a citizen of Cook County, Illinois. Mr. Alcauter is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Alcauter is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Alcauter other than to bind him to the outcome of this action. In the event Mr. Alcauter stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

18. Defendant Jacob Biros is a citizen of Cook County, Illinois. Mr. Biros is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Biros is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Biros other than to bind him to the outcome of this action. In the event Mr. Biros stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

5

19.     Defendant Paul Bojan is a citizen of Cook County, Illinois.  Mr. Bojan is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Bojan is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Bojan other than to bind him to the outcome of this action.  In the event Mr. Bojan stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

20.     Defendant Louis Bongiorno is a citizen of Cook County, Illinois.  Mr. Bongiorno is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Bongiorno is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Bongiorno other than to bind him to the outcome of this action.  In the event Mr. Bongiorno stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action

21.     Defendant Steve Bosniak, Jr. is a citizen of Cook County, Illinois.  Mr. Bosniak is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Bosniak is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Bosniak other than to bind him to the outcome of this action.  In the event Mr. Bosniak stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

22.     Defendant George Bukowski is a citizen of Collier County, Florida. Mr. Bukowski is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Bukowski is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr.

6

Bukowski other than to bind him to the outcome of this action. In the event Mr. Bukowski stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

23. Defendant Cody Connelly is a citizen of Cook County, Illinois. Mr. Connelly is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Connelly is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Connelly other than to bind him to the outcome of this action. In the event Mr. Connelly stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

24. Defendant Sharon DeVita is a citizen of Cook County, Illinois. Ms. DeVita is a former client of Ulanski who was allegedly defrauded by Galles. Ms. DeVita is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. DeVita other than to bind her to the outcome of this action. In the event Ms. DeVita stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

25. Defendant Brian Dober is a citizen of Will County, Illinois. Mr. Dober is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Dober is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Dober other than to bind him to the outcome of this action. In the event Mr. Dober stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

26. Defendant Sharon Dober. is a citizen of Cook County, Illinois. Ms. Dober is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Dober is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has

an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Ms. Dober other than to bind her to the outcome of this action.  In the event Ms. Dober stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

27.     Defendant John Ernst is a citizen of Cook County, Illinois.  Mr. Ernst is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Ernst is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Ernst other than to bind him to the outcome of this action.  In the event Mr. Ernst stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

28.     Defendant Jose Garcia is a citizen of Cook County, Illinois.  Mr. Garcia is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Garcia is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Garcia other than to bind him to the outcome of this action.  In the event Mr. Garcia stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

29.     Defendant Paul Gesiakowski is a citizen of Cook County, Illinois.  Mr. Gesiakowski is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Gesiakowski is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Gesiakowski other than to bind him to the outcome of this action.  In the event Mr. Gesiakowski stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

30.     Defendant Michael Griffin is a citizen of Cook County, Illinois.  Mr. Griffin is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Griffin is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Griffin other than to bind him to the outcome of this action.  In the event Mr. Griffin stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

31.     Defendant David Griggs is a citizen of Cook County, Illinois.  Mr. Griggs is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Griggs is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Griggs other than to bind him to the outcome of this action.  In the event Mr. Griggs stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

32.     Defendant Joseph Hoefling is a citizen of Cook County, Illinois.  Mr. Hoefling is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Hoefling is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Hoefling other than to bind him to the outcome of this action.  In the event Mr. Hoefling stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

33.     Defendant Tom Hollingsworth is a citizen of Sarpy County, Nebraska.  Mr. Hollingsworth is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Hollingsworth is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Hollingsworth other than to bind him to the outcome of this action.  In the event

9

Mr. Hollingsworth stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

34.     Defendant Christopher Iverson is a citizen of Cook County, Illinois. Mr. Iverson is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Iverson is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Iverson other than to bind him to the outcome of this action. In the event Mr. Iverson stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

35.     Defendant Timothy Jarosz is a citizen of Cook County, Illinois. Mr. Jarosz is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Jarosz is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Jarosz other than to bind him to the outcome of this action. In the event Mr. Jarosz stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

36.     Defendant Jennifer Jones in a citizen of Cook County, Illinois. Ms. Jones is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Jones is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Jones other than to bind her to the outcome of this action. In the event Ms. Jones stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

37.     Defendant James LeFevour is a citizen of Cook County, Illinois. Mr. LeFevour is a former client of Ulanski who was allegedly defrauded by Galles. Mr. LeFevour is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has

an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. LeFevour other than to bind him to the outcome of this action.  In the event Mr. LeFevour stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

38. Defendant Clayton Lyons is a citizen of Cook County, Illinois.  Mr. Lyons is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Lyons is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Lyons other than to bind him to the outcome of this action.  In the event Mr. Lyons stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

39. Defendant Kerry O'Boyle is a citizen of Cook County, Illinois.  Mr. O'Boyle is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. O'Boyle is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. O'Boyle other than to bind him to the outcome of this action.  In the event Mr. O'Boyle stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

40. Defendant Adam Pacha is a citizen of DuPage County, Illinois.  Mr. Pacha is a former client of Ulanski who was allegedly defrauded by Galles.  Mr. Pacha is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute.  MAIC seeks no affirmative relief from Mr. Pacha other than to bind him to the outcome of this action.  In the event Mr. Pacha stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

41. Defendant Laura Packwood is a citizen of Cook County, Illinois.  Ms. Packwood is a former client of Ulanski who was allegedly defrauded by Galles.  Ms. Packwood is named as

a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Packwood other than to bind her to the outcome of this action. In the event Ms. Packwood stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

42. Defendant James Parisi is a citizen of Washington County, Illinois. Mr. Parisi is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Parisi is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Parisi other than to bind him to the outcome of this action. In the event Mr. Parisi stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

43. Defendant Jenny Peters is a citizen of Cook County, Illinois. Ms. Peters is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Peters is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Peters other than to bind her to the outcome of this action. In the event Ms. Peters stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

44. Defendant Jennifer Pillon is a citizen of Cook County, Illinois. Ms. Pillon is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Pillon is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Pillon other than to bind her to the outcome of this action. In the event Ms. Pillon stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

45. Defendant Angelica Sanchez is a citizen of Cook County, Illinois. Ms. Sanchez is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Sanchez is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Sanchez other than to bind her to the outcome of this action. In the event Ms. Sanchez stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

46. Defendant Anthony Sanders is a citizen of Cook County, Illinois. Mr. Sanders is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Sanders is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Sanders other than to bind him to the outcome of this action. In the event Mr. Sanders stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

47. Defendant Janice Sinclair is a citizen of Sinclair County, Illinois. Ms. Sinclair is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Sinclair is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Sinclair other than to bind her to the outcome of this action. In the event Ms. Sinclair stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

48. Defendant Thomas Skowronski is a citizen of Cook County, Illinois. Mr. Skowronski is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Skowronski is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr.

Skowronski other than to bind him to the outcome of this action. In the event Mr. Skowronski stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

49. Defendant Kevin Taylor is a citizen of Cook County, Illinois. Mr. Taylor is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Taylor is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Taylor other than to bind him to the outcome of this action. In the event Mr. Taylor stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

50. Defendant Dawn Wahlgren is a citizen of Cook County, Illinois. Ms. Wahlgren is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Wahlgren is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Wahlgren other than to bind her to the outcome of this action. In the event Ms. Wahlgren stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

51. Defendant Elina Zilske is a citizen of Cook County, Illinois. Ms. Zilske is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Zilske is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Zilske other than to bind her to the outcome of this action. In the event Ms. Zilske stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

52. Defendant Keith Zilske is a citizen of Cook County, Illinois. Mr. Zilske is a former client of Ulanski who was allegedly defrauded by Galles. Mr. Zilske is named as a Defendant in this lawsuit only to the extent he is required to be named as a necessary party or has an interest in

the outcome of this dispute. MAIC seeks no affirmative relief from Mr. Zilske other than to bind him to the outcome of this action. In the event Mr. Zilske stipulates to be bound by the judgment of the Court, MAIC will dismiss him from the action.

53. Defendant Marybeth Zilske is a citizen of Cook County, Illinois. Ms. Zilske is a former client of Ulanski who was allegedly defrauded by Galles. Ms. Zilske is named as a Defendant in this lawsuit only to the extent she is required to be named as a necessary party or has an interest in the outcome of this dispute. MAIC seeks no affirmative relief from Ms. Zilske other than to bind her to the outcome of this action. In the event Ms. Zilske stipulates to be bound by the judgment of the Court, MAIC will dismiss her from the action.

## JURISDICTION AND VENUE

54. This is an action for Declaratory Judgment filed pursuant to 28 U.S.C.A. §2201 *et seq.* and Fed. R. Civ. P. No. 57, to determine a question of actual controversy among the parties as is more particularly described herein, and to ascertain rights, duties and obligations, if any, under Company Sponsored Life Insurance Agents Professional Liability Master Policy No. MKLM7PLCA00065 (the "Policy").

55. Plaintiff MAIC, on the one hand, and Defendants, on the other hand, are citizens of different states, creating diversity of citizenship sufficient to support this Court's jurisdiction, pursuant to 28 U.S.C.A. §1332.

56. The amount in controversy exceeds $75,000, exclusive of interest and costs.

57. This case arises from potential liabilities that Defendant Ulanski may incur, for which he has sought and may continue to seek defense and/or indemnification from MAIC, as set forth in more detail below.

58. An actual controversy has arisen among and between MAIC and Ulanski, with respect to rights and obligations under the terms of the Policy, as set forth in more detail below.

59. As a result of the coverage controversy, MAIC seeks a declaration of its rights and/or responsibilities under the Policy.

60. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because most, if not all, of the incidents giving rise to the Ulanski Clients Demands occurred in this District and the vast majority of the Defendants are residents of this District.

### THE GALLES PONZI SCHEME[7]

61. On information and belief, beginning in October/November 2020, Defendant Ulanski began referring his clients to Galles for the purposes of investing in Galles' investment company, Tyche.

62. Tyche is a Delaware limited liability company registered with the CFTC.

63. From October 2019 through early 2023, Galles received over $6 million from approximately 50 individuals – roughly half of which were Ulanski clients – to invest in Tyche and various Tyche-related entities.

64. Galles described Tyche to prospective investors as a "managed futures" fund that traded futures and options contracts on the Chicago Board of Trade and the Chicago Mercantile Exchange.

65. Galles used Tyche's status as an entity registered with the CFTC to deceive investors into depositing funds with Tyche.

---

[7] The facts alleged in connection with the Galles' Ponzi scheme are set forth in the Findings of Fact section of Judge Bucklo's November 8, 2023 order in *CFTC v. Galles*. See Ex. E. at ¶¶ 1-66.

66.     Galles gave prospective investors promotional materials in which he fabricated various "automated trading models" that generated high rates of return for those participating in the Tyche managed futures fund.

67.     In fact, Galles and Tyche placed only a few trades in a futures trading account in the name of a Tyche entity, and those futures trades did not occur until January 2023, well after Galles claimed to have been employing his purported automated trading models.

68.     Galles used the money deposited by investors into Tyche's bank accounts primarily for his own personal benefit, but also to repay certain early investors and to pay expenses designed to make Tyche appear to be a legitimate operation, a classic Ponzi scheme.[8]

69.     In furtherance of the scheme, Galles and Tyche sent periodic account statements to investors that misrepresented the value of their respective interests in the purported managed futures fund.

70.     In late 2022, Galles' scheme began to unravel as several participants sought to withdraw money from their Tyche accounts.

---

[8] According to the U.S. Securities and Exchange Commission ("SEC"):

> A Ponzi scheme is an investment fraud that pays existing investors with funds collected from new investors. Ponzi scheme organizers often promise to invest your money and generate high returns with little or no risk. But in many Ponzi schemes, the fraudsters do not invest the money. Instead, they use it to pay those who invested earlier and may keep some for themselves.
>
> With little or no legitimate earnings, Ponzi schemes require a constant flow of new money to survive. When it becomes hard to recruit new investors, or when large numbers of existing investors cash out, these schemes tend to collapse.
>
> Ponzi schemes are named after Charles Ponzi, who duped investors in the 1920s with a postage stamp speculation scheme.

https://www.investor.gov/protect-your-invstments/fraud/types-fraud/ponzi-scheme.

17

71. Because Galles/Tyche did not have sufficient funds to meet customer withdrawal requests, Galles attempted to delay the return of investor funds by lying about, among other things, the location of the Tyche funds and the process required to return investor funds.

72. By the time of Galles' arrest in May 2023 for Wire Fraud (18 U.S.C. § 1343) and Commodities Fraud (18 U.S.C. § 1348), the defrauded investors had deposited $6,262,673 into Galles/Tyche's bank account; $935,500 of the investors' deposits were repaid, leaving an unpaid and uncollectible balance of $5,237,173.

73. On May 11, 2023, the CFTC filed the CFTC Lawsuit, alleging various violations of the Commodity Exchange Act and Regulations.

74. On November 8, 2023, the Honorable Elaine Bucklo, the presiding judge in the *CFTC* Lawsuit entered an Order for Final Judgment By Default against Galles, Tyche and its related entities, finding among other things that the Galles defendants:

    a. Committed fraud in violation of 7 U.S.C. § 6b(a)(1)(A)-(C), which prohibits, *inter alia*, the misappropriation of participant funds;[9]

    b. Committed fraud in violation of 7 U.S.C. § 6o(1), which prohibits a Commodity Pool Operator ;[10]

    c. Committed commodity fraud in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1, which make it unlawful for any person or entity from employing a deceptive device or contrivance in connection with the sale of any commodity;[11]

---

[9] Ex. E at ¶ 77.

[10] Ex. E at ¶ 82.

[11] Ex. E at ¶ 87.

    d.   Improperly commingled funds invested by pool participants by directly depositing those funds in Tyche bank accounts in violation of 17 C.F.R. § 4.20.[12]

### ULANSKI'S INVOLVEMENT WITH GALLES/TYCHE

75.    Ulanski has never been affiliated with HTK, PMLIC's wholly-owned securities brokerage firm (often referred to as a "broker/dealer").

76.    Ulanski has never had a license from the Financial Industry Regulatory Authority ("FINRA"), the SEC or any state securities or insurance regulator to act as a financial advisor; Ulanski is only licensed to sell insurance products.

77.    Nonetheless, on information and belief, Ulanski described himself to his PMLIC clients as their "financial advisor."

78.    Beginning in October/November 2020, Ulanski began referring his PMLIC clients to Galles for investment in Tyche's purported managed futures funds.

79.    On information and belief, Ulanski assured his clients that Galles had a very secure, legal and safe operation, with above average returns on a low risk investment.

80.    On information and belief, in at least one instance, Ulanski offered one of his clients a 1-2% fee for anyone the client recommended to Ulanski that ultimately invested in Tyche.[13]

81.    On information and belief, in at least one instance, Ulanski represented to his clients that he himself had invested money in Tyche.

82.    Ulanski's clients' subsequent investments with Tyche were not authorized or approved by HTK. Nor were the investments processed through HTK.

---

[12] Ex. E at ¶ 94.

[13] See May 6, 2023 letter from Jacob Biros to Penn Mutual Insurance, a true and correct copy of which is attached as **Exhibit G**.

83. On information and belief, in late-2022/early-2023, various clients of Ulanski reached out to him to report difficulties withdrawing funds from their Tyche accounts.

84. In May 2023, U.S. Department of Justice ("DOJ") personnel began reaching out to Tyche investors, including those referred by Ulanski, advising them of Galles' arrest for Wire Fraud.

85. Shortly thereafter, Ulanski's clients began reaching out to PMLIC, Ulanski and/or MAIC's third-party administrator, Lancer Claims Services ("Lancer"), to report the monies lost as a result of their Tyche investments.

86. On May 11, 2023, Ulanski was subpoenaed to testify before a grand jury of the U.S. District Court for the District of New Jersey.[14]

87. The subpoena required Ulanski to produce:

All documents and information, in any form, relating to: Tyche Asset Management ("Tyche"), any Tyche-related entities, and/ or Phillip Galles, including but not limited to:
- All records of salary, commission, compensation, or benefits paid or provided to you
- All communications (including text messages)
- Documentation, including communications, regarding any Tyche clients, investors, or potential investors[15]

88. On May 12, 2023, the Federal Bureau of Investigation seized Ulanski's phone.

89. On information and belief, Ulanski was terminated by PMLIC subsidiary, Penn Mutual Midwest Wealth Strategies, in June of 2023.

---

[14] A true and correct copy of the subpoena is attached as **Exhibit H**.
[15] See Ex. G.

20

## THE ULANSKI CLIENT DEMANDS

90. On May 12, 2023, Ulanski telephoned Lancer (MAIC's third party administrator) advising that clients he had recommended to Galles/Tyche would likely be asserting claims under the Policy.[16]

91. On May 15, 2023, Ulanski emailed Lancer a list of thirty-five (35) clients he believed would be making complaints against him.[17]

92. On May 19, 2023, Ulanski's client, Defendant Adam Pacha, emailed MAIC's third party administrator, Lancer, advising that he lost $500,000 as a result of following Ulanski's recommendation to invest in Tyche and that he had hired an attorney to take "all necessary steps to get back all of my initial investment of $500,000, interest and pain and suffering."[18]

93. On May 24, 2023, Lancer representative Erin McCusker had a telephone call with Ulanski during which Ulanski stated that the Tyche investments he was recommending to his clients were futures of options and that the Tyche investments were not authorized or approved by HTK or sold through them.

94. During the May 24, 2023 telephone call, Ulanski also confirmed that he was not registered to sell securities; he only had an insurance license.

95. On June 14, 2023, Ulanski client, Defendant Laura Packwood, emailed Markel Service, Incorporated, the claims service manager for MAIC, advising that she wished to assert a

---

[16] See May 12, 2023 email from Carolyn Guy of Lancer to Ulanski, confirming May 12, 2023 telephone conference, a true and correct copy of which is included in **Group Exhibit I**.

[17] See Ex. I at May 15, 2023 email from Ulanski to Lancer. (All of the individuals listed in Ulanski's email to Lancer are named as defendants in this action.)

[18] Ex. F.

claim for $126,702.40 – comprised of her $70,000 initial investment plus the returns that Galles/Tyche represented were generated by her investment.[19]

96.     On August 17, 2023, Lancer on behalf of MAIC issued a series of letters reserving MAIC's rights with respect to the Ulanski Client Demands (the "Reservation of Rights Letters").[20]

97.     On December 5, 2023, Ulanski, via email, forwarded to Lancer two settlement demands he received from former clients who invested with Galles/Tyche: an undated letter from Defendant Jennifer Jones demanding $125,000 and a November 20, 2023 letter from Defendant Clayton Lyons demanding $30,000.[21]

98.     On March 5, 2024, the Stoltman Law Offices, P.C., which represents twenty-four (24) of Ulanski's former clients, issued a $1 million policy-limits demand to MAIC to resolve its clients claims against Ulanski (the "Stoltman Policy Limits Demand").[22]

**THE RELEVANT TERMS OF THE POLICY**

99.     The relevant Insuring Agreement of the Policy provides in pertinent part:

**SECTION I – INSURING AGREEMENTS**

**A.  Professional Liability**

The **Insurer**[23] shall pay, on behalf of an **Insured**, **Damages** which an **Insured** becomes legally obligated to pay because of a **Claim** that is both made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), or as allowed by Section **XI** — Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an

---

[19] A true and correct copy of Ms. Packwood's June 14, 2023 email is attached as **Exhibit J**.

[20] See e.g., August 17, 2023 reservation of rights letter to Ulanski re allegations made by Jacob Biros, a true and correct copy of which is attached as **Exhibit K**.

[21] A true and correct copy of Ulanski's December 5, 2023 email, with attachments, is attached as **Exhibit L**.

[22] A true and correct copy of the Stoltman Policy Limits Demand is attached as **Exhibit M**.

[23] Words appearing in **bold** are defined terms in the Policy.

22

**Insured**, provided:

1. Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**); and

2. As of the inception date of this Policy as shown in the Master Policy Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**.[24]

100. The Policy defines the term "**Insured**" to include an "**Agent**."[25]

101. The Policy's definition of the term "**Agent**" provides in pertinent part:

A. **Agent** means an Insured person who:

1. Maintains an agent or field manager contract with the **Sponsoring Company**;

2. Has elected to enroll for coverage under this Policy, either at the inception date of the Policy Period or prior to the expiration date of the Policy Period, and whose enrollment is on file with the Sponsoring Company;

3. Is shown as such in a Certificate Of Insurance;

4. Has paid the applicable premium; and

5. Is licensed by all necessary federal, state or local governmental authorities to render Professional Services where both the Agent and client are located.

* * *

**Agent** shall also mean:

* * *

9. An individual who was an **Agent** as of the effective date of this Policy whose contract terminated with the **Sponsoring Company** during the **Policy Period**, but only for **Professional Services** rendered under the definition of **Professional Services** 1.a and h.[26]

102. The Policy defines the term "**Sponsoring Company**" as "the insurance company

---

[24] Ex. A at Section I.A.

[25] Ex. A at Section V.K.1.

[26] Ex. A at Section V.K.1.

or organization shown as such in the Master Policy Declarations, and any **Subsidiary**." [27]

103.     Penn Mutual Life Insurance Company ("PMLIC") is shown in the Policy Declarations as the "**Sponsoring Company Master Policy Holder**." [28]

104.     The Policy's definition of "**Subsidiary**" provides in pertinent part:

**Subsidiary** means a corporation in which the **Sponsoring Company**:

Owns, as of the inception date of the **Policy Period**, more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more **Subsidiaries** and which such corporation is engaged in **Professional Services** . . ..

105.     On the inception date of the Policy – August 1, 2022 – PMLIC owned more than 50% of the stock of Penn Mutual Midwest Wealth Strategies.

106.     The Policy defines the term "**Claim**" as follows:

**Claim** means a written demand received by an **Insured** for **Damages** (including pleadings received in a civil litigation or arbitration) because of an actual or alleged **Wrongful Act** or, with respect to Section I — Insuring Agreement **B.** Managing Agents Management Liability, an actual or alleged **Management Wrongful Act**.

**Claim** shall also mean a cost of correction resulting from a negligent act, error or omission of an **Insured** or employee of the **Broker/Dealer** arising out of the rendering of **Professional Services** which would have been a valid covered **Claim** if not corrected, and shall be limited to: (1) demands for an amount less than $20,000 by the **Sponsoring Company** or **Broker/Dealer** in indemnifying a client of an **Insured**; and/or (2) **Damages** incurred by a client of an **Insured** in excess of $20,000 that are reported to the Insurer within a reasonable amount of time from the date of when the act, error or omission was discovered, provided that such timely report is otherwise provided to the **Insurer** during the **Policy Period** or Extended Reporting Period, if applicable.

A **Claim** does not include the following:

1.   A demand for declaratory, injunctive or other non-monetary relief;

2.   Any form of criminal proceeding; or

3.   Any proceeding commenced by a governmental or quasi-governmental official or agency or any self-regulatory official or agency, except for a **Disciplinary Proceeding**, but only with respect to coverage provided by Section IV. —

---

[27] Ex. A at Section V.AA.

[28] Ex. A at Declarations.

Coverage Extension **A.** or if the agency or official is a client of the **Insured** in connection with the rendering of **Professional Services**.[29]

107. The Policy defines the term "**Claims Expenses**" as follows:

**Claim Expenses** means reasonable and necessary amounts incurred by the **Insurer**, or by the **Insured** with the prior written consent of the **Insurer**, in the defense of a **Claim** that is covered under this Policy, including attorneys' fees, costs of investigation, court or arbitration costs and premiums for appeal, attachment or similar bonds. The **Insurer**, however, is not required to provide such bonds. **Claim Expenses** do not include the wages, salaries, fees or costs of the directors, officers, employees, representatives, in-house counsel, agents or servants of any **Insured**.[30]

108. The Policy defines the term "**Damages**" as follows:

**Damages** means monetary judgments, settlements or awards resulting from a **Claim**. **Damages** do not include the following:

1. Taxes, fines or penalties, unless incurred by a claimant and made part of a **Claim** against an **Insured**;

2. Punitive or exemplary damages;

3. The multiplied portion of a multiplied damage award;

4. The return, restitution, reduction, compromise or refund of commissions, fees or charges;

5. Costs incurred as a result of non-monetary, declaratory or injunctive relief;

6. Any matters that are deemed uninsurable under the law; and

7. **Claim Expenses**.[31]

109. The Policy defines the term "**Wrongful Acts**" as follows:

**Wrongful Act** means a negligent act or omission, including a **Personal Injury Act**, committed by an **Insured** in the rendering of or failing to render **Professional Services** to a client.[32]

110. The Policy defines the term "**Interrelated Wrongful Acts**" as follows:

**Interrelated Wrongful Acts** means any **Wrongful Acts** that are:

---

[29] Ex. A at Section V.F.

[30] Ex. A at Section V.G.

[31] Ex. A at Section V.H.

[32] Ex. A at Section V.DD.

25

1. Similar, repeated or continuous; or

2. Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.[33]

111.    With respect to PMLIC life insurance agents such as Ulanski who are/were not affiliated with HTK, PMLIC's wholly-owned broker/dealer, the Policy's Professional Services Amendment Endorsement replaces the Policy's definition of the term "**Professional Services**" with the following:

**Professional Services** means:

1. The solicitation, sale or servicing of the following:

    a. Life insurance, accident and health insurance, workers' compensation insurance as part of a 24-Hour accident and health insurance product, managed care organization contracts, long term care products, disability income insurance and fixed annuities;

    b. Employee benefit plans, including, but not limited to, **Placement of Coverage with Multiple Employer Welfare Arrangements, Self-Funded Plans**, group plans, group or ordinary pension or profit sharing plans, retirement annuities, KEOGH retirement plans, life, accident and health and/or disability plans;

    However, coverage for **Claims** based upon, arising out of or in any way involving, in whole or in part, **Placement of Coverage with Multiple Employer Welfare Arrangements** is subject to the following Sub-Limits of Liability (which are part of an not in addition to the other Limits of Liability provided by the Policy) and Deductible, unless **Placement of Coverage with Multiple Employer Welfare Arrangements** is made in accordance with the **Sponsoring Company's** written procedures for such placement and same is funded .in whole or in part, by insurance products issued by the **Sponsoring Company**:

    Each **Claim**:                    $500,000
    **Agent** Aggregate:            $500,000
    Deductible (**Damages** only):  $5,000

    In addition, coverage for **Claims** based upon, arising out of or in any way involving **Self-Funded Plans** is applicable to **Claims Expenses** only, and not **Damages**; and

---

[33] Ex. A at Section V.N.

   **c.** Pharmacy benefit management plans either approved by the Centers for Medicare and Medicaid Services or that are sold in conjunction with a group or individual medical plan;

**2.** Providing advice, consultation, administration and/or services in connection with any of the products listed in Paragraph **1.**, above, whether or not a separate fee is charged;

**3.** Consultation with participants in an employee benefit plan in order to explain the provisions of such plan and the handling of day-to-day ministerial functions required by such plan including, but not limited to, enrollment, record keeping and filing reports with governmental agencies;

**4.** Provision of financial planning services including, but not limited to, the recommendation or preparation of a financial program for a client involving the client's present and anticipated assets and liabilities, and shall include recommendations regarding savings, investments, insurance, anticipated retirement, estate planning or other employee benefits, whether or not a separate fee is charged;

**5.** Notary Public Services; or

**6.** The purchase, sale or giving advice regarding life settlements arranged through a provider approved by the **Sponsoring Company** provided:

   **a.** On or before the life insurance policy is settled, the **Insured** obtained a signed and dated waiver from all beneficiaries of the life insurance policy acknowledging that the life settlement will occur;

   **b.** On or before the life insurance policy is settled, the owner(s) of the life insurance policy has/have signed the provider's life settlement purchase and/or sale agreement;

   **c.** The **Insured** was approved in writing by the **Sponsoring Company** or the **Broker/Dealer** to engage in life settlement transactions;

   **d.** The life settlement transaction complies with the **Sponsoring Company's** or the **Broker/Dealer's** policies and procedures for life settlement transactions; and

   **e.** The life settlement does not involve terminally ill clients in accordance with the definition of "terminally ill" by the relevant state.[34]

112. The Policy defines the term "**Broker/Dealer**" as "the entity designated as such in the Declarations, Hornor, Townsend & Kent, LLC.[35]

113. The Policy defines the term "**Securities**" as follows:

**Securities** shall have the same meaning as the term used in the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940,

---

[34] Ex. A at Professional Services Amendment Endorsement.

[35] Ex. A at Section V.D.

and any amendments thereto.[36]

114.    The Policy defines the term "**Private Placements**" as follows:

**Private Placements** means an offering of **Securities** by an issuer that meets the requirements of Sections 3(b) or 4(2) of the Securities Act of 1933 or must follow the conditions set out under Regulation D of the Securities Act of 1933.[37]

115.    The Policy at Section VI – Exclusions, A., provides:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim**:

**A.** For any actual or alleged sickness, disease, death or other bodily injury, including, but not limited to, emotional distress and mental anguish, or damage or destruction of property, including loss of use thereof[.][38]

116.    The Policy at Section VI – Exclusions, D., provides:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claims Expenses** for any **Claim**:

\* \* \*

**D.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any:

1.    Actual or alleged dishonest, purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute, by, at the direction of or with the knowledge of any **Insured**; or

2.    Gaining of profit, remuneration or monetary advantage to which an **Insured** is not legally entitled.

However, the **Insurer** shall continue to defend a **Claim** alleging any of the foregoing conduct until there is a judgment, final adjudication, adverse admission or finding of fact against any **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for the costs of defending the **Claim**. Moreover, an actual or alleged dishonest, purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute of one **Agent** or **Managing Agent** will not be imputed to another **Agent** or **Managing Agent**[.][39]

117.    The Policy at Section VI – Exclusions, E., provides:

---

[36] Ex. A at Section V.Y.

[37] Ex. A at Section V.T.

[38] Ex. A at Section VI.A.

[39] Ex. A at Section VI.D.

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claims Expenses** for any **Claim**:

\* \* \*

**E.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged conversion, commingling, use, handling, entrustment, safeguarding, inability to pay or failure to pay premiums, funds or any form of money[.][40]

118. The Policy at Section VI – Exclusions, I., provides:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claims Expenses** for any **Claim**:

\* \* \*

**I.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged insolvency, receivership, conservatorship, liquidation, bankruptcy, failure or inability to pay of any company, organization, entity, vehicle or arrangement of any nature in which an **Insured** placed, recommended to be placed or obtained coverage or in which an **Insured** placed, recommended to be placed funds or an investment of any nature; however, this exclusion shall not apply to a **Claim** based upon or arising out of the placement, recommendation for placement or obtaining coverage with an insurance company rated by A .M Best's as B+ or better at the time when coverage is placed, recommended or obtained[.][41]

119. The Policy at Section VI – Exclusions, R., provides:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claims Expenses** for any **Claim**:

\* \* \*

**R.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Securities** (other than variable life insurance, variable annuities and mutual funds) or **Private Placements** that were not authorized or approved by and actually processed through the **Broker/Dealer**[.][42]

120. The Policy at Section VI – Exclusions, U.2, provides:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claims Expenses** for any **Claim**:

\* \* \*

---

[40] Ex. A at Section VI.E.

[41] Ex. A at Section VI.I.

[42] Ex. A at Section VI.R.

**U.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

\* \* \*

**2.** Commodities, commodity futures and option contracts, except for option contracts that are covered by ownership of the underlying **Securities**, cash or cash equivalent, not including margin[.][43]

## COUNT I
### Declaratory Judgment:

**Coverage For Any Claim That Has Been Made Or Will Be Made Arising Out Of The Ulanski Client Demands Is Barred By The Policy Exclusion R.**

121. The allegations set forth in Paragraphs 1 through 120 above are re-alleged and incorporated as if fully set forth herein.

122. Exclusion R of the Policy bars coverage for any Claim:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Securities** (other than variable life insurance, variable annuities and mutual funds) or **Private Placements** that were not authorized or approved by and actually processed through the **Broker/Dealer**[.][44]

123. Because the Ulanski Client Demands arise out of Ulanski's recommendations to invest in Securities or Private Placements that "were not authorized or approved by and actually processed through [HTK]," coverage for any Claim that has been or will be made against Ulanski arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the Ulanski Client Demands is barred by Policy Exclusion R.

## COUNT II
### Declaratory Judgment:

**Coverage For Any Claim That Has Been Made Or Will Be Made Arising Out Of The Ulanski Client Demands Is Barred By The Policy Exclusion E.**

124. The allegations set forth in Paragraphs 1 through 123 above are re-alleged and

---

[43] Ex. A at Section VI.U.2.

[44] Ex. A at Section VI.R.

incorporated as if fully set forth herein.

125.    Exclusion E of the Policy bars coverage for any Claim:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged conversion, commingling, use, handling, entrustment, safeguarding, inability to pay or failure to pay premiums, funds or any form of money[.][45]

126.    Because the Ulanski Client Demands arise out of Galles' actual or alleged conversion, commingling, use, handling, entrustment, safeguarding, inability to pay or failure to pay funds or any form of money to the Ulanski clients, coverage for any Claim that has been or will be made against Ulanski arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the Ulanski Client Demands is barred by Policy Exclusion E.

**COUNT III**
**Declaratory Judgment:**

**Coverage For Any Claim That Has Been Made Or Will Be Made Arising Out Of The Ulanski Client Demands Is Barred By The Policy Exclusion I.**
(In the Alternative to Count I)

127.    The allegations set forth in Paragraphs 1 through 126 above are re-alleged and incorporated as if fully set forth herein.

128.    Exclusion I of the Policy provides, in pertinent part:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim** . . . [a]rising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged . . . failure or inability to pay of any company, organization, entity, vehicle or arrangement of any nature in which . . . an **Insured** placed, recommended to be placed funds or an investment of any nature[.][46]

---

[45] Ex. A at Section VI.E.

[46] Ex. A at Section VI.I.

129.     With the collapse of the Galles/Tyche Ponzie scheme, Galles/Tyche are unable to refund the investments made by Ulanski's clients; accordingly, coverage for any Claim that has been or will be made against Ulanski arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving of the Ulanski Client Demands is barred by Policy Exclusion I.

## COUNT IV
### Declaratory Judgment:

**Coverage For Any Claim That Has Been Made Or Will Be Made Arising Out Of The Ulanski Client Demands Is Barred By The Policy Exclusion U.2.**

130.     The allegations set forth in Paragraphs 1 through 129 above are re-alleged and incorporated as if fully set forth herein.

131.     Exclusion U.2 of the Policy bars coverage for any Claim:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving . . . [c]ommodities, commodity futures and option contracts, except for option contracts that are covered by ownership of the underlying **Securities**, cash or cash equivalent, not including margin[.][47]

132.     Because the Tyche investment vehicle that Ulanski encouraged his clients to invest in were commodity future and option contracts, none of which were covered by ownership in the purported underlying security, coverage for any Claim that has been or will be made against Ulanski arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving the Ulanski Client Demands is barred by Policy Exclusion U.2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Markel American Insurance Company ("MAIC") respectfully requests that this Honorable Court enter judgment in its favor and further:

    a.  Find and declare that any Claim (as defined by Company Sponsored Life Insurance
        Agents Professional Liability Master Policy No. MKLM7PLCA00065 (the "Policy"))

---

[47] Ex. A at Section VI.U.2.

32

made against Jason Ulanski ("Ulanski") arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving his recommendation that any individual or entity invest in Tyche Asset Management, LLC ("Tyche") or any other entity owned and controlled by Phillip Galles ("Galles") is barred by Exclusion R. of the Policy and therefore MAIC has no duty to pay on behalf of Ulanski any amounts that Ulanski becomes legally obligated to pay as a result of any such Claim;

b. Find and declare that any Claim (as defined by the Policy) made against Ulanski arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving of his recommendation that any individual or entity invest in Tyche or any other entity owned and controlled by Galles is barred by Exclusion E. of the Policy and therefore MAIC has no duty to pay on behalf of Ulanski any amounts that Ulanski becomes legally obligated to pay as a result of any such Claim;

c. Find and declare that any Claim (as defined by the Policy) made against Ulanski arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving his recommendation that any individual or entity invest in Tyche or any other entity owned and controlled by Galles is barred by Exclusion I. of the Policy and therefore MAIC has no duty to pay on behalf of Ulanski any amounts that Ulanski becomes legally obligated to pay as a result of any such Claim;

d. Find and declare that any Claim (as defined by the Policy) made against Ulanski arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving his recommendation that any individual or entity invest in Tyche or any other entity owned and controlled by Galles is barred by Exclusion U.2. of the Policy and therefore MAIC has no duty to pay on behalf of Ulanski any amounts that Ulanski becomes legally obligated to pay as a result of any such Claim; and

e. Award such other and further relief that this Court deems appropriate.

DATED:  April 24, 2024

Respectfully submitted,

MARKEL AMERICAN INSURANCE COMPANY

/s/ Joseph J. Borders

Joseph J. Borders
McJessy Ching & Thompson, LLC
Counsel for Plaintiff
3759 N. Ravenswood Ave.
Suite 231
Chicago, IL  60613
630.624.6776
773.880.1260 (Fax)
borders@MCandT.com

33

**A STOCK COMPANY**



## MARKEL AMERICAN INSURANCE COMPANY
4521 Highwoods Parkway
Glen Allen, VA 23060

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

_____
**Secretary**

_____
**President**

PLAINTIFF'S
EXHIBIT

**A**
____

MJIL 1000 06 10

Page 1 of 1



**PROFESSIONAL LIABILITY**

# MARKEL AMERICAN INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS –
## NOTICES AND CLAIM REPORTING

Our address for any notice pursuant to the conditions of the policy is:

Lancer Claim Services
681 South Parker Street, Suite 300
Orange, CA 92868
Phone: 800-821-0540
Fax: 714-978-8023

To report a **Claim**, or a **Wrongful Act** or **Management Wrongful Act** reasonably expected to give rise to a **Claim**, send written notice to the address shown above to the attention of the Claims Service Center, or send by email to:

firstreports@lancerclaims.com

**MGPPL 4001 02 20 - Penn Mutual**                                    **Page 1 of 1**

INTERLINE

**MARKEL**®

# MARKEL AMERICAN INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice                                            Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>• your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>• your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>• your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>• publicly-available information from government records;<br><br>• de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

MPIL 1007 01 20                                                      Page 1 of 3

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –** <br> such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –** <br> to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –** <br> information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –** <br> information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you <br> complete an application or other form for insurance <br> perform transactions with Us, Our Affiliates, or others <br> file an insurance claim or provide account information <br> use your credit or debit card <br> We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only <br> sharing for Affiliates' everyday business purposes – information about your creditworthiness <br> Affiliates from using your information to market to you <br> sharing for Nonaffiliates to market to you <br> State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you.<br><br>• Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |


| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060.<br><br>We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information.<br><br>For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |

INTERLINE

**MARKEL AMERICAN INSURANCE COMPANY**

**U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS**

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

| | | |
|---|---|---|
| **MPIL 1083 04 15** | Includes copyrighted material of Insurance Services Office, Inc. with its permission. | **Page 1 of 1** |



# Markel American Insurance Company

# COMPANY SPONSORED LIFE INSURANCE AGENTS PROFESSIONAL LIABILITY MASTER POLICY DECLARATION

**THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER IN WRITING DURING THE CERTIFICATE PERIOD AS SHOWN IN THE CERTIFICATE OF INSURANCE OR EXTENDED REPORTING DISCOVERY PERIOD, IF APPLICABLE.**

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

MASTER POLICY NUMBER.: MKLM7PLCA00065          RENEWAL OF MASTER POLICY: MKLM7PLCA00047

**Sponsoring Company Master Policy Holder** and Mailing Address (No., Street, Town or City, County, State, Zip Code)

**PENN MUTUAL LIFE INSURANCE COMPANY**
**600 DRESHER ROAD**
**HORSHAM, PENNSYLVANIA 19044**

**BROKER/DEALER:    HORNOR, TOWNSEND & KENT, LLC**

Policy Period: From _8/1/2022_____ to _8/1/2023_____ at 12:01 A.M. Standard Time at the mailing address shown above.

| Retroactive Date | |
|---|---|
| Retroactive Date: | See definition of Retroactive Date contained in the Policy. |

| Limit Of Liability | Deductible |
|---|---|
| AGENTS AND REGISTERED REPRESENTATIVES: SEE INDIVIDUAL CERTIFICATE OF INSURANCE<br><br>BROKER/DEALER:<br>$1,000,000 EACH CLAIM/$3,000,000 AGGREGATE<br><br><u>NOTE:</u> A separate $1,000,000 each Claim and in the Aggregate applies to Claim Expenses as to all Insureds. | AGENTS AND REGISTERED REPRESENTATIVES: SEE INDIVIDUAL CERTIFICATE OF INSURANCE<br><br>BROKER/DEALER:<br>$100,000 EACH CLAIM |

MGDPL 4001 02 20 — Penn Mutual

| Forms and Endorsements |
|---|
| Forms and Endorsements applying to and made part of this Policy at time of issuance: |

- Policy Jacket
- Notice To Policyholders - Notices And Claim Reporting
- Privacy Notice
- U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory Notice To Policyholders"
- Declarations
- Schedule of Coverage and Premium Options
- Master Policy
- Endorsements:
1. Professional Services Amendatory Endorsement
2. Cyber Management with Extortion Demand, Business Interruption and Network Restoration Cost Coverage Endorsement
3. Social Engineering Claim Coverage Endorsement
4. Liberalization Endorsement
5. Broker/Dealer and Sponsoring Company Choice of Defense Counsel Endorsement
6. Broker/Dealer Selling Away Liability Endorsement
7. Pennsylvania Amendatory Endorsement
8. Cover Oregon Increased Limits of Liability Endorsement
9. Cryptocurrency and NFT Exclusion Endorsement
- Trade or Economic Sanctions

| Producer Number, Name and Mailing Address |
|---|
| CALSURANCE ASSOCIATES; A DIVISION OF BROWN & BROWN PROGRAM INSURANCE SERVICES, INC. 681 SOUTH PARKER STREET, SUITE 300 ORANGE, CALIFORNIA 92868 |

**These declarations, together with the completed and signed Application, the Policy and any Endorsement(s) attached hereto, shall constitute the contract between the Insurer and Insureds.**

Countersigned: _____September 28, 2022_____    By: _____
                                           DATE                                          AUTHORIZED REPRESENTATIVE



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065

# MARKEL AMERICAN INSURANCE COMPANY

## SCHEDULE OF COVERAGE AND PREMIUM OPTIONS

COMPANY SPONSORED INSURANCE AGENTS PENN MUTUAL LIFE INSURANCE COMPANY

The coverage and premium options available under the Policy are as follows:

| Options | LIMITS OF LIABILITY | |
|---|---|---|
| **Emerging Advisor (EA): (Agent Type: 201)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **Career Builders: (Agent Type: 205)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **Full-Time: (Agent Type: 206-Y)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **HTK Representatives: (Agent Type: 207 & 208)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |

**Page 1 of 3**

| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
|---|---|---|
| **Functional Specialists/Regional Annuity Specialists: (999)** | | |
| | $1,000,000 each Claim; $1,000,000 Aggregate | |
| **2nd Line Field Manager: (Agent Type: 213)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **1st Line Field Manager: (Agent Type: 214)** | | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **Life Only (HTK-No): (Agent Type: 206-N)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |

**Sales Assistants:** (Agent Type: **216**)
$1M/$1M
$2M/$2M

**OPTIONAL COVERAGES**

Individual RIA Coverage

Discretionary Authority

Both RIA & Discretionary Authority

**DEDUCTIBLES**

**AGENTS OR REGISTERED REPRESENTATIVES**

$1,500  each Claim arising from products of the Sponsoring Company, Subsidiaries and non-life brokered products

$2,000  each Claim arising from non-proprietary products sold through the Broker/Dealer

$3,000  each Claim arising from all other products

$1,500  each Cost of Correct Claim arising from products of the Sponsoring Company, Subsidiaries and non-life brokered products

$2,000  each Cost of Correct Claim arising from Securities sold through the Broker/Dealer

**Page 2 of 3**

**NON-AFFILATED HTK/LIFE ONLY AGENTS**

$1,500  each Claim arising from products of the Sponsoring Company, Subsidiaries and non-life brokered products

$3,000  each Claim arising from all other products

$1,500  each Cost of Correct Claim arising from products of the Sponsoring Company, Subsidiaries and non-life brokered products

**PROFESSIONAL LIABILITY**



# MARKEL AMERICAN INSURANCE COMPANY

## COMPANY SPONSORED LIFE INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY

**PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS POLICY.**

**THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER IN WRITING DURING THE CERTIFICATE PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.**

**THIS POLICY PROVIDES INSURANCE TO THE AGENT OR MANAGING AGENT SHOWN IN THE CERTIFICATE OF INSURANCE SUBJECT TO THE MASTER POLICY DECLARATIONS ISSUED TO THE SPONSORING COMPANY.**

**WORDS OR PHRASES IN BOLD MAY HAVE SPECIAL MEANING. REFER TO SECTION IV – DEFINITIONS.**

In consideration of the payment of premiums and in reliance upon the statements contained in the **Application**, which is incorporated into this Policy and forms a part hereof, and subject to the terms, limitations, conditions and exclusions of this Policy, the **Insurer** agrees as follows:

## SECTION I – INSURING AGREEMENTS

### A. Professional Liability

The **Insurer** shall pay, on behalf of an **Insured**, **Damages** which an **Insured** becomes legally obligated to pay because of a **Claim** that is both made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Insured**, provided:

1. Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**); and

2. As of the inception date of this Policy as shown in the Master Policy Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**.

### B. Managing Agents Management Liability

The **Insurer** shall pay, on behalf of a **Managing Agent**, **Damages** which a **Managing Agent** becomes legally obligated to pay because of a **Claim** that is both made against a **Managing Agent** and reported to the **Insurer** in writing during the **Certificate Period**, or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Management Wrongful Act** or **Interrelated Management Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by a **Managing Agent**, provided:

1. Such **Management Wrongful Act** or any **Interrelated Management Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period**; and

2. As of the inception date of this Policy as shown in the Master Policy Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Management Wrongful Act** or any **Interrelated Management Wrongful Act** could result in a **Claim**.

### C. Sponsoring Company Vicarious Liability

The **Insurer** shall pay, on behalf of the **Sponsoring Company**, **Damages** which the **Sponsoring Company** becomes legally obligated to pay as the result of vicarious liability asserted in a **Claim** that is both made against the **Sponsoring Company** and reported to the **Insurer** in writing during the applicable **Certificate Period**, or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated**

**Page 1 of 18**

**Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Agent** for a client, provided:

1. The **Claim** against the **Sponsoring Company** must arise out of a **Wrongful Act** of an **Agent** committed in an **Agent's** rendering of or failing to render **Professional Services** for a client; and not any actual or alleged independent acts, errors, conduct or bad faith of any nature committed by the **Sponsoring Company**, including, but not limited to, deceptive or improper marketing of insurance and negligent hiring, retention, training or supervision of an **Agent**;

2. Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the applicable **Certificate Period**;

3. As of the inception date of this Policy as shown in the Master Policy Declarations, neither the **Sponsoring Company** nor any other **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**; and

4. The **Claim** against the **Sponsoring Company** must be otherwise covered pursuant to all terms, provisions, limitations, exclusions and conditions of the Policy, and the **Sponsoring Company** shall not be entitled to any rights greater than those available to an **Agent**.

In the event that a **Claim** against the **Sponsoring Company** includes allegations that are both covered and uncovered pursuant to this Section **I** – Insuring Agreement **C.** Sponsoring Company Vicarious Liability, as well as other terms, limitations, exclusions and conditions of the Policy, then payments of **Damages** and **Claim Expenses** must be allocated between the **Insurer** and **Sponsoring Company**. The **Insurer** and **Sponsoring Company** shall use their best efforts to reach a fair and reasonable agreement as to allocation. Notwithstanding the foregoing, under no circumstances will the **Insurer** be required to make any payments of **Damages** and **Claim Expenses** hereunder if a **Claim** does not include any allegations against the **Sponsoring Company** that are covered hereunder.

## SECTION II – DEFENSE AND CLAIM EXPENSES

A. The **Insurer** shall have the right and duty to defend a **Claim** against an **Insured** seeking **Damages** that is covered by this Policy.

B. The **Insurer's** right and duty to defend a **Claim**, subject to the Sub-Limit Of Liability for **Claims Expenses** provided in Section **VIII** – Limits Of Liability, as well as all other obligations under this Policy, shall terminate when the applicable Limit Of Liability Each Claim is paid by the **Insurer** for **Damages**, regardless of whether a **Claim** continues to proceed against an **Insured**. The **Insurer's** rights and duties to defend all **Claims**, as well as all other obligations under this Policy, shall terminate upon payment of each **Insured** Aggregate Limit Of Liability for **Damages**. In the event that the Limits Of Liability are exhausted by the **Insurer's** payment of **Damages**, then the **Insurer** shall tender the defense to the **Insured**, who will be responsible for continued defense and payment of **Claim Expenses** without recourse to the Policy.

C. The **Insurer** shall select defense counsel for a **Claim** that is covered by this Policy and pay associated **Claim Expenses**.

D. In the event that applicable law allows the **Insured** to control selection of defense counsel when a conflict of interest arises between the **Insured** and **Insurer**, the **Insurer** will provide a list of attorneys or law firms from which the **Insured** may designate defense counsel who shall act solely in the interest of the **Insured**, and the **Insured** shall direct such defense counsel to cooperate with the **Insurer**. Such cooperation shall include, without limitation:

1. Providing on a regular basis, but no less frequently than every 3 months, written reports on alleged **Damages**, potential liability, progress of any litigation or arbitration, any settlement demands and any investigation developments that materially affect the **Claim**;

2. Providing any other reasonable information requested;

3. Submission of itemized billing on a periodic basis at rates which are paid by the **Insurer** to other attorneys or law firms in the jurisdiction where the **Claim** is pending; and

4. Cooperating with the **Insurer** in resolving any discrepancies with respect to the **Claim**.

## SECTION III – SETTLEMENT OF CLAIMS

The **Insurer** shall investigate and settle a **Claim** in a manner that it deems appropriate. The **Insurer** shall not settle or compromise a **Claim** without the written consent of an **Insured**. If the **Insured** refuses to consent to a settlement or compromise acceptable to the **Insurer**, then the **Insurer's** duty to defend the **Insured** shall cease as of the date of the **Insured's** refusal to consent. Thereafter, the limit of liability applicable to such **Insured** shall be reduced to an amount equal to the **Damages** for which the **Claim** could have been settled or compromised, which amount shall not exceed the applicable Each Claim or Aggregate Limits Of Liability.

## SECTION IV – EXTENSIONS OF COVERAGE

Subject to all other terms, conditions and exclusions stated herein, coverage under the Policy also extends as follows:

**A.   Disciplinary Proceedings**

1.   In addition to the applicable Limits of Liability, the **Insurer** shall reimburse an **Agent** or **Registered Representative** for reasonable and necessary attorney's fees and costs only incurred in responding to a **Disciplinary Proceeding** commenced against an **Agent** or **Registered Representative** during the **Certificate Period** or Extended Reporting Period, if applicable.

2.   The maximum payment by the **Insurer** pursuant to the Extension of Coverage shall be $10,000 for each **Agent** or **Registered Representative**, regardless of the number of **Disciplinary Proceedings**.

3.   The Deductible shall not apply to payments under this Extension of Coverage.

4.   The **Insurer** shall not pay any amount under this Extension of Coverage until the conclusion of the **Disciplinary Proceeding** and only if such **Disciplinary Proceeding** has not resulted in the suspension of revocation of an **Agent's** license.

**B.   Subpoena Compliance**

1.   In addition to the applicable Limits of Liability, the **Insurer** shall pay reasonable and necessary attorney's fees and costs only in connection with the receipt of a subpoena by an **Agent** or **Registered Representative** during the **Certificate Period** or Extended Reporting Period, if applicable, for document production or representation in giving sworn testimony related to **Professional Services** that is issued in a lawsuit in which an **Agent** or **Registered Representative** is not a party.

2.   The maximum payment by the **Insurer** pursuant to the Extension of Coverage shall be $25,000 for each **Agent** or **Registered Representative**, regardless of the number of subpoenas.

3.   The Deductible shall not apply to payments under this Extension of Coverage.

## SECTION V – DEFINITIONS

For purposes of this Policy, the terms in bold type shall have special meanings that are designated below. All other terms shall have those meanings commonly understood by professionals who are engaged in the business of insurance.

**A.   Agent** means an **Insured** person who:

1.   Maintains an agent or field manager contract with the **Sponsoring Company**;

2.   Has elected to enroll for coverage under this Policy, either at the inception date of the **Policy Period** or prior to the expiration date of the **Policy Period**, and whose enrollment is on file with the **Sponsoring Company**;

3.   Is shown as such in a Certificate Of Insurance;

4.   Has paid the applicable premium; and

5.   Is licensed by all necessary federal, state or local governmental authorities to render **Professional Services** where both the **Agent** and client are located.

An **Agent** shall not be provided with coverage under Section I – Insuring Agreement **B.** Managing Agents Management Liability, unless the **Agent** is also a **Managing Agent**.

**Agent** shall also mean:

6.   An individual who was an **Agent** of the **Sponsoring Company** and who retired from the business of providing **Professional Services** prior to July 31, 2011;

7.   An individual who was an **Agent** of the **Sponsoring Company** and who because of a disability could no longer provide **Professional Services** prior to July 31, 2011; and

8.   The estate of an **Agent** of the **Sponsoring Company** who died prior to July 31, 2011;

Provided that with respect to Subsections **6.**, **7.** and **8.**, above, such individual was enrolled in the Penn Mutual Life Insurance Company sponsored errors and omissions insurance program at the time of his/her retirement, disability

or death, is otherwise covered under the Policy for a **Claim** and if the actual or alleged **Wrongful Acts** or **Interrelated Wrongful Acts** occurred prior to such retirement, disability or death;

9.   An individual who was an **Agent** as of the effective date of this Policy whose contract terminated with the **Sponsoring Company** during the **Policy Period**, but only for **Professional Services** rendered under the definition of **Professional Services** 1.a and h.

**Page 3 of 18**

B.  **Application** means:

1.  The application for this Policy and for any policy issued by the **Insurer**, or any of its affiliates, of which this Policy is a direct or indirect renewal or replacement;

2.  Any attachment to any such application;

3.  Any other materials submitted with or incorporated into any such application; and

4.  Any documents submitted in connection with the underwriting of any such policy.

C.  **Associated Person** means "Affiliated Person" as that phrase is defined in the Investment Company Act of 1940, and any amendments thereto, or a "Person Associated with an Investment Adviser" as that phrase is defined in the Investment Advisors Act of 1940, and any amendments thereto, and who is performing services on behalf of clients of the **Sponsoring Company** and/or its **Subsidiaries**, but when not providing services for any other broker-dealer. **Associated Person** shall also mean a person providing services provided on behalf of an Outside **Registered Investment Advisor** which is scheduled and on file with the **Broker/Dealer**. Such individuals shall be explicitly approved and in compliance with the outside investment advisory procedures of the **Broker/Dealer** and their names shall be on file with the **Broker/Dealer**. Coverage as an **Associated Person** of an Outside **Registered Investment Advisor** applies solely to this individuals who have elected this coverage and have paid an additional premium. Evidence of this election shall be kept on file by CalSurance.

D.  **Broker/Dealer** means the entity designated as such in the Declarations, Horner, Townsend & Kent, LLC.

E.  **Certificate Period** means the period of time from the inception date and time shown in the Certificate Of Insurance to the earlier of the expiration date and time shown in the Certificate Of Insurance or the effective date of the termination of this Policy.

F.  **Claim** means a written demand received by an **Insured** for **Damages** (including pleadings received in a civil litigation or arbitration) because of an actual or alleged **Wrongful Act** or, with respect to Section **I** – Insuring Agreement **B.** Managing Agents Management Liability, an actual or alleged **Management Wrongful Act**.

**Claim** shall also mean a cost of correction resulting from a negligent act, error or omission of an **Insured** or employee of the **Broker/Dealer** arising out of the rendering of **Professional Services** which would have been a valid covered **Claim** if not corrected, and shall be limited to: (1) demands for an amount less than $20,000 by the **Sponsoring Company** or **Broker/Dealer** in indemnifying a client of an **Insured**; and/or (2) **Damages** incurred by a client of an **Insured** in excess of $20,000 that are reported to the **Insurer** within a reasonable amount of time from the date of when the act, error or omission was discovered, provided that such timely report is otherwise provided to the **Insurer** during the **Policy Period** or Extended Reporting Period, if applicable.

A **Claim** does not include the following:

1.  A demand for declaratory, injunctive or other non-monetary relief;

2.  Any form of criminal proceeding; or

3.  Any proceeding commenced by a governmental or quasi-governmental official or agency or any self-regulatory official or agency, except for a **Disciplinary Proceeding**, but only with respect to coverage provided by Section **IV.** – Coverage Extension **A.** or if the agency or official is a client of the **Insured** in connection with the rendering of **Professional Services**.

G.  **Claim Expenses** means reasonable and necessary amounts incurred by the **Insurer**, or by the **Insured** with the prior written consent of the **Insurer**, in the defense of a **Claim** that is covered under this Policy, including attorneys' fees, costs of investigation, court or arbitration costs and premiums for appeal, attachment or similar bonds. The **Insurer**, however, is not required to provide such bonds. **Claim Expenses** do not include the wages, salaries, fees or costs of the directors, officers, employees, representatives, in-house counsel, agents or servants of any **Insured**.

H.  **Damages** means monetary judgments, settlements or awards resulting from a **Claim**. **Damages** do not include the following:

1.  Taxes, fines or penalties, unless incurred by a claimant and made part of a **Claim** against an **Insured**;

2.  Punitive or exemplary damages;

3.  The multiplied portion of a multiplied damage award;

4.  The return, restitution, reduction, compromise or refund of commissions, fees or charges;

5.  Costs incurred as a result of non-monetary, declaratory or injunctive relief;

6.  Any matters that are deemed uninsurable under the law; and

**7.** Claim Expenses.

**I.** **Disciplinary Proceeding** means any proceeding by a regulatory or disciplinary official, board or agency to investigate charges of professional misconduct by an **Agent** arising solely from the performance of **Professional Services.**

**J.** **Due Diligence Services** means services in connection with the investigation of representations made by an issuer of **Securities** approved by the **Broker/Dealer** in order to determine the accuracy of such representations in connection with the purchase of sale of such **Securities** or the advisability of purchasing such **Securities.**

**K.** **Insured** means:

**1.** An **Agent** shown as such in a Certificate Of Insurance;

**2.** A **Managing Agent** shown as such in a Certificate Of Insurance;

**3.** A **Registered Representative** shown as such in a Certificate Of Insurance;

**4.** A corporation, partnership or other business entity owned by and in which an **Agent, Managing Agent** or **Registered Representative** has an ownership interest, or in which an **Agent, Managing Agent** or **Registered Representative** is an employee, but solely with respect to the liability of such organization as it arises out of an **Agent, Managing Agent** or **Registered Representative** rendering of or failing to render **Professional Services;** Coverage hereunder shall not be afforded for any actual or alleged **Wrongful Act** or **Management Wrongful Act** of such organization, but shall only apply to a **Claim** arising out of the actual or alleged **Wrongful Act** of an **Agent** or **Registered Representative** or the **Management Wrongful Act** of a **Managing Agent;**

**5.** A person acting on behalf of an **Agent, Managing Agent** or **Registered Representative,** who was or is a partner, officer, director, stockholder or an employee of an **Agent, Managing Agent** or **Registered Representative,** or the business entity of an **Agent, Managing Agent** or **Registered Representative,** provided such person is not a party to an agent, general agent or registered representative contract with any insurance company or broker-dealer and only with respect to the **Professional Services** of an **Agent, Managing Agent** or **Registered Representative;**

**6.** Heirs, executors, administrators or legal representatives of an **Agent, Managing Agent** or **Registered Representative,** in the event of death, incapacity or bankruptcy;

**7.** A Pre-Contract Career Builder, but solely in connection with **Professional Services** provided by an **Agent** and while under an **Agent's** supervision;

**8.** Past enrollers of an **Agent** acting in his or her capacity as such on behalf of an **Agent,** but solely if such past enroller does not earn any commission under an agent/broker contract with any insurance company as a result of the provision of **Professional Services** provided by an **Agent;**

**9.** The lawful spouse or domestic partner of any individual who qualifies as an **Insured** under Subsections 1., 2., 3., 5., 6., 7., and 8., above, for a **Claim** arising solely out of his/her spousal or domestic partner status, and not any independent **Wrongful Acts** of such individual;

**10.** The **Broker/Dealer;**

**11.** Any former, current or future principal, partner, executive officer, director or employee of the **Broker/Dealer,** but solely in connection with **Professional Services** provided on behalf of the **Broker/Dealer** and any subsidiary or affiliate;

**12.** The **Sponsoring Company** shown as such in the Master Policy Declarations, but only with respect to coverage provided under Section **I** – Insuring Agreement **C.** Sponsoring Company Vicarious Liability;

**13.** An individual who makes referrals to an **Agent** through the Professional Advisors Alliance created by the **Sponsoring Company,** only for products approved in writing by the **Sponsoring Company;**

Coverage shall be afforded only if such individual is named as a co-defendant with an **Agent** and such individual maintains his/her own professional liability insurance; and

**14.** An affiliated **Associated Person** of an Outside **Registered Investment Advisor.** The Outside **Registered Investment Advisor** shall be specifically approved, and designated by name, by the **Broker/Dealer,** and in compliance with the outside investment advisory procedures of the **Broker/Dealer.**

The Limits of Liability available to **Insureds** defined in Subsections **4.** through **9., 12., 13.,** and **14.,** above, shall be shared with and shall not be in addition to the Limits of Liability of the **Agent, Registered Representative** or **Broker/Dealer** whose **Wrongful Act** gave rise to the **Claim** or the **Agent, Registered Representative** or **Broker/Dealer** who is responsible for the **Wrongful Act** of such other **Insured.**

**L.** **Insurer** means the insurance company providing this insurance shown in the Master Policy Declarations and Certificate Of Insurance.

**M. Interrelated Management Wrongful Acts** means any **Management Wrongful Acts** that are:

1. Similar, repeated or continuous; or

2. Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

**N. Interrelated Wrongful Acts** means any **Wrongful Acts** that are:

1. Similar, repeated or continuous; or

2. Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

**O. Managing Agent** means an **Insured** person shown as such in a Certificate of Insurance who is contracted with the **Sponsoring Company** or **Broker/Dealer** as a managing general agent, registered principal, manager or other designation for recruiting, selecting, hiring, contracting, supervising or training of agents or registered representatives and who otherwise qualified as an **Agent**.

**P. Management Wrongful Act** means a negligent act, error or omission committed by a **Managing Agent** in the course of:

1. Recruiting, selecting, hiring, contracting, supervising or training an **Agent**, but only with respect to such **Agent's Professional Services**; or

2. Terminating a contract between an **Agent** and the **Managing Agent** or **Sponsoring Company** or **Broker/Dealer**;

provided, however, that a **Management Wrongful Act** shall not include any form of actual or alleged discrimination, harassment, disparagement of an **Agent**, failure to promote or grant tenure, improper disciplinary action, improper evaluation or performance reviews, failure to provide an adequate workplace or employment procedures or any other employment-related acts besides those specifically referenced in Subsections **1.** and **2.**, above.

**Q. Personal Injury Act** means libel, slander, defamation, disparagement or violation of a right to privacy committed unintentionally during the course of rendering **Professional Services**.

**R. Placement of Coverage with Multiple Employer Welfare Arrangements** means plans placed with Multiple Employer Welfare Arrangements ("MEWA") as defined by the Employee Retirement Income Act of 1974, as amended, and shall include 419 Plans.

**S. Policy Period** means the period of time from the inception date and time shown in the Master Policy Declarations to the earlier of the expiration date and time shown in the Master Policy Declarations or the effective date and time of the cancellation of this Policy.

**T. Private Placements** means an offering of **Securities** by an issuer that meets the requirements of Sections 3(b) or 4(2) of the Securities Act of 1933 or must follow the conditions set out under Regulation D of the Securities Act of 1933.

**U. Professional Services** means:

1. The solicitation, sale or servicing of the following:

    a. Life insurance, accident and health insurance, workers' compensation insurance as part of a 24-Hour accident and health insurance product, managed care organization contracts, long term care products, disability income insurance and fixed annuities including when these products are sold on a group basis;

    b. Variable insurance products, including, but not limited to, variable annuities, flexible and scheduled premium annuities and variable life insurance through a broker-dealer;

    c. Mutual funds and unit investment trusts that are registered with the SEC and authorized or approved by and distributed through a broker-dealer;

    d. 529 plans sold through a broker-dealer that is a member of FINRA;

    e. Registered **Securities** (other than variable annuities, variable life insurance and mutual funds) that are authorized or approved by and actually processed through the **Broker/Dealer**, except for those products specifically referenced in Subsection **f.**, below;

    f. **Private Placements**, limited partnerships, non-trade Real Estate Investment Trusts ("REITS"), Tennant-In-Common/IRS 1031 Exchanges or hedge funds, all of which are approved in writing at the time of the transaction and sold through the **Broker/Dealer**, provided that **Registered Representative** who solicited, sold or serviced such product was specifically authorized in writing to do so by the **Broker/Dealer** at the time of the transaction;

**Page 6 of 18**

In addition, coverage for **Claims** based upon, arising out of or in any way involving, in whole or in part, the solicitation, sale or servicing of the foregoing products shall be subject to the following Sub-Limits of Liability (which are part of and not in addition to, the other Limits of Liability provided by the Policy):

| | |
|---|---|
| Each **Claim**: | $1,000,000 |
| Policy Aggregate: | $10,000,000 |

g. Employee benefit plans, including, but not limited to, **Placement of Coverage with Multiple Employer Welfare Arrangements**, **Self-Funded Plans**, group plans, group or ordinary pension or profit sharing plans, retirement annuities, KEOGH retirement plans, life, accident and health and/or disability plans; other than those described in a. above;

However, coverage for **Claims** based upon, arising out of or in any way involving, in whole or in part, **Placement of Coverage with Multiple Employer Welfare Arrangements** is subject to the following Sub-Limits of Liability (which are part of an not in addition to the other Limits of Liability provided by the Policy) and Deductible, unless **Placement of Coverage with Multiple Employer Welfare Arrangements** is made in accordance with the **Sponsoring Company's** written procedures for such placement and same is funded in whole or in part, by insurance products issued by the **Sponsoring Company**:

| | |
|---|---|
| Each **Claim**: | $500,000 |
| **Agent** Aggregate: | $500,000 |
| Deductible (**Damages** only): | $5,000 |

In addition, coverage for **Claims** based upon, arising out of or in any way involving **Self-Funded Plans** is applicable to **Claims Expenses** only, and not **Damages**; and

h. Pharmacy benefit management plans either approved by the Centers for Medicare and Medicaid Services or that are sold in conjunction with a group or individual medical plan;

2. Providing advice, consultation, administration and/or services in connection with any of the products listed in Paragraph **1.**, above, whether or not a separate fee is charged;

3. Consultation with participants in an employee benefit plan in order to explain the provisions of such plan and the handling of day-to-day ministerial functions required by such plan including, but not limited to, enrollment, record keeping and filing reports with governmental agencies;

4. Provision of financial, investment or economic advice as a: (a) **Registered Investment Advisor** or **Associated Person** while acting on behalf of the **Sponsoring Company's Subsidiary Registered Investment Advisor** or (b) an Outside **Registered Investment Advisor** or an affiliated **Associated Person** of an Outside **Registered Investment Advisor**; An Outside **Registered Investment Advisor** and affiliated **Associated Person** shall be specifically approved, and designated by name, by the **Broker/Dealer**, and in compliance with the outside investment advisory procedures of the **Broker/Dealer**;

5. Provision of financial planning services including, but not limited to, the recommendation or preparation of a financial program for a client involving the client's present and anticipated assets and liabilities, and shall include recommendations regarding savings, investments, insurance, anticipated retirement, estate planning or other employee benefits, whether or not a separate fee is charged;

6. **Due Diligence Services** and **Supervisory Services** by the **Broker/Dealer**;

7. Notary Public Services; or

8. The purchase, sale or giving advice regarding life settlements arranged through a provider approved by the **Sponsoring Company** provided:

a. On or before the life insurance policy is settled, the **Insured** obtained a signed and dated waiver from all beneficiaries of the life insurance policy acknowledging that the life settlement will occur;

b. On or before the life insurance policy is settled, the owner(s) of the life insurance policy has/have signed the provider's life settlement purchase and/or sale agreement;

c. The **Insured** was approved in writing by the **Sponsoring Company** or the **Broker/Dealer** to engage in life settlement transactions;

d. The life settlement transaction complies with the **Sponsoring Company's** or the **Broker/Dealer's** policies and procedures for life settlement transactions; and

    e.   The life settlement does not involve terminally ill clients in accordance with the definition of "terminally ill" by the relevant state.

**V.**   **Registered Investment Advisor** means an "Investment Advisor," as that term is defined by the Investment Company Act of 1940 or the Investment Advisors Act of 1940, as amended, who is currently registered with the SEC as an Investment Advisor under the Investment Advisors Act of 1940, as amended.

**W.**   **Registered Representative** means an **Insured** person who:

1. Maintains a registered representative contract with the **Broker/Dealer**;

2. Has elected to enroll for coverage under this Policy, either at the inception date of the **Policy Period** or prior to the expiration date of the **Policy Period**, and whose enrollment is on file with the **Broker/Dealer**;

3. Is shown as such in a Certificate Of Insurance;

4. Has paid the applicable premium; and

5. Is licensed by and properly registered with FINRA and all necessary federal, state or local governmental authorities to render **Professional Services**, at the time such services are rendered, where both the **Registered Representative** and client are located.

**Registered Representative** shall also mean:

6. An individual who was a **Registered Representative** of the **Broker/Dealer** and who retired from the business of providing **Professional Services** prior to July 31, 2011;

7. An individual who was a **Registered Representative** of the **Broker/Dealer** and who because of a disability could no longer provide **Professional Services** prior to July 31, 2011;

8. The estate of a **Registered Representative** of the **Broker/Dealer** who died prior to July 31, 2011;

Provided that with respect to Subsections **6.**, **7.** and **8.**, above, such individual was enrolled in the Penn Mutual Life Insurance Company sponsored errors and omissions insurance program at the time of his/her retirement, disability or death, is otherwise covered under the Policy for a **Claim** and if the actual or alleged **Wrongful Acts** or **Interrelated Wrongful Acts** occurred prior to such retirement, disability or death; and

9. An individual who was a **Registered Representative** as of the effective date of this Policy whose contract terminated with the **Broker/Dealer** during the **Policy Period**, but only for **Professional Services** rendered under the definition of **Professional Services** 1.a and h.

**X.**   **Retroactive Date** means:

1. With respect to a **Claim** arising out of or based upon the rendering of or failing to render any **Professional Services** defined in Paragraphs **U.1.** (Subsections **a.**, **b.**, **c.**, **d.**, **g.** and **h.**), **U.2.**, **U.3.**, **U.5.**, **U.7.** and **U.8.** of the definition of **Professional Services** above , the earlier of the date of the **Agent's** and/or **Registered Representative's** first:

   a. Continuously renewed life insurance agents or registered representatives professional liability coverage, which was in effect without interruption from the date of the **Wrongful Act** or first **Interrelated Wrongful Act** related to the **Claim** to the date when the **Claim** is first made, subject to submission of proof of such coverage to the **Insurer**; or

   b. First uninterrupted and continuously effective agent contract with the **Sponsoring Company** or **Broker/Dealer**.

2. With respect to a **Claim** arising out of or based upon the rendering of or failing to render any **Professional Services** as defined in Paragraphs Paragraphs **U.1.** (Subsections **e.** and **f.**) and **U.4.** of the definition of **Professional Services** above, the date of the **Agent's** and/or **Registered Representative's** first uninterrupted and continuously effective contract with the **Broker/Dealer**.

3. With respect to a **Claim** against a **Managing Agent** for a **Management Wrongful Act**, the date of the **Managing Agent's** first uninterrupted and continuously effective general agent, compliance officer, registered principal or manager contract with the **Sponsoring Company**.

4. With respect to the **Broker/Dealer**, July 31, 1995.

**Y.**   **Securities** shall have the same meaning as the term used in the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940 or the Investment Advisors Act of 1940, and any amendments thereto.

**Z.**   **Self-Funded Plans** means any employee benefit plan involving self-funding, in whole or in part, by an employer, when issued with stop-loss coverage provided by an insurance company.

**AA. Sponsoring Company** means the insurance company or organization shown as such in the Master Policy Declarations, and any **Subsidiary**.

**BB. Subsidiary** means a corporation in which the **Sponsoring Company**:

1. Owns, as of the inception date of the **Policy Period**, more than 50% of the issued and outstanding voting stock either directly or indirectly though one of more **Subsidiaries** and which corporation is engaged in **Professional Services**; or

2. Forms or acquires during the **Policy Period**, if the **Sponsoring Company** owns, directly or indirectly through one or more of its **Subsidiaries**, more than 50% of the issued and outstanding voting stock and which corporation is engaged in **Professional Services**, provided that notice of such formation or acquisition was disclosed to the **Insurer** within a reasonable time for it to consider any changes or modifications to this Policy which may be necessary, including, but not limited to, additional premium. Under no circumstances shall coverage be afforded to the newly acquired **Subsidiary** for a **Claim** arising out of or based upon a **Wrongful Act** committed prior to the date when the **Sponsoring Company** or one or more of its **Subsidiaries** acquired more than 50% of its issued and outstanding voting stock.

**CC. Supervisory Services** means the supervision of activities of a **Registered Representative**, who is contracted with the **Broker/Dealer**, in accordance with statutes, regulations or procedures established by governmental or self-regulatory authorities, including, but not limited to, the SEC and FINRA, or duties imposed under common law, but only in connection with activities of such **Registered Representative** that are covered under this Policy.

**DD. Wrongful Act** means a negligent act or omission, including a **Personal Injury Act**, committed by an **Insured** in the rendering of or failing to render **Professional Services** to a client.

## SECTION VI – EXCLUSIONS

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim**:

**A.** For any actual or alleged sickness, disease, death or other bodily injury, including, but not limited to, emotional distress and mental anguish, or damage to or destruction of property, including loss of use thereof;

**B.** Against an **Insured**:

1. By or on behalf of any other **Insured**, any enterprise that owns, operates or controls an **Insured** or any enterprise that an **Insured** owns, operates or controls, provided, however, that this Exclusion shall not apply to any **Claim** otherwise covered under Section **I** – Insuring Agreement **B.** Managing Agents Management Liability;

2. By or on behalf of any individual, company or entity that is not a client of the **Insured**, including, but not limited to, an insurance company or insurance agent or broker; provided, however, that this exclusion shall not apply to a **Claim** brought by or on behalf of an actual or alleged beneficiary of a product referenced in Paragraph **1.** of Definition **P. Professional Services** above;

**C.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

1. Any **Wrongful Act** or **Management Wrongful Act** alleged in any **Claim** which has been reported, or any circumstance of which notice has been given, prior to the **Policy Period**; or

2. Any other **Wrongful Act** or **Management Wrongful Act**, whenever occurring, which together with a **Wrongful Act** or **Management Wrongful Act** which has been the subject of such **Claim** or notice, would constitute **Interrelated Wrongful Acts** or **Interrelated Management Wrongful Acts**, regardless of the legal grounds upon which such **Claim** is predicated upon any:

   a. **Claim,** demand, suit, proceeding or investigation of which the **Insured** had knowledge, pending on or prior to the inception date of the **Policy Period**; or

   b. Fact, matter, circumstance, situation, transaction or event underlying or alleged in such demand, suit, proceeding, **Claim** or investigation, regardless of the legal grounds upon which such **Claim** is predicated;

**D.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any:

1. Actual or alleged dishonest, purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute, by, at the direction of or with the knowledge of any **Insured**; or

2. Gaining of profit, remuneration or monetary advantage to which an **Insured** is not legally entitled.

However, the **Insurer** shall continue to defend a **Claim** alleging any of the foregoing conduct until there is a judgment, final adjudication, adverse admission or finding of fact against any **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for the costs of defending the **Claim**. Moreover, an actual or alleged dishonest,

purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute of one **Agent** or **Managing Agent** will not be imputed to another **Agent** or **Managing Agent**;

E. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged conversion, commingling, use, handling, entrustment, safeguarding, inability to pay or failure to pay premiums, funds or any form of money;

F. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged liability of others assumed by any **Insured** under an agreement, contract, guarantee or warranty unless the **Insured** would be liable in the absence of such agreement, contract, guarantee or warranty;

G. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged rendering of services as an actuary, accountant, attorney, real estate agent, real estate broker, third-party claims administrator, property and casualty agent or broker or expert witness, regardless of whether such services are incidental to the rendering of **Professional Services**; however, this exclusion shall not apply to tax advice provided to a client as a necessary part of rendering **Professional Services**;

H. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged placement of a client's coverage or funds, directly or indirectly with any organization, entity or vehicle of any kind, nature or structure which is not licensed or authorized to do business in the state or jurisdiction with authority to regulate such business; however, this exclusion shall not apply to a **Claim** based upon or arising out of the placement of insurance or coverage with an eligible surplus lines insurer in the state or jurisdiction with authority to regulate such business;

I. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged insolvency, receivership, conservatorship, liquidation, bankruptcy, failure or inability to pay of any company, organization, entity, vehicle or arrangement of any nature in which an **Insured** placed, recommended to be placed or obtained coverage or in which an **Insured** placed, recommended to be placed funds or an investment of any nature; however, this exclusion shall not apply to a **Claim** based upon or arising out of the placement, recommendation for placement or obtaining coverage with an insurance company rated by A.M Best's as B+ or better at the time when coverage is placed, recommended or obtained;

J. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any pension plan, profit sharing plan, health and welfare or any other employee benefit plan or trust sponsored by an **Insured**, in which an **Insured** is a participant, trustee or named fiduciary;

K. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any pension plan, profit sharing plan, health and welfare or any other employee benefit plan or trust or which are self-funded, in whole or in part;

L. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any ownership, formation, operation or administration of any insurance company, captive, risk retention group, self-insurance program or purchasing group;

M. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged:

1. Unfair competition;
2. Anti-competitive acts;
3. Restraint of trade;
4. Price fixing;
5. Monopolization;
6. Misuse of confidential or proprietary information;
7. Copyright, patent, trade mark or trade secret infringement;
8. Piracy, theft or conversion of ideas, employees, contacts or business methods; or
9. Illegal, improper or deceptive advertisement;

N. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged actual or alleged discrimination or harassment in any form or manner;

O. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any failure, malfunction or breakdown of any computers, electrical, electronic or mechanical systems or machines;

**Page 10 of 18**

**P.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged notarization of documents without authorization or without the signatory's actual presence before an **Insured**;

**Q.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged guarantee, promise or warranty as to interest rates, market values, earnings, future values or future premiums or payments in connection with variable life insurance, variable annuities, scheduled premium annuities, mutual funds or **Securities**;

**R.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Securities** (other than variable life insurance, variable annuities and mutual funds) or **Private Placements** that were not authorized or approved by and actually processed through the **Broker/Dealer**;

**S.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any function of an **Insured** as a specialist or market maker for any **Securities**, an **Insured** failing to make a market for any **Securities**, or the purchase, sale or failure to sell **Securities** when the **Insured** is a specialist or market maker for such **Securities**;

**T.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving an **Insured's** actual or alleged exercise of discretionary authority over a client's assets, funds or liabilities, undertaking of trades or transactions on a discretionary basis or any trading or transactions without the express authority of a client; however, this exclusion shall not apply to the exercising of discretionary authority:

1. By the **Broker/Dealer** as a **Registered Investment Advisor**;

2. As an **Associated Person** while acting on behalf of the **Sponsoring Company's Subsidiary Registered Investment Advisor** with respect to mutual funds, variable annuities or variable life products;

3. As an **Associated Person** while acting on behalf of the **Sponsoring Company's Subsidiary Registered Investment Advisor** while providing asset management allocation services for a fee with respect to mutual funds, variable annuities or variable life products;

4. As an Outside **Registered Investment Advisor** or an affiliated **Associated Person** of the Outside **Registered Investment Advisor** while providing an advisory program where an outside money manager is used, provided that such activity is authorized and approved in writing by the **Broker/Dealer**;

5. As an Outside **Registered Investment Advisor** or an affiliated **Associated Person** of the Outside **Registered Investment Advisor**, provided that such activity is authorized and approved in writing by the **Broker/Dealer**; or

6. As an **Associated Person**, who has elected this coverage and paid an additional premium, while acting on behalf of the **Sponsoring Company's Subsidiary Registered Investment Advisor**, provided such activity is authorized and approved in writing by the **Broker/Dealer**. Evidence of this election shall be kept on file by CalSurance.

   It is agreed with respect to coverage above (items 1 – 6) for the **Broker/Dealer**, shall be subject to the following Sub-Limits of Liability (which are part of and not in addition to, the other Limits of Liability provided by the Policy):

   Each **Claim**:         $500,000

   Policy Aggregate:    $500,000

**U.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

1. Promissory notes, viatical settlements involving terminally ill clients in accordance with the definition of "terminally ill" by the relevant state, or any **Securities** backed by promissory notes or such viatical settlements;

2. Commodities, commodity futures and option contracts, except for option contracts that are covered by ownership of the underlying **Securities**, cash or cash equivalent, not including margin;

3. Any "junk bonds" or "high yield bonds" (for purposes of this exclusion, "junk bonds" or "high yield bonds" mean bonds which, at the time of purchase or sale were unrated or rated as below investment grade by any rating agency, including, but not limited to, Moody's bonds of Ba or lower or S&P bonds of BB or lower);

4. Any **Securities** sold exclusively outside of the United States of America or Canada;

5. Actual, attempted or threatened mergers, acquisitions, divestitures, tender offers, proxy contests, leveraged buy-outs, going private transactions, reorganizations, capital restructuring, recapitalization, fairness opinions, spin-offs, primary or secondary offerings of **Securities** (regardless of whether the offering is a public offering or a private placement) or other efforts to raise or furnish capital or financing for any company, corporation, enterprise or entity or disclosure requirements in connection with any of the foregoing, as well as any other investment banking activities;

**Page 11 of 18**

6. Structured settlements; however, this exclusion shall not apply to a **Claim** arising out of or based upon the sale or servicing of the underlying product, if otherwise covered by this Policy;

7. Any **Securities** that are wholly or partially owned by any **Insured**;

8. Callable certificates of deposit and debentures; and

9. any **Securities** or investment/financial products backed by mortgages, including, but not limited to CMOs, CDOs, and CDS;

V. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving actual or alleged use or disclosure, aiding or abetting use or disclosure or participation after the fact in use or disclosure of non-public or insider information as prohibited by any federal, state or local laws, statutes, regulations or ordinances, including but not limited to, the Insider Trading and Securities Fraud Enforcement Act of 1988, Section 10(b) of the Securities Exchange Act of 1934 and Securities Exchange Commission Rule 10b-5 thereunder;

W. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving, actual or alleged advice, consultation or recommendations of any type of mortgage, including, but not limited to, a reverse mortgage, regardless of whether an incidental part of the rendering of **Professional Services**; and

X. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving **Securities**, **Private Placements** and/or investment or financial products issued by the following and/or any related, associated or affiliated companies, organizations, partnerships, syndicates or entities of any nature:

1. ETS/ATM Payphones;

2. DBSI Management and DBSI, Inc.;

3. Provident Royalties;

4. Medical Capital Note Program;

5. Shale Royalties;

6. Black Diamond Program;

7. Desert Capital REIT;

8. IMH Secured Loan Fund; and

9. GPB Capital Holdings, LLC. and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with GPB Capital Holdings, LLC or any employee, partner, officer, director, agent, representative or other person associated with any of the foregoing.

## SECTION VII – TERRITORY

This insurance applies to **Wrongful Acts** or **Management Wrongful Acts** committed anywhere in the world, provided that the **Claim** is made against an **Insured** in the United States of America, its territories or possessions, Puerto Rico or Canada.

## SECTION VIII – LIMITS OF LIABILITY

A. **Limit Of Liability Each Claim:**

Subject to Paragraph **B.** below, the limit of the **Insurer's** liability for **Damages** for a **Claim** made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period**, or as allowed by Section **XI – Notice Of Claim** below, or Extended Reporting Period, if applicable, shall not exceed the Limit Of Liability Each Claim shown in the Certificate Of Insurance.

The Limit Of Liability Each Claim does not include **Claim Expenses**. However, the **Insurer's** payment of **Claim Expenses** shall be subject to a $1,000,000 Sub-Limit Of Liability Each Claim for each **Insured**. The **Insurer's** payment of **Claim Expenses** for each **Claim** against an **Insured** will under no circumstances exceed $1,000,000, regardless of the other Limits Of Liability that are implicated.

The **Insurer's** obligations under this Policy as to a **Claim** against an **Insured**, including the duty to defend and pay **Claim Expenses**, shall cease after the applicable Limit Of Liability Each Claim has been paid by the **Insurer** for **Damages**. The inclusion of multiple **Insureds** in a **Claim** shall not increase the applicable Limit Of Liability Each Claim. Only one Limit Of Liability Each Claim shall apply to such a **Claim**.

The Limit Of Liability Each Claim applicable to a **Claim** involving multiple **Insureds** shall be the single largest such Limit Of Liability, in the event that different Limits Of Liability Each Claim, or Sub-Limits of Liability, are implicated.

B. **Limit Of Liability Aggregate:**

The Limit Of Liability for **Damages** for all **Claims** made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period**, or as allowed by Section **XI** – Notice Of Claim below, or Extended Reporting Period, if applicable, shall not exceed the Limit Of Liability Aggregate shown in the Certificate Of Insurance.

The Limit Of Liability does not include **Claim Expenses**. However, the **Insurer's** payment of **Claim Expenses** shall be subject to a $1,000,000 Sub-Limit of Liability Aggregate for each **Insured**. The **Insurer's** payment of **Claim Expenses** for all **Claims** against an **Insured** will under no circumstances exceed $1,000,000, regardless of the other Limits Of Liability that are implicated.

The **Insurer's** obligations under this Policy as to all **Claims** against an **Insured**, including the duty to defend and pay **Claim Expenses**, shall cease after the applicable Limit Of Liability Aggregate has been paid by the **Insurer** for **Damages**.

If multiple **Insureds** are implicated in a **Claim**, the Limit Of Liability Aggregate shown in the **Certificate of Insurance** for each implicated **Insured** shall be decreased in equal amounts.

**C.  Limits Of Liability Applicable To The Sponsoring Company:**

The Limits Of Liability available to the **Sponsoring Company** for a **Claim** against the **Sponsoring Company** that is covered under Section **I** – Insuring Agreement **C.** Sponsoring Company Vicarious Liability, as well as other terms, limitations, exclusions and conditions of the Policy, shall be shared with and not in addition to the Limits Of Liability applicable to the **Agent** implicated by the **Claim**. As with all other **Insureds**, all of the **Insurer's** obligations as to the **Sponsoring Company**, including those pertaining to its defense, shall cease after the applicable Limits Of Liability are paid by the **Insurer** for **Damages**.

## SECTION IX – DEDUCTIBLE

**A.**  The Deductible shown in the Certificate Of Insurance shall apply to **Damages**, if any, that are incurred in each **Claim**. The **Insured** must pay the Deductible to the **Insurer** at the time of settlement.

**B.** If multiple **Insureds** are implicated in a **Claim**, then only one Deductible shall apply to the **Damages** that may be incurred in such **Claim**. Such Deductible shall be the largest, in the event that different Deductibles are implicated by a **Claim**. The **Sponsoring Company** must pay the Deductible to the **Insurer** at the time of settlement.

## SECTION X – MULTIPLE CLAIMS

**A.**  All **Claims** based upon or arising out of the same **Wrongful Act, Interrelated Wrongful Acts, Management Wrongful Act**, or **Interrelated Management Wrongful Acts**, shall be considered a single **Claim** and each such single **Claim** shall be deemed to have been made on the earlier of the following:

1.  When the earliest **Claim** arising out of such **Wrongful Act, Interrelated Wrongful Acts, Management Wrongful Act,** or **Interrelated Management Wrongful Acts** was first made; or

2.  When notice was provided concerning a **Wrongful Act, Interrelated Wrongful Acts, Management Wrongful Act,** or **Interrelated Management Wrongful Acts** giving rise to such **Claim** under the Policy or any other policy;

regardless of whether before the **Policy Period** or the term of any preceding policy.

**B.**  Such single **Claim** shall be subject to one Limit Of Liability Each Claim and one Deductible, even if involving multiple claimants, **Insureds** or proceedings.

## SECTION XI – NOTICE OF CLAIM

**A.**  As a condition precedent to the obligations of the **Insurer** under this Policy, an **Insured** shall give the **Insurer** written notice of a **Claim** made against the **Insured** as soon as practicable, but in no event later than either:

1.  The end of the **Certificate Period**, or Extended Reporting Period, if applicable;

2.  30 days after the end of the **Policy Period**, or Extended Reporting Period, if applicable, as long as such **Claim** is first made within the final 30 days of the **Policy Period** or Extended Reporting Period; or

3.  Notwithstanding the requirements of 1. and 2. above, if continuous coverage is in effect pursuant to consecutive policies issued by the **Insurer**, a **Claim** may be reported to the **Insurer** in writing, as soon as practicable, during the policy period consecutive to and immediately following this **Policy Period** without constituting a violation of this provision. In such condition, the **Claim** will be deemed reported on the last day of the **Policy Period.**

**B.**  Written notice of a **Claim** shall be addressed to the **Insurer.**

**C.**  A **Claim** shall be deemed reported at the time when the **Insurer** receives written notice.

Page 13 of 18

D. The **Insured** shall provide the **Insurer** with copies of all documents received by the **Insured** concerning a **Claim**, including, but not limited to, a summons, complaint, statement of claim or any other papers served in a civil litigation or arbitration. In addition, the **Insured** shall provide the **Insurer** with the following:

   1. The name of the claimant;

   2. The name of each **Insured** involved in the **Claim**;

   3. A detailed description of the **Wrongful Act** or **Management Wrongful Act** giving rise to the **Claim**;

   4. The **Damages** that may result from the **Claim**; and

   5. The circumstances by which the **Insured** became aware of the **Claim**.

## SECTION XII – NOTICE OF A WRONGFUL ACT OR MANAGEMENT WRONGFUL ACT

A. An **Insured** may provide the **Insurer** with written notice of a **Wrongful Act** or **Management Wrongful Act** committed during the **Certificate Period** which reasonably may be expected to give rise to a **Claim** as soon as practicable after the **Wrongful Act** or **Management Wrongful Act** becomes known to the **Insured**. Such notice may not be provided after the **Certificate Period** expires, nor during any Extended Reporting Period.

B. The **Insured** shall provide the **Insurer** with the following concerning any such **Wrongful Act** or **Management Wrongful Act**:

   1. The name of the potential claimant;

   2. The name of each **Insured** allegedly responsible for such **Wrongful Act** or **Management Wrongful Act**;

   3. A detailed description of the fact, allegation, circumstance or situation that could result in a **Claim**;

   4. The **Damages** that may result from the **Wrongful Act** or **Management Wrongful Act**;

   5. The circumstances by which the **Insured** became aware of the **Wrongful Act** or **Management Wrongful Act**; and

   6. The reasons for anticipating a **Claim**.

C. A **Claim** arising from a **Wrongful Act** or **Management Wrongful Act** and reported in accordance with Paragraphs **A.** and **B.** above shall be deemed to have been first reported when the **Insurer** receives written notice of the **Wrongful Act** or **Management Wrongful Act**.

D. Such written notice of a **Wrongful Act** or **Management Wrongful Act** which reasonably may be expected to give rise to a **Claim** must be given to the **Insurer**.


## SECTION XIII – ASSISTANCE AND COOPERATION

A. The **Insured** shall cooperate with the **Insurer** and provide such assistance and information as the **Insurer** may reasonably request, including submission to examination and interrogation by a representative of the **Insurer**, under oath if required. The **Insured** shall assist with the defense of a **Claim** and shall attend hearings, depositions, trials and otherwise assist in the conduct of suits, including but not limited to effecting settlement, securing evidence and giving evidence, obtaining the attendance of witnesses, and giving written statements to the **Insurer's** representatives.

B. The **Insured** shall not take any action which may increase exposure or **Damages**. The **Insured** shall not admit liability, agree to settlement, mediation or arbitration of any **Claim** or incur any cost or expense without the written consent of the **Insurer** which shall not be unreasonably withheld.

C. If any **Insured** shall commit fraud in reporting any **Claim**, the insurance provided by this Policy shall be void from the date such fraudulent **Claim** is reported to the **Insurer**.

## SECTION XIV – EXTENDED REPORTING PERIODS

A. **Optional Group Extended Reporting Period**

   1. In the event of cancellation or non-renewal of this Policy by the **Insurer**, the **Sponsoring Company**, on behalf of the **Insureds**, shall have the right to purchase an Extended Reporting Period for payment of an additional premium equal to 200% of the total annual premium paid for the Policy. Such an Extended Reporting Period, if purchased, shall be for 3 years commencing on the date of cancellation or non-renewal and ending 36 months thereafter. During this Extended Reporting Period, if purchased, the **Insureds** may report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the date of cancellation or non-renewal. A **Claim** reported under the Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

2.  Notwithstanding any of the provisions of this Policy, the Extended Reporting Period provided herein shall not apply if an **Insured** has other insurance that applies to a **Claim**, in whole or in part.

3.  The Extended Reporting Period provided herein shall not apply if the **Sponsoring Company** terminates the Policy as provided for in Section **XV** – Termination Of Coverage below or decides not to renew this Policy.

4.  The Extended Reporting Period provided herein shall not reinstate, increase or affect the applicable Limits Of Liability nor extend the **Policy Period.**

5.  The Extended Reporting Period provided herein shall include, and not be in addition to, the Extended Reporting Periods provided by Paragraph **B.** below.

B.  **Automatic Agent, Managing Agent Or Registered Representative Extended Reporting Period**

1.  Upon termination of an **Agent's, Managing Agent's** or **Registered Representative's** coverage under this Policy for the reason stated in Paragraph **A.2.** of Section **XV** – Termination Of Coverage below, such an **Insured** shall have an automatic Extended Reporting Period of one year commencing on the date of the **Insured's** termination and ending 12 months thereafter during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** termination. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

2.  Notwithstanding any other provision of this Policy, the Extended Reporting Period provided herein shall not apply if an **Agent, Managing Agent** or **Registered Representative** has other insurance that applies to a **Claim**, in whole or in part.

3.  The Extended Reporting Period provided herein shall not apply if the **Sponsoring Company** or **Broker/Dealer** terminates an individual **Agent's, Managing Agent's** or **Registered Representative's** contract because of a failure to comply with the **Sponsoring Company's** or **Broker/Dealer's** rules, requirements or guidelines governing the conduct, business or activities of **Insureds**.

4.  The Extended Reporting Period provided herein shall not reinstate, increase or otherwise affect the applicable Limits Of Liability nor extend the **Certificate Period.**

5.  A **Claim** which is properly reported during this Extended Reporting Period will be deemed to have been first made on the last day of the **Certificate Period.**

6.  The Extended Reporting Period provided herein shall only apply if the **Insurer** continues coverage under a renewal or replacement policy issued to the **Sponsoring Company** one year after the **Agent's, Managing Agent's** or **Registered Representative's** contract with the **Sponsoring Company** or **Broker/Dealer** is terminated. In the event that the **Insurer** does not continue coverage, the Extended Reporting Period provided herein shall end 30 days after the expiration date of the last policy issued by the **Insurer** to the **Sponsoring Company**.

C.  **Automatic Agent, Managing Agent Or Registered Representative Extended Reporting Period Due To Disability, Retirement Or Death**

1.  If an **Agent, Managing Agent** or **Registered Representative** becomes disabled, retires from the business of providing **Professional Services** in accordance with the formal retirement procedures of the **Sponsoring Company**, or dies, then such **Insured** or the estate of the deceased **Insured** shall have an automatic Extended Reporting Period of 2 years commencing on the date of the **Insured's** disability, retirement or death and ending 24 months thereafter during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** disability, retirement or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

2.  Notwithstanding any other provision of this Policy, the Extended Reporting Period provided herein shall not apply if an individual **Insured** or the estate of a deceased **Insured** has other insurance that applies to a **Claim**, in whole or in part.

3.  The Extended Reporting Period provided herein shall not reinstate, increase or otherwise affect the applicable Limits Of Liability nor extend the **Certificate Period.**

4.  A **Claim** which is properly reported during this Extended Reporting Period will be deemed to have been first made on the last day of the **Certificate Period.**

5.  The Extended Reporting Period provided herein shall only apply if the **Insurer** continues coverage under a renewal or replacement policy issued to the **Sponsoring Company** 2 years after the **Insured's** disability, retirement or

death. In the event that the **Insurer** does not continue coverage, the Extended Reporting Period provided herein shall end 30 days after the expiration date of the last policy issued by the **Insurer** to the **Sponsoring Company**.

**D. Optional Agent, Managing Agent Or Registered Representative Extended Reporting Period Due To Disability, Retirement Or Death**

1. If an **Agent, Managing Agent** or **Registered Representative** becomes disabled or retires from the business of providing **Professional Services** in accordance with the formal retirement procedures of the **Sponsoring Company**, or dies, then such **Insured** or the estate of the deceased **Insured** may elect to purchase one of the following Optional Extended Reporting Periods:

   a. 3 years commencing on the date of the **Insured's** disability, retirement or death and ending 36 months thereafter during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** disability, retirement or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period. The cost of such optional Extended Reporting Period shall be 200% of the **Insured's** last annual premium, and must be paid within 60 days after termination of such **Agent's** contract with the **Sponsoring Company** because of disability, retirement or death.

   b. 5 years commencing on the date of the **Insured's** disability, retirement or death and ending 60 months thereafter during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** disability, retirement or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period. The cost of such optional Extended Reporting Period shall be 300% of the **Insured's** last annual premium, and must be paid within 60 days after termination of such **Agent's** contract with the **Sponsoring Company** because of disability, retirement or death.

   c. An unlimited amount of time commencing on the date of the **Insured's** disability, retirement or death during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** disability, retirement or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period. The cost of such optional Extended Reporting Period shall be 400% of the **Insured's** last annual premium, and must be paid within 60 days after termination of such **Agent's** contract with the **Sponsoring Company** because of disability, retirement or death.

2. Notwithstanding any other provision of this Policy, the Extended Reporting Period provided herein shall not apply if an individual **Insured** or the estate of a deceased **Insured** has other insurance that applies to a **Claim**, in whole or in part.

3. The Extended Reporting Period provided herein shall not reinstate, increase or otherwise affect the applicable Limits Of Liability nor extend the **Certificate Period**.

4. A **Claim** which is properly reported during this Extended Reporting Period will be deemed to have been first made on the last day of the **Certificate Period**.

## SECTION XV – TERMINATION OF COVERAGE

**A. Applicable To Agent, Managing Agent Or Registered Representative**

1. The coverage afforded by this Policy shall terminate upon the earlier of:

   a. The expiration date of the **Policy Period**;

   b. Cancellation as provided by Paragraph **C.** below; or

   c. The termination of an **Agent's, Managing Agent's** or **Registered Representative's** contract for cause with the **Sponsoring Company** or **Broker/Dealer** to render **Professional Services**.

2. An **Agent, Managing Agent** or **Registered Representative** may terminate participation in this Policy by sending written notice to the **Sponsoring Company** at the **Sponsoring Company's** address shown in the Certificate Of Insurance with the effective date of termination being not less than 30 days thereafter.

**B. Applicable To Sponsoring Company**

1. The coverage afforded by this Policy shall terminate upon the earlier of:

   a. The expiration date of the **Policy Period**; or

     **b.** Cancellation as provided by Paragraph **C.** below.

  **2.** The **Sponsoring Company** may terminate the Policy by sending written notice to the **Insurer** with the effective date of termination being not less than 30 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice. If the **Sponsoring Company** terminates the Policy, the **Insurer** shall be deemed to have fully earned the premium for the Policy.

**C. Applicable To Insurer**

  **1.** This Policy may be terminated by the **Insurer**, for other than failure to pay a premium when due, by providing written notice to the **Sponsoring Company** at the **Sponsoring Company's** address shown in the Master Policy Declarations with the effective date of termination being not less than 60 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice. If the **Insurer** terminates the Policy, the **Sponsoring Company** shall receive a return of premium to be computed on a short rate basis proportional to the length of time from the inception date of the **Policy Period** to the termination date.

  **2.** This Policy may be cancelled by the **Insurer** because of failure to pay a premium when due by providing written notice to the **Sponsoring Company** at the **Sponsoring Company's** address shown in the Master Policy Declarations with the effective date of termination being not less than 10 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice.

Nothing contained herein shall limit, abrogate or negate the rights of the **Insurer** under law and equity to declare that the Policy is void based on material misrepresentations or omissions contained in the **Application**.

## SECTION XVI – OTHER INSURANCE

**A.** If any **Insured** has other insurance for a **Claim** made and reported during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable, then this Policy shall be excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**B.** The foregoing shall not apply if such other insurance is specifically intended to be excess over the coverage afforded by this Policy.

**C.** If a **Claim** is covered by this Policy and another policy issued by the **Insurer** or any company or entity affiliated with the **Insurer**, regardless of the **Insured** included in a **Claim**, then a single Limit Of Liability and single Deductible shall apply under both policies to the **Claim**. The single Limit Of Liability applicable to the **Claim** shall be the largest such Limit Of Liability under the policies. The Deductible applicable to the **Claim** shall likewise be the largest under the policies.

## SECTION XVII – SUBROGATION

**A.** In the event that the **Insurer** pays **Damages** or **Claim Expenses** on behalf of any **Insured**, the **Insurer** shall be subrogated to all of the **Insured's** rights of recovery, contribution, indemnification and apportionment against any third party implicated in a **Claim**. The **Insured** shall do nothing before or after the **Insurer's** payment of **Damages** or **Claim Expenses** that would waive, prejudice or impair the **Insurer's** subrogated rights of recovery, contribution, indemnification or apportionment.

**B.** The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of recovery, contribution, indemnification or apportionment which the **Insured** may have, including the execution of such documents as are necessary to enable the **Insurer** to commence proceedings in any **Insured's** name. The **Insured** shall provide all other assistance and cooperation which the **Insurer** may reasonably require.

## SECTION XVIII – OTHER PROVISIONS

**A. Entire Agreement**

The terms and provisions of this Policy shall not be waived, changed or modified, unless by endorsement. Notices to, by or from any agent, representative or servant of any **Insured** or the **Insurer** shall not affect a waiver, change or modification of the Policy and shall not prevent the **Insurer** from asserting any rights under the Policy.

**B. Assignment**

This Policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

**C. Authorization**

By acceptance of this Policy, the **Sponsoring Company** agrees to act on behalf of the **Insureds** for all purposes including but not limited to the negotiation of the terms of the Policy, payment of or return of premiums, receipt and acceptance of any endorsement issued to form a part of the Policy and giving and receiving notice of cancellation, termination or non-renewal of the Policy.

**D. Action Against The Insurer**

    1.   No action shall be taken against the **Insurer** unless, as a condition precedent thereto, an **Insured** has fully complied with all the terms and provisions of this Policy. In addition, no action shall be taken against the **Insurer** until the amount of an **Insured's** obligation or liability to a third party has been finally determined by an award or judgment against an **Insured** in an actual adjudicatory proceeding.

    2.   No person, organization or entity shall have the right under this Policy to join any **Insured** in any action or proceeding against an **Insurer** to determine the **Insurer's** liability nor shall the **Insurer** be impleaded in an action or proceeding by any **Insured** or the legal representative of such **Insured**.

**E. Bankruptcy**

Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the **Insurer** of any of its obligations hereunder.

**F. Conformance to Statute**

Terms of this Policy which are in conflict with the statutes of the State wherein this Policy is issued are hereby amended to conform to such statutes.

**G. Headings**

The descriptions in the headings and any subheading of this Policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 1**

# MARKEL AMERICAN INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES AMENDMENT ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is hereby understood and agreed that in consideration of the premium charged, and solely with respect to Non-Affiliated Horner, Townsend & Kent, Inc./"Life Only" Agents of the **Sponsoring Company**, Section **V**, Paragraph **U.** -- Definition of **Professional Services** -- is deleted in the entirety and replaced with the following:

**Professional Services** means:

1.  The solicitation, sale or servicing of the following:

    a.  Life insurance, accident and health insurance, workers' compensation insurance as part of a 24-Hour accident and health insurance product, managed care organization contracts, long term care products, disability income insurance and fixed annuities;

    b.  Employee benefit plans, including, but not limited to, **Placement of Coverage with Multiple Employer Welfare Arrangements, Self-Funded Plans**, group plans, group or ordinary pension or profit sharing plans, retirement annuities, KEOGH retirement plans, life, accident and health and/or disability plans;

    However, coverage for **Claims** based upon, arising out of or in any way involving, in whole or in part, **Placement of Coverage with Multiple Employer Welfare Arrangements** is subject to the following Sub-Limits of Liability (which are part of an not in addition to the other Limits of Liability provided by the Policy) and Deductible, unless **Placement of Coverage with Multiple Employer Welfare Arrangements** is made in accordance with the **Sponsoring Company's** written procedures for such placement and same is funded in whole or in part, by insurance products issued by the **Sponsoring Company**:

    | | |
    |---|---|
    | Each **Claim**: | $500,000 |
    | **Agent** Aggregate: | $500,000 |
    | Deductible (**Damages** only): | $5,000 |

    In addition, coverage for **Claims** based upon, arising out of or in any way involving **Self-Funded Plans** is applicable to **Claims Expenses** only, and not **Damages**; and

    c.  Pharmacy benefit management plans either approved by the Centers for Medicare and Medicaid Services or that are sold in conjunction with a group or individual medical plan;

2.  Providing advice, consultation, administration and/or services in connection with any of the products listed in Paragraph **1.**, above, whether or not a separate fee is charged;

3.  Consultation with participants in an employee benefit plan in order to explain the provisions of such plan and the handling of day-to-day ministerial functions required by such plan including, but not limited to, enrollment, record keeping and filing reports with governmental agencies;

4.  Provision of financial planning services including, but not limited to, the recommendation or preparation of a financial program for a client involving the client's present and anticipated assets and liabilities, and shall include recommendations regarding savings, investments, insurance, anticipated retirement, estate planning or other employee benefits, whether or not a separate fee is charged;

**Page 1 of 2**

5. Notary Public Services; or

6. The purchase, sale or giving advice regarding life settlements arranged through a provider approved by the **Sponsoring Company** provided:

   a. On or before the life insurance policy is settled, the **Insured** obtained a signed and dated waiver from all beneficiaries of the life insurance policy acknowledging that the life settlement will occur;

   b. On or before the life insurance policy is settled, the owner(s) of the life insurance policy has/have signed the provider's life settlement purchase and/or sale agreement;

   c. The **Insured** was approved in writing by the **Sponsoring Company** or the **Broker/Dealer** to engage in life settlement transactions;

   d. The life settlement transaction complies with the **Sponsoring Company's** or the **Broker/Dealer's** policies and procedures for life settlement transactions; and

   e. The life settlement does not involve terminally ill clients in accordance with the definition of "terminally ill" by the relevant state.

All other terms and conditions remain unchanged.

**Page 2 of 2**



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 2**

# MARKEL AMERICAN INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CYBER MANAGEMENT WITH EXTORTION DEMAND, BUSINESS INTERRUPTION AND NETWORK RESTORATION COST COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

**CYBER MANAGEMENT EXPENSES, DAMAGES, CREDIT MONITORING COSTS, CLAIM EXPENSES, EXTORTION PAYMENT, BUSINESS INCOME AND EXTRA EXPENSES ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

### SCHEDULE

| | | |
|---|---|---|
| Cyber Management Limits Of Liability: | $250,000 | Each Claim |
| | $500,000 | Insured Aggregate |
| Cyber Management Retention: | $5,000 | Each Claim |
| Extortion Payment Limit Of Liability: | $250,000 | Each Extortion Demand |
| | $500,000 | Insured Aggregate |
| Extortion Payment Retention: | $5,000 | Each Extortion Demand |
| First Party Loss Limit Of Liability | $250,000 | Each Exploit or Network Impairment |
| | $500,000 | Insured Aggregate |
| First Party Loss Retention | $5,000 | Each Exploit or Network Impairment |
| Total Aggregate Limit Of Liability | $1,000,000 | As to All Claims, Extortion Demands, Exploits and Network Impairments |

**NOTE** – pursuant to the terms of this endorsement, as stated below, a single Limit of Liability and Retention shall apply to each Claims, Extortion Demands, Exploits and/or Network Impairments that are the result of Network Security Breaches, Privacy Violations, Extortion Demands, Exploits and/or Network Impairments, which are the same, similar, repeated or continuous; or connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies. Under no circumstances shall the Insurer's liability under this endorsement exceed the Total Aggregate Limit of Liability, regardless of the number of Claims, Extortion Demands, Exploits or Network Impairments hereunder.

**A.** The following are added to Section I – Insuring Agreements:

**Cyber Management**

**1.** The **Insurer** shall pay, on behalf of the **Insured**:

**Page 1 of 8**

a. **Cyber Management Expenses** incurred by an **Insured** with the **Insurer's** prior written consent that are a direct result of a **Security Breach**, **Privacy Violation** or **Interrelated Breaches/Violations**, provided the **Cyber Management Expenses** are reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim, or during an Extended Reporting Period, if applicable;

b. **Damages** and **Claim Expenses** which an **Insured** shall become legally obligated to pay because of actual monetary loss by the **Insured's** client as the direct result of a **Security Breach, Privacy Violation** or **Interrelated Breaches/Violations**, provided a **Claim** is both made against the **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim, or during an Extended Reporting Period, if applicable; and

c. **Credit Monitoring Costs** incurred by an **Insured** with the **Insurer's** prior written consent that are the direct result of a **Security Breach** or **Privacy Violation** that directly results in theft or unauthorized copying of **Personal Information** and may reasonably be expected to result in **Identity Theft**, provided the **Credit Monitoring Costs** are reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim, or during an Extended Reporting Period, if applicable.

2. This **Cyber Management** coverage applies only if:

   a. Such **Security Breach**, **Privacy Violation** or any **Interrelated Breaches/Violations** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**); and

   b. As of the inception date of this Policy as shown in the Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Security Breach**, **Privacy Violation** or any **Interrelated Breaches/Violations** could result in **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** or any loss that may be sustained by a client.

### Extortion Demand

The **Insurer** shall reimburse the **Insured** for:

**Extortion Payment** resulting from an **Extortion Demand**, in excess of the **Extortion Payment** Retention and up to the **Extortion Payment** Limits of Liability, provided that:

a. The **Extortion Demand** is first made against the **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim or during an Extended Reporting Period, if applicable, in accordance with the Section **XI**; and

b. The **Extortion Payment** is incurred within 12 months after the date that the **Insured** reports the **Extortion Demand** in accordance with the Section **XI** – Notice of Claim, and such amounts are consented to in writing by the **Insurer**, such consent not to be unreasonably withheld.

### Business Interruption and Network Restoration Costs

The **Insurer** shall pay on behalf of the **Insured** all **First Party Loss** in excess of the **First Party Loss** Retention and up to the **First Party Loss** Limits of Liability that the **Insured** incurs:

a. **Business Interruption Coverage and Extra Expense**

   for **Business Income and Extra Expense** resulting from an **Exploit** that first causes **Network Impairment** during the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker/Dealer**), provided that such **Exploit** is reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim, if applicable, in accordance with the Section **XI**.

b. **Loss of or Damage to Insured's Network**

**Page 2 of 8**

for the **Insured's** reasonable and necessary expenses resulting from an **Exploit** that first causes **Network Impairment** during the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker/Dealer**), provided that such **Exploit** is reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim or during an Extended Reporting Period, if applicable, in accordance with the Section **XI**, that are required to restore the **Network** or information residing on the **Network** to the form in which it existed immediately prior to such **Exploit**.

**B.** For the purpose of this endorsement, the following definitions in Section **V** – Definitions are amended:

**G. Claim Expenses** do not include **Cyber Management Expenses**, **Credit Monitoring Expenses**, **Extortion Payments** or **First Party Loss**.

**DD. Wrongful Act** also means **Network Security Breach**, **Privacy Violation**, or any **Interrelated Breaches/Violations**, but only with respect to **Cyber Management** coverage.

**C.** For the purpose of this endorsement, the following definitions are added to Section **V** – Definitions:

**Business Income and Extra Expense** means:

1. the amount of net income, before interest, tax, depreciation or amortization, that the **Insured** would have earned during the period of time when **Network Impairment** caused by an **Exploit** commences and ending when such **Network Impairment** is corrected, allowing the resumption of **Professional Services**; and

2. **Extra Expense**;

however, **Business Income and Extra Expense** does not include:

1. ordinary operating expenses incurred by the **Insured** during the period of time when **Network Impairment** commences and ending when such **Network Impairment** is corrected, allowing the resumption of **Professional Services**;

2. costs or expenses to update, upgrade, enhance, or replace the **Insured's Network** beyond that which existed prior to the occurrence of the **Network Impairment**;

3. costs or expenses the **Insured** incurs to prove or document **First Party Loss**;

4. **Cyber Management Expenses**;

5. **Damages** and **Claim Expenses**;

6. **Credit Monitoring Expenses**; and/or

7. **Extortion Payments**.

**Credit Monitoring Costs** means the costs for retaining a third party service provider approved by the **Insurer** and with the **Insured's** prior written consent to provide **Credit Monitoring Services** to those individuals who were victims of theft or unauthorized copying of **Personal Information**.

**Credit Monitoring Services** means the services that allow individuals to access and review their credit reports to determine if **Identity Theft** has occurred.

**Cyber Management Expenses** means necessary and reasonable expenses to hire an attorney, selected from the **Insurer's** panel counsel, to determine whether any breach notice laws apply and the obligations of any such applicable laws including the drafting of letters to satisfy the applicable law, including the cost to notify those effected by the **Network Security Breach** or **Privacy Violation**, or to provide **Credit Monitoring Services** to the **Insured's** clients. **Cyber Management Expenses** shall also include approved expenses to respond to a regulatory action commenced or pending solely against the **Insured**, and the hiring of a public relations firm to communicate with the **Insured's** clients

**Page 3 of 8**

in order to mitigate the reputational damage of the **Insured** directly resulting from a **Network Security Breach** or **Privacy Violation**.

**Exploit** means **Network Impairment** or a series of related **Network Impairments** by a third party, and not any **Insured**.

**Extortion Demand** means an incident or series of related incidents occurring during the **Policy Period** where an **Insured** receives a threat to launch an attack on, to suspend, or to otherwise disrupt a **Network,** disrupt or deface the **Insured's** website or release or use **Personal Information** in the **Insured's** care, unless monies are paid or specified action is taken, and an **Insured** believes there is an imminent and probable danger of such action. An **Extortion Demand** does not include any demand seeking monies from the **Insured** that are allegedly due and owing pursuant to contract or operation of law.

**Extortion Payment** means all reasonable and necessary expenses incurred by the **Insured** with the **Insurer's** prior consent, in order to respond to an **Extortion Demand**, including payment of monies demanded by an extortionist. **Extortion Payments** do not include such expenses to the extent the **Insured** has recovered such expenses or been reimbursed for them from any other source. **Extortion Payments** do not include **Damages, Claim Expenses, Cyber Management Expenses, Credit Monitoring Expenses, Business Income and Extra Expense** and/or **First Party Losses**.

**Extra Expense** means any reasonable and necessary expenses, in excess of the **Insured's** normal operating expenses, that the **Insured** incurs during period of time when **Network Impairment** commences and ending with **Network Impairment** is corrected, allowing the resumption of **Professional Services**, including:

1. reasonable expense incurred to minimize the interruption of **Professional Services** not otherwise covered by this Policy;

2. reasonable expense incurred to resume **Professional Services** on a temporary basis, including those associated with securing temporary third party Internet service provider services, temporary website and/or e-mail hosting services, rental of temporary **Networks**, other temporary equipment or service contracts; and

3. reasonable expense incurred to engage a third party security expert to:

   a. investigate, minimize and stop damage to the **Network** caused by the **Exploit** while such **Exploit** is ongoing; and

   b. collect, analyze and preserve forensic evidence of an **Exploit** for use in identifying the perpetrator responsible for the disruption to **Professional Services**.

**First Party Loss** means amounts which the **Insurer** is obligated to pay as set forth in the **Business Interruption and Network Restoration Costs** Insuring Agreement.

**Identity Theft** means the theft or unauthorized copying of **Personal Information** of a client of the **Insured**, and use of such **Personal Information** to open new financial accounts for the purpose of fraudulently impersonating such individual, including without limitation, payment card accounts, bank accounts, loan accounts, health insurance accounts and insurance accounts.

**Insured's Computer System** means any computer hardware, software or firmware, and components thereof including data stored thereon, that is owned or leased by an **Insured** and is under the direct operational control of an **Insured**.

**Interrelated Breaches/Violations** means **Security Breaches** and/or **Privacy Violations** that are:

1. Similar, repeated or continuous; or

2. Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

**Network** means a local or wide area network owned or operated by or on behalf of or for the benefit of the **Broker/Dealer**; provided, however, **Network** shall not include the internet, telephone company networks, or other public infrastructure network (collectively "public infrastructure network"), unless such public infrastructure network is operated and controlled exclusively by the **Broker/Dealer**.

**Network Impairment** means the disruption, modification, destruction or damage to the **Insured's Network** that results in the impairment of the **Insured's Network** to such an extent that the **Insured** is substantially unable to conduct **Professional Services**.

**Personal Information** means:

1. The name of an **Insured's** client in combination with any one or more of the following:

    a. Social security number;

    b. Driver's license number or any other state identification number;

    c. Medical or healthcare data including protected health information; or

    d. Any financial account number, credit or debit card number in combination with any required password, access code or other security code that would permit access to the financial account;

    not including any lawfully available data accessible by the general public; or

2. Non-public personal information as defined in any **Privacy Regulation**.

**Privacy Regulation** means those parts of the following statues or regulations regulating the use and protection of non-public personal information (as defined in such statutes or regulations):

1. Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the rules and regulations promulgated thereunder as amended;

2. Gramm-Leach Bliley Act of 1999 (GLBA) and the rules and regulations promulgated thereunder, as amended;

3. Consumer protection and unfair and deceptive trade practice laws enforced by state Attorneys General or the Federal Trade Commission, including but not limited to, Section 5(a) of the FTC Act 15;

4. Security breach notification laws that require notice to individuals of the actual or potential theft of their non-public personal information, including but not limited to, the California Security Breach Notification Act of 2003 (CA SB 1386); or

5. Other state, federal or foreign privacy laws requiring reasonable security for non-public personal information, or a privacy policy limiting the sale, disclosure or sharing of non-public personal information or providing individuals with the right to access or correct non-public personal information.

**Privacy Violation** means any:

1. Theft of **Personal Information** while in the care, custody or control of an **Insured**; or

2. Violation of a **Privacy Regulation**.

**Security Breach** means:

1. The actual failure and inability to prevent:

    a. Unauthorized access to or unauthorized use of **Personal Information** stored in the **Insured's Computer System**; or

    b. The theft or unauthorized copying of **Personal Information** on the **Insured's Computer System**; or

2. The actual failure and inability to prevent the theft of **Personal Information** as a result of the physical theft by a person other than an **Insured** of the **Insured's Computer System** from premises occupied and controlled by the **Insured**.

D. For the purposes of this endorsement, the following are added to Section **VI** – Exclusions:

This Policy shall not apply to, and the **Insurer** shall pay neither **Cyber Management Expenses**, **Credit Monitoring Costs**, **Damages**, **Claim Expenses**, **Extortion Payments** nor **First Party Loss**:

1. Arising out of, based upon or in consequence of, directly or indirectly resulting from of in any way involving any actual or alleged:

    a. Costs or expenses for the reprinting, reposting, recall, removal or disposal of any online content or any other information, content or media, including any media or products containing such online content, information, content or media;

    b. Wear and tear or gradual deterioration of any data saved on an **Insured's Computer System** or a **Network**;

**Page 5 of 8**

    **c.** Costs or expenses incurred by any **Insured** or others:

      **(1)** To recall, repair, withdraw, replace, upgrade, supplement or remove the **Insured's** online content, products or services from the marketplace, including but not limited to products or services which incorporate the **Insured's** online content, products or services; or

      **(2)** For any loss of use by any **Insured** or others that arises out of such recall, repair, withdrawal, replacement, upgrade, supplement or removal.

    **d.** Failure to use best efforts to install commercially available software product updates and releases, or to apply security related software patches, to computers and other components of the **Insured's Computer System** or a **Network**;

    **e.** Seizure, confiscation, destruction or nationalization of **Insured's Computer System** or a **Network**; or any data accessed by or on behalf of any governmental or public authority;

    **f.** Interruption, suspension, failure or outage of any component of the Internet, including without limitation any hardware or software infrastructure supporting the Internet;

    **g.** Fine or penalty arising out of any agreement by any **Insured** to comply with or follow the PCI Standard or any Payment Card Company rules, or to implement, maintain or comply with any security measure(s) or standards related to any payment card data;

    **h.** Unsolicited electronic faxes, emails, telephone calls or unsolicited communications, including but not limited to unsolicited electronic messages, chat room postings, bulletin board postings, newsgroup postings, "pop-up" or "pop-under" Internet advertising or fax-blasting, direct mailing or telemarketing, or actual or alleged violations of the Telephone Consumer Protection Act, of 1991, as amended, the CAN-SPAM Act of 2003, as amended, and any other federal, foreign or state anti-spam statutes, or federal, foreign or state statue, law or regulation relating to a person's right to seclusion; or

    **i.** Unauthorized or illegal collection of **Personal Information**, including but not limited to the collection of **Personal Information** using cookies, spyware, or other malicious code, or the failure to provide adequate notice that **Personal Information** is being collected;

  **2.** Arising out of, based upon or in consequence of, directly or indirectly resulting from of in any way involving any section 605 (requirements relating to information contained in consumer reports) or Section 616 (civil liability for willful noncompliance) of the Fair Credit Reporting Act, or any other similar federal, state or local laws or regulations, including but not limited to any laws or regulations requiring truncation of payment card numbers on, or the removal of the expiration date from, payment card receipts; or

  **3.** Covered in whole or in part under any other insurance.

**E.** For purposes of this endorsement, the following is added to Section **VIII** – Limits Of Liability:

**Cyber Management Limits Of Liability**

The Cyber Management Limits Of Liability are subject to Paragraphs **A.** and **B.** of Section **VIII** – Limits Of Liability.

Subject to the Cyber Management Limits Of Liability Insured Aggregate, the limit of the **Insurer's** liability for **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** and **Claim Expenses** incurred in each **Network Security Breach** or **Privacy Violation** reported by an **Insured** to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the Limit of Liability Each Claim shown in the Schedule of the endorsement. The inclusion of multiple **Insureds** or clients in **Interrelated Breaches/Violations** shall not increase the applicable Limit Of Liability Each Claim shown in the Schedule of this Endorsement.

The Limit of Liability for all **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** and **Claim Expenses** incurred in all **Network Security Breaches** or **Privacy Violations** submitted by an **Insured** in writing during the **Policy Period** shall not exceed the Cyber Management Limit Of Liability Insured Aggregate shown in the Schedule of this Endorsement.

The Cyber Management Limit of Liability Each Claim and Cyber Management Limit Of Liability Insured Aggregate are part of, subject to and do not increase the Total Aggregate Limit Of Liability as shown in the Schedule of this Endorsement.

The **Insurer's** obligations under this Policy, including the duty to defend, shall cease after the applicable Limits Of Liability has been paid by the **Insurer** for **Cyber Management Expenses, Damages, Credit Monitoring Costs** or **Claim Expenses.**

The Cyber Management Limits of Liability shown in the Schedule of this Endorsement are part of, and not in addition to the Limits Of Liability shown in the Declaration.

### Extortion Payment and First Party Loss Limits Of Liability

The Extortion Payments and First Party Loss Limits Of Liability are subject to Paragraphs **A.** and **B.** of Section **VIII** – Limits Of Liability.

Subject to the Extortion Payments and First Party Loss Limits Of Liability Insured Aggregates, the limit of the **Insurer's** liability for **Extortion Payments, Business Income and Extra Expenses** and **First Party Losses** incurred in each **Extortion Demand, Exploit** or **Network Impairment** reported by an **Insured** to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the Limit of Liability Each **Extortion Payment** or **First Party Loss** shown in the Schedule of the Endorsement. The inclusion of multiple **Insureds** or clients in an **Extortion Demand, Exploit** or **Network Impairment** shall not increase the applicable Limit of Liability Each **Extortion Payments** or **First Party Loss** shown in the Schedule of this Endorsement.

The Limit Of Liability for all **Extortion Payments, Business Income and Extra Expenses** and **First Party Losses** incurred in all **Extortion Demands, Exploits** or **Network Impairments** submitted by an **Insured** in writing during the **Policy Period** shall not exceed the Extortion Payment and First Party Loss Limits Of Liability Insured Aggregates shown in the Schedule of this endorsement.

The Extortion Payment and First Party Loss Limits Of Liability Each Claim and Extortion Payment and First Party Loss Limits Of Liability Insured Aggregate are part of, subject to and do not increase the Total Aggregate Limit Of Liability as shown in the Schedule of this endorsement.

The **Insurer's** obligations under this Policy shall cease after the applicable Limits Of Liability has been paid by the **Insurer** for **Extortion Payments, Business Income and Extra Expense** and/or **First Party Losses.**

The Extortion Payment and First Party Loss Limits Of Liability shown in the Schedule of this endorsement are part of, and not in addition to the Limits of Liability shown in the Declaration.

### Single Limit of Liability

In the event that **Cyber Management Expenses, Damages, Credit Monitoring Costs, Claim Expenses, Extortion Payments, Business Income and Extra Expenses** and/or **First Party Losses** are incurred as the result of **Network Security Breaches, Privacy Violations, Extortion Demands, Exploits** and/or **Network Impairments**, which are the same, similar, repeated or continuous; or connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies, then only a single Limit of Liability shall apply, as shown in the Schedule of this endorsement, regardless of whether such **Network Security Breaches, Privacy Violations, Extortion Demands, Exploits** and/or **Network Impairments** implicate more than one Insuring Agreement stated in Section **A.**, above. Such single Limit of Liability shall be whichever applicable one stated in the Schedule of this endorsement that is the largest.

### Total Aggregate Limit of Liability

The **Insurer's** liability for all **Cyber Management Expenses, Damages, Credit Monitoring Costs, Claim Expenses, Extortion Payments, Business Income and Extra Expenses** and/or **First Party Losses** incurred in all **Network Security Breaches, Privacy Violations, Extortion Demands, Exploits** or **Network Impairments** shall not exceed the Total Aggregate Limit Of Liability shown in the schedule of this endorsement. All of the **Insurer's** obligations under the Policy shall cease when the Total Aggregate Limit Of Liability has been paid, regardless of whether **Network Security Breaches, Privacy Violations, Extortion Demands, Exploits** or **Network Impairments** have been resolved.

The Total Aggregate Limits Of Liability shown in the Schedule of this endorsement is part of, and not in addition to the Limits Of Liability shown in the Declaration.

F. Section **IX** – Retention is amended to include the following:

The Retentions, shown in the Schedule of this endorsement, apply to **Cyber Management Expenses, Damages, Credit Monitoring Costs, Claim Expenses, Extortion Payments, Business Income and Extra Expenses** or **First**

**Page 7 of 8**

**Party Loss** incurred in each **Network Security Breach**, **Privacy Violation**, **Interrelated Breaches/Violations**, **Extortion Demand**, **Exploit** or **Network Impairment**. The Limits of Liability shown in the Schedule of this endorsement shall apply in excess of the Retentions, which are the sole responsibility of the **Insureds** and will remain uninsured.

All other terms and conditions remain unchanged.

**Page 8 of 8**



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 3**

# MARKEL AMERICAN INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SOCIAL ENGINEERING CLAIM COVERAGE ENDORSEMENT

**CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

**SCHEDULE**

| | |
|---|---|
| Social Engineering Claim Limits Of Liability: | $250,000 Each Claim<br>$500,000 Insured Aggregate<br>$1,000,000 Coverage Aggregate |
| Social Engineering Claim Deductible: | $5,000 |

**A.** The following is added to Section **I** – Insuring Agreements:

**Social Engineering Claim**

The **Insurer** shall pay, on behalf of an **Insured**, **Damages** which an **Insured** becomes legally obligated to pay because of a **Social Engineering Claim** that is both made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker/Dealer**), or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Insured**, provided:

1. Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**); and

2. As of the inception date of this Policy as shown in the Master Policy Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Social Engineering Claim**.

**B.** For the purpose of this endorsement, the following definitions are added to Section **V** – Definitions:

**Deceptive Communication** means an electronic, facsimile or written document or telephone contact received by an **Agent** from a third-party which:

1. directly relates to a life insurance or other product referenced in the Definition **V.U** (**Professional Services**) that is serviced by an **Insured** on behalf of a client and in which a third party has no legal right or interest;

2. contains a misrepresentation of material fact concerning a client of an **Insured**, which is reasonably relied upon by an **Insured** in believing that the document or contact is from his or her client or the client's authorized representative; and

**Page 1 of 3**

3. requests the withdrawal, surrender or transfer of fund held in the client's life insurance or other product referenced in the Definition **V.U (Professional Services)**.

**Social Engineering Claim** means a **Claim** arising from a third party misleading an **Insured** through a **Deceptive Communication**, which is reasonably relied upon by an **Insured** as genuine and results in an **Unauthorized Transfer**.

**Unauthorized Transfer** means theft, conversion or misappropriation of funds held in a client's life insurance or other products referenced in the Definition **V.U (Professional Services)** by a third party solely because of such party's **Deceptive Communication** with an **Insured** and without knowledge of and actual or implied consent by a client.

**C.** For the purposes of this endorsement, the following are added to Section **VI – Exclusions:**

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for any **Social Engineering Claim:**

1. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged:

   a. Costs or expenses for the reprinting, reposting, recall, removal or disposal of any online content or any other information, content or media, including any media or products containing such online content, information, content or media;

   b. Costs or expenses incurred by any **Insured** or others:

      **(1)** To recall, repair, withdraw, replace, upgrade, supplement or remove the **Insured's** online content, products or services from the marketplace, including but not limited to products or services which incorporate the **Insured's** online content, products or services; or

      **(2)** For any loss of use by any **Insured** or others that arises out of such recall, repair, withdrawal, replacement, upgrade, supplement or removal;

   c. Fine or penalty arising out of any agreement by any **Insured** to comply with or follow the PCI Standard or any Payment Card Company rules, or to implement, maintain or comply with any security measure(s) or standards related to any payment card data; or

   d. Unsolicited electronic faxes, emails, telephone calls or unsolicited communications, including but not limited to unsolicited electronic messages, chat room postings, bulletin board postings, newsgroup postings, pop-up or pop-under Internet advertising or fax-blasting, direct mailing or telemarketing, or actual or alleged violations of the Telephone Consumer Protection Act of 1991, as amended, the CAN-SPAM Act of 2003, as amended, and any other federal, foreign or state anti-spam statutes, or federal, foreign or state statute, law or regulation relating to a person's right to seclusion; or

   e. Unauthorized or illegal collection of any data or information, including but not limited to the collection of any data or information using cookies, spyware, or other malicious code, or the failure to provide adequate notice that data or information is being collected; or

   f. Liability of the **Sponsoring Company**. This exclusion does not apply to the **Broker/Dealer**.

2. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any Section 605 (requirements relating to information contained in consumer reports) or Section 616 (civil liability for willful noncompliance) of the Fair Credit Reporting Act, or any other similar federal, state or local laws or regulations, including but not limited to any laws or regulations requiring truncation of payment card numbers on, or the removal of the expiration date from, payment card receipts; or

3. Covered in whole or in part under any other insurance.

**D.** For purposes of this endorsement, the following is added to Section **VIII – Limits Of Liability:**

**Social Engineering Claim Limits Of Liability**

The **Social Engineering Claim** Limits Of Liability are subject to Paragraphs **A.** and **B.** of Section **VII – Limits Of Liability**.

Subject to the **Social Engineering Claim** Limits Of Liability Aggregate and Coverage Aggregate, the limit of the **Insurer's** liability for **Damages** and **Claim Expenses** incurred in each **Social Engineering Claim** reported by an **Insured** to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI – Notice of Claim**, or Extended Reporting Period, if applicable, shall not exceed the **Social Engineering Claim** Limit Of Liability Each Claim shown in the Schedule of the endorsement. The inclusion of multiple **Insureds** or clients in **Interrelated Wrongful Acts** shall not increase the **Social Engineering Claim** Limit Of Liability Each Claim shown in the Schedule of this endorsement.

**Page 2 of 3**

The Limit Of Liability for all **Damages** and **Claim Expenses** incurred in all **Social Engineering Claims** submitted by an **Insured** in writing during the **Policy Period** shall not exceed the **Social Engineering Claim** Limit Of Liability Insured Aggregate shown in the Schedule of this endorsement.

The **Social Engineering Claim** Limit Of Liability Each Claim and **Social Engineering Claim** Limit Of Liability Insured Aggregate are part of, subject to and do not increase the **Social Engineering Claim** Limit Of Liability Coverage Aggregate as shown in the Schedule of this endorsement.

The **Insurer's** obligations under this Policy, including the duty to defend, shall cease after the applicable **Social Engineering Claim** Limits Of Liability has been paid by the **Insurer** for all **Damages** and/or **Claim Expenses**.

The **Social Engineering Claim** Limits Of Liability shown in the Schedule of this endorsement are part of, and not in addition to the Limits Of Liability shown in the Certificate Of Insurance.

**E.** The following is added to Section **IX** – Deductible:

The **Social Engineering Claim** Deductible shown in the Schedule of this endorsement applies to **Damages** and **Claim Expenses** incurred in each **Social Engineering Claim** or **Social Engineering Claim** arising from **Interrelated Wrongful Acts**.

All other terms and conditions remain unchanged.

**Page 3 of 3**



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 4**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## LIBERALIZATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that:

A.  If there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of the Policy, the **Insurer** shall apply whichever term or condition is more favorable to the **Insured,** unless application of such term or condition is against public policy or applicable state law.

B.  For the purposes of this Endorsement, it is further understood that in the event the terms, conditions or exclusions of the **Expiring Policy** would grant coverage for a **Claim** that is not covered under the terms, conditions or exclusions of this Policy (including endorsements to this Policy), then the terms, conditions and exclusions of the **Expiring Policy** will apply to such **Claim**. However, the coverage granted by this Endorsement will not apply if such **Claim** is not covered under this Policy by virtue of the **Policy Period**, Limit of Liability, Retention, Policy **Retroactive Date** or the name of the **Insured** shown in the Declarations of this Policy.

For the purposes of this Endorsement, the term **Expiring Policy**, whenever used in this endorsement, shall mean Policy Number LRA8KK919 issued by Aspen American Insurance Company.

All other terms and conditions remain unchanged.

**Page 1 of 1**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BROKER/DEALER AND SPONSORING COMPANY CHOICE OF DEFENSE COUNSEL ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that Section **II** -- Defense and Claim Expenses – is amended to include the following:

   **E.** Notwithstanding the foregoing, the **Insurer** and **Broker/Dealer** and/or **Sponsoring Company** shall mutually agree to the appointment of counsel in a **Claim** that gives rise to the **Insurer's** right and duty to defend under the Policy. The foregoing shall not apply to any other **Insureds** nor otherwise limit or abridge the **Insurer's** right and duty to defend any potentially covered **Claim** under the Policy.

   Should the **Insurer** and **Broker/Dealer** and/or **Sponsoring Company** mutually agree to the appointment of counsel, the **Insurer** shall only pay the hourly rate that would have been charged under the **Insurer's** agreed upon panel counsel rates.

   Moreover, for such **Claim**, counsel shall fully adhere and comply with the **Insurer's** billing, reporting and any other guidelines or requirements, and will otherwise fully cooperate with the **Insurer**, as a condition of the firm's representation of the **Broker/Dealer** and/or **Sponsoring Company.**

   In the event appointment of counsel cannot be agreed upon in a **Claim** that gives rise to the **Insurer's** right and duty to defend under the Policy, then defense counsel for such **Claim** shall be selected in accordance with Section **II**, Subsections **A.** through **D.**

All other terms and conditions remain unchanged.

**Page 1 of 1**



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 6**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BROKER/DEALER SELLING AWAY LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY

**CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

### SCHEDULE

| | |
|---|---|
| Name Of Broker/Dealer: | Horner, Townsend & Kent, Inc. |
| Selling Away Limits Of Liability: | $500,000 Broker/Dealer Each Claim<br>$500,000 Broker/Dealer Aggregate |
| Selling Away Deductible: | $100,000 Broker/Dealer Each Claim |

A.  For the purposes of this Endorsement, Section **I** – Insuring Agreement -- is amended to include the following:

**Broker/Dealer Selling Away Liability**

The **Insurer** shall pay, on behalf of the **Broker/Dealer**, **Damages** which the **Broker/Dealer** becomes legally obligated to pay as a result of a **Selling Away Claim** that is both made against the **Broker/Dealer** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Supervisory Services** by the **Broker/Dealer**, provided:

1.  Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Policy Period**; and

2.  As of the inception date of this Policy, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Selling Away Claim**.

B.  For purposes of this Endorsement, Section **V** – Definitions -- is amended to include the following:

**Selling Away Claim** means a **Claim** arising from the solicitation, sale or servicing of, or any activities whatsoever, in connection with **Securities** or **Private Placements** which were not approved and authorized by and actually distributed through the **Broker/Dealer** by a **Registered Representative**, who is or was contracted with the **Broker/Dealer** and who is or was the subject of the **Broker/Dealer's Supervisory Services**. Only the **Broker/Dealer** shall be afforded coverage hereunder for a **Selling Away Claim**. Such coverage shall not extend to any other **Insured**, including, but not limited to, a **Registered Representative**.

C.  For the purposes of this Endorsement, Section **VI** – Exclusions, Paragraphs **R.** (selling away), **T.** (discretionary authority) and **U.** (certain investment products) shall not apply to a **Selling Away Claim** against the **Broker/Dealer**. These Exclusions, however, shall apply to all other **Claims** against all other **Insureds**.

**Page 2 of 2**

**D.** For purposes of this endorsement, Section **VIII** – Limits of Liability -- is replaced by the following:

**Limit Of Liability Each Selling Away Claim:**

Subject to Paragraph **D.** below, the limit of the **Insurer's** liability for **Damages** and **Claim Expenses** for a **Selling Away Claim** made against a **Broker/Dealer** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim below, or Extended Reporting Period, if applicable, shall not exceed the Limit Of Liability Each Selling Away Claim shown in the Schedule of this Endorsement.

**Limit Of Liability Selling Away Aggregate:**

The Limit Of Liability for **Damages** and **Claim Expenses** for all **Selling Away Claims** made against an **Insured** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim below, or Extended Reporting Period, if applicable, shall not exceed the Selling Away Limit Of Liability Aggregate shown in the Schedule of this endorsement.

The Selling Away Aggregate Limit of Liability shall be part of, and not in addition to, the Broker/Dealer Aggregate Limit of Liability stated in the Schedule to this Endorsement.

Any other terms or provisions of the Policy which state that the Limits Of Liability thereunder do not include **Claim Expenses** are deleted as to any **Claim** or **Selling Away Claim** against the **Broker/Dealer**. It is understood and agreed that the Limits Of Liability applicable to the **Broker/Dealer** include both **Damages** and **Claim Expenses**, and any of the **Insurer's** duties hereunder owed to the **Broker/Dealer** will be terminated when **Damages** and/or **Claim Expenses** when said Limits Of Liability are paid by the **Insurer**.

**H.** With respect to the coverage provided by this Endorsement, Section **IX** – Deductible -- is replaced by the following:

The Selling Away Deductible shown in the Schedule of this Endorsement shall apply to shall apply to **Damages** and **Claim Expenses** that are incurred in each **Claim**.

The Selling Away Limits Of Liability stated in this Endorsement apply in excess of the **Broker/Dealer's** Selling Away Deductible. The Selling Away Deductible shall be the sole responsibility of the **Broker/Dealer** and will remain uninsured.

All other terms and conditions remain unchanged.



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that Section **XV.**, Subsection **C.** – Termination of Coverage Applicable to the Insurer - is amended to include the following:

3. **Nonrenewal**

   If the **Insurer** elects not to renew this Policy, the **Insurer** will mail by registered, certified or other first class mail written notice of non-renewal to the **Sponsoring Company** at the address identified in the Declarations, at least 60 days before the expiration date of the Policy unless: (i) the reason for the nonrenewal is due to nonpayment of premium; or (ii) the **Sponsoring Company** acting on behalf of all **Insured** has obtained replacement coverage with another insurer.

4. **Conditional Renewal**

   If the **Insurer** increases the renewal premium, the **Insurer** will mail by registered, certified or other first class mail written notice of the **Insurer's** intent to increase the premium to the **Sponsoring Company** at the address identified in the Declarations, at least 30 days before the effective date of the premium increase.

5. **Right to Loss Information**

   The **Insured** may request loss information from the **Insurer** within 10 days of receipt of a cancellation or nonrenewal notice. The **Insurer** shall have 30 days from the date of receipt of the written request to provide the requested information. Loss information on an **Insured** shall consist of the following:

   a. Information on closed **Claims**, including date and description of occurrence, and any amount of payments, if any;

   b. Information on open **Claims**, including date and description of occurrence, amount of payment, if any, and amount of reserves, if any; and

   c. Information on notices of occurrence, including date and description of occurrence and amount of reserves, if any.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedent over any provisions of this Policy and any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the terms of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of Pennsylvania.

All other terms and conditions remain unchanged.

**Page 1 of 1**



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 8**

# MARKEL AMERICAN INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## COVER OREGON INCREASED LIMITS OF LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that Section **VIII** – Limits of Liability -- is amended to include the following:

1. Cover Oregon is the State of Oregon's public corporation which operates the Oregon Health Insurance Exchange (hereinafter "OHIE"), as provided by the laws of the State of Oregon.

2. The State of Oregon and Cover Oregon require that all insurance agents transacting business with OHIE maintain minimum errors and omissions insurance coverage of $1,000,000 each claim and $3,000,000 in the aggregate.

3. The Limits of Liability afforded to **Agents** and **Registered Representatives** insured under this Policy shall operate to comply with the OHIE (hereinafter "OHIE Limits of Liability"), but solely with respect to **Claims** arising out of business transactions involving **Professional Services** with OHIE.

4. Such OHIE Limits of Liability are part of, and not in addition to, the Limits of Liability otherwise provided by the Policy.

It is further understood and agreed that Section **V** – Exclusions -- is amended to include the following:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving activities of an **Insured**, or any other individual or entity, as a Navigator or Assister as defined under the Affordable Care Act, unless such Navigator or Assister is appropriately certified under the Affordable Care Act; and

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving transactions which, with regard to OHIE or Cover Oregon, do not include commercially reasonable written disclosures and signed acknowledgments from the client.

All other terms and conditions remain unchanged.

**Page 1 of 1**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 9**

# MARKEL AMERICAN INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CRYPTO CURRENCY AND NFT EXCLUSION ENDORSEMENT

**CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

This endorsement modifies insurance provided under the following:

Section **V** – Exclusions, is amended to include the following:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim**:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving, in whole or in part, individually or in conjunction with other matters, **Crypto Currency** and/or **NFT**; however this Exclusion shall not apply to mutual funds or securities registered with the Securities and Exchange Commission that are publicly traded on a national exchange.

Section **IV** – Definitions, is amended to include the following:

**Crypto Currency** means digital, computerized or on-line medium of exchange, including, but not limited to, any kind of virtual or electronic currency, that: (i) is not issued or guaranteed by a government central bank, domestic or foreign government or other public authority; or (ii) not adopted or authorized by a domestic or foreign government as a part of its currency.

**NFT** means a non-fungible token, which is any digital or virtual asset or unit of data stored on blockchain or other digital or virtual ledger, which represents a tangible or intangible item, such as, without limitation, graphic art, GIF, music, video or collectible, and grants or certifies the holder's ownership rights to such item, in whole or in part.

All other terms and conditions remain unchanged.

**Page 1 of 1**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

MIL 1214 09 17 **Page 1 of 1**

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
04/05/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Brown & Brown Program Insurance Services, Inc. d.b.a. CalSurance Associates P.O. Box 7048 Orange, CA 92863-7048 | PHONE (A/C, No, Ext): 866-893-1097 | | FAX (A/C, No): |
| | E-MAIL ADDRESS: info@calsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Markel American Insurance Co. | | 28932 |
| INSURED Producers and Registered Reps of Penn Mutual/PIA or HTK, Members of the Financial Sales Professionals Purchasing Group | INSURER B : | | |
| Jason Ulanski | INSURER C : | | |
| 3551 W 111TH ST | INSURER D : | | |
| CHICAGO, IL 60655 | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER: 6434268    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** ☐ CLAIMS-MADE ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY ☐ PRO-JECT ☐ LOC ☐ OTHER | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** ☐ ANY AUTO | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICE/MEMBER EXCLUDED? ☐ (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | **CLAIMS MADE AND REPORTED** Description        Deductible E&O Coverage – Life Only | | | MKLM7PLCA00065 | 8/1/2022 | 8/1/2023 | Each Claim Aggregate Each Producer/Reg Rep | $1,000,000 $1,000,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

Subject to the terms, conditions and exclusions of the policy. Insured must be contracted with PML/PIA to be eligible for coverage. Coverage is provided for the sale and/or servicing of Life Insurance, Accident and Health Insurance, Workers' Compensation Insurance as part of a 24-Hour Accident and Health Insurance product, Managed Health Care Organization Contracts, Long Term Care Products, Disability Income Insurance, or fixed annuities. Certain coverage maybe subject to a sub-limit and/or higher retentions, refer to coverage highlights for details. Deductible: $1,500 per Claim for products of Penn Mutual or its subsidiaries and affiliates and non-life brokered-in products; $2,000 per Claim for non-proprietary products sold through HTK; $3,000 per Claim for all other covered products; Cost of Correction Deductible: $1,500 per cost of correction Claim for non-variable products of Penn Mutual or its subsidiaries and affiliates and non-life brokered-in products; $2,000 per cost of correction for Securities (including mutual funds, variable products and 529 plans) sold through HTK. Deductible is applicable to damages only. If all contracts with PML/PIA and/or HTK terminate, coverage ceases that same date.

Individual Coverage Effective Date is the later of the date indicated under Policy Eff or date of contract with sponsor.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Jason Ulanski 3551 W 111TH ST CHICAGO, IL 60655 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Lynn Johnson* |

ACORD 25 (2016/03)     © 1988-2015 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | Hon. Jessica S. Allen |
| | : | |
| v. | : | Mag. No. 23-8076 |
| | : | |
| PHILLIP GALLES | : | CRIMINAL COMPLAINT |
| | : | |
| | : | **<u>FILED UNDER SEAL</u>** |

I, Darryl Williams, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am an Inspector with the United States Postal Inspection Service, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

/s/ *Inspector Darryl Williams*

Inspector Darryl Williams
U.S. Postal Inspection Service

Inspector Williams attested to this Affidavit by telephone pursuant to F.R.C.P. 4. l(b)(2)(A) on this 10th day of May, 2023

/s/ *Honorable Jessica S. Allen*

HONORABLE JESSICA S. ALLEN
UNITED STATES MAGISTRATE JUDGE



PLAINTIFF'S EXHIBIT

B

## ATTACHMENT A
### (Wire Fraud)

From in or around October 2019 through in or around May 2023, in the District of New Jersey and elsewhere, defendant

## PHILLIP GALLES

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds, to wit, an interstate wire related to the wire transfer, sent on or about September 7, 2022, of approximately $100,000 fraudulently obtained from Victim-2.

In violation of Title 18, United States Code, Sections 1343 and 2.

2

## ATTACHMENT B

I, Darryl Williams, am an Inspector with the United States Postal Inspection Service. I have conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation and have knowledge of the following facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause. All dates and dollar amounts described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

### Overview

1. From in or around October 2019 through in or around May 2023, defendant PHILLIP GALLES ("GALLES") defrauded his victims by falsely claiming that he would invest their money in commodity futures through his purported investment company called Tyche Asset Management ("Tyche"), based in Chicago, Illinois. As part of the scheme, GALLES and those working for him falsely told prospective investors that Tyche had a history of success using proprietary trading strategies. But in reality, Tyche made virtually no legitimate investments. And instead of applying investors' funds to commodity futures trades as promised, GALLES used that money to pay back other investors and on his own personal expenses—including high-end clothing, rent on a luxury apartment, and luxury automobiles. In total, through his scheme, GALLES defrauded more than a dozen victims out of more than $2 million.

### The Scheme

2. At least approximately 50 victims gave GALLES and Tyche investment money based on claims that, among other things, Tyche had annual returns exceeding 100% and hundreds of millions of dollars under management. In reality, however, no Tyche-affiliated entity traded in commodity futures during calendar years 2020, 2021, or 2022, and the one Tyche account used to execute commodity futures trades in or around early 2023 never contained more than approximately $26,000.

3. As discussed below, Victim-1, a professional photographer from Texas, and Victim-2, a mortgage professional from Texas, were among GALLES's victims. Their experiences closely reflect that of other victims.

### *Victim-1*

4. On or about January 28, 2021, after being referred to Tyche by a friend, Victim-1 received an "Executive Summary" from Tyche's Client Relations Manager ("Individual-1") that described Tyche as a "Fin-Tech company" that was "founded on Proprietary Trading while serving as a CPO/CTA [Commodity Pool

3

Operator/Commodity Trading Advisor] using proven algorithmically driver model-based methodology for the benefit of the Members of the LLC."   The Executive Summary further provided that "Our Hedge Fund solution is to address the growing problem of retirees falling short on the funds needed by providing additional income their Social Security, IRA's, and 401K's can't provide."  The summary also claimed that Tyche's 2020 annual returns were 237.73%.

5.      Victim-1 subsequently spoke with GALLES before making any investment.  When they spoke, GALLES made a number of misrepresentations to Victim-1, including that: (1) GALLES would be investing Victim-1's money through Tyche in commodity futures and options; (2) Tyche's 2021 annual returns were 100%; (3) Tyche used a low-risk investment strategy; (4) the fund was "liquid" such that Victim-1 could get her money back in 30 to 60 days if requested.

6.      On or about February 2, 2021, in reliance on GALLES's representations and those contained in the documents described above, Victim-1 wired approximately $20,000 to a Tyche checking account.  In or around 2021 and 2022, Victim-1 made additional investments in Tyche, totaling approximately $240,000.

7.      Victim-1 periodically received emails and documents from Tyche purporting to show substantial returns on her investments. Then in or around January 2023, after requesting a redemption on her investment, Victim-1 received approximately two wires from Tyche, for a total of approximately $20,000. Also in or around January 2023, Victim-1 received a check for $150,000, but when she attempted to cash it, the check bounced due to insufficient funds. Victim-1 received a third wire from Tyche, in or around February 2023, for approximately $10,000.

8.      As Victim-1 tried to redeem the remaining approximately $190,000 of her investment, GALLES repeatedly provided excuses for why he was not returning Victim-1's money. GALLES claimed, among other things, that he had switched banks, Tyche had been the victim of fraud, banks and wire payments were not working properly, and he was ill.

9.      In response to follow-up texts from Victim-1, GALLES claimed that he had sent two cashier's checks, each for $100,000. But Victim-1 never received any cashier's checks from GALLES.  In or around April 2023, after Victim-1 received an unsigned check from Tyche for $100,000, Victim-1 texted GALLES a picture of the check and asked him to just wire the money or send a cashier's check. GALLES replied, "Shit I forgot to sign it for you. I will be back in [C]hicago tomorrow night. In NYC. Damn it."

10.     To date, Victim-1 has not received the remainder of her investment from Tyche or GALLES.

4

*Victim-2*

11. In or around August 2022, Victim-2 was introduced to Tyche through a friend and his mother-in-law, both of whom had previously invested in Tyche.

12. On or about August 29, 2022, Individual-1 sent Victim-2 a "tear sheet," which claimed to provide information about a Tyche affiliate, and said that "Tyche is a new venture whose genesis is the vision of founder Phillip Galles." The tear sheet provided historic performance information regarding the fund, claiming annual rates of return of 190.18% in 2020 and 133.22% in 2021, and a six-month rate of return in 2022 of 84.51%.

13. Based on those and other false representations, Victim-2 signed an "Investment Agreement," dated on or about September 1, 2022, which GALLES also signed. The agreement claimed, among other things, that Victim-2's funds would be invested consistent with Victim-2's "investment objectives, financial circumstances and risk tolerance[.]"

14. On or about September 7, 2022, relying on the false and fraudulent representations in, among other things, the Investment Agreement and pitch materials, Victim-2 wired approximately $100,000 into an account a Tyche bank account (the "Bank-1 Account"). Also on or about that same day, GALLES caused the following transfers and/or wires from the Bank-1 Account (all numbers are approximate):

   a. $19,300 to pay one of GALLES' credit card bills;

   b. $14,800 to a jewelry store;

   c. $10,000 to another victim in the scheme;

   d. $9,000 to a bed and mattress store;

   e. $3,200 to GALLES' girlfriend; and

   f. $6,000 to a luxury car rental company.

15. Thereafter, Victim-2 received quarterly statements from Tyche, claiming to show that Victim-2's investment was steadily growing. For example, Victim-2's earnings statement from the fourth quarter of 2022 showed that Victim-2's investment was up 40%, and that Tyche's annual rate of return was 137.39%.

16. In or around January 2023, Victim-2 asked to redeem $50,000 from his Tyche investment. In response, GALLES signed a check for $50,000 from Tyche to Victim-2, which bounced due to insufficient funds. GALLES then gave Victim-2 a number of excuses as to why he could not receive his money, including that Tyche

was having problems with Bank-1 and that GALLES had moved Tyche's funds from Bank-1 to Bank-2.

17.     On or about March 24 and 31, 2023, GALLES messaged Victim-2 screenshots purporting to be of a Bank-2 account showing a pending balance of approximately $20 million in one message, and a current balance of approximately $17 million in another message.  Those balances were fabricated and forged; neither GALLES nor Tyche held any accounts at Bank-2 with amounts anywhere close to that.  In fact, as of late April 2023, the accounts held by GALLES and/or Tyche at Bank-2 each contained less than approximately $1,500.

### *Undercover Operation*

18.     On or about April 13, 2023, after law enforcement learned about GALLES's scheme, an undercover law enforcement agent ("UC-1") contacted Tyche from New Jersey purporting to be an investment manager looking to make a large investment.

19.     On or about April 18, 2023, during a lawfully recorded videoconference call with UC-1, who was located in New Jersey, GALLES claimed that, among other things: Tyche had over $4.3 billion under management, split among five Tyche-branded entities; most of the money from those entities was all "pooled" for trading purposes; and Tyche returns were 137% in 2022, and approximately 29-30% year-to-date in 2023.

20.     GALLES further claimed during the videoconference that he had a meeting the previous day and another meeting planned the following day with a well-known owner of a professional sports team ("Owner-1") who was interested in a potential investment.  However, Owner-1 subsequently verified to law enforcement that he never heard of GALLES or Tyche, and never had any plans to invest in Tyche.

21.     Shortly thereafter, GALLES sent UC-1 two emails that included copies of a Tyche "pitchbook" and two private placement memoranda for Tyche funds.  The pitchbook touted a "data driven strategy" that "continuously evaluates thousands of securities prices" with "multiple layers of protection."  The pitchbook also reported "Superior Risk-Adjusted Returns" that showed an annual return of 363.29% in 2020, and an annual return of 238% in 2021.  The pitchbook further stated that the gross assets under management were $266.2 million at the end of 2020 and $797.9 million at the end of 2021.

22.     Seeking to solicit an investment from UC-1, GALLES travelled from Chicago to New Jersey, where he met in-person with UC-1 on or about March 24, 2023. A second undercover agent ("UC-2") also attended the meeting and claimed to be a physician whose money was part of the pool managed by UC-1.  During the meeting, which was video and audio recorded, GALLES claimed that from in or around 2020, Tyche had secured exorbitant returns on investment, including

6

approximately 336% returns in 2022. But many of the figures GALLES cited contradicted the figures provided to victims, including Victim-2, and contained in the pitchbook that GALLES sent UC-1.

23.     During the same recorded meeting, GALLES made series of other false and fraudulent representations, which included the following claims that were either demonstrably false or directly contradicted by claims GALLES previously made to other victim investors (or both):

| GALLES's Fraudulent Claims | Proof of Falsity |
|---|---|
| GALLES claimed that Tyche currently used four specific futures commission merchants ("FCMs"), which referred to registered firms that acted as brokers in the purchase or sale of futures contracts or options on futures contracts. Using FCMs is typically required to trade in commodity futures or options. | Two of the FCMs confirmed that they had no accounts with Tyche-related entities or GALLES. The third FCM identified one Tyche account, which was opened but never used. The fourth FCM identified one open Tyche account, which was funded in or around September 2022 with approximately $25,000, but otherwise received no additional funding. |
| GALLES held undergraduate and graduate degrees from a prestigious midwestern university ("University-1"). | According to University-1, GALLES does not hold any degrees, undergraduate or graduate, from University-1. |
| GALLES had previously started his own hedge fund in 2011, backed by billionaires, and that he sold that fund in 2018. | Those claims were contradicted by the tear sheet that GALLES sent Victim-2 and GALLES's financial records. |
| Within approximately 60 days of officially beginning Tyche, the fund had approximately $2 billion under management, as a result of, *inter alia*, GALLES investing his own money and funds provided by a Kuwaiti sovereign fund. | Those statements conflicted with information in the Tyche pitchbook and with Tyche's and GALLES's financial records. |
| Owner-1 planned to invest approximately $15 million in Tyche on or about May 1, 2023. | As discussed above, Owner-1 never heard of GALLES or Tyche, and never planned to invest in Tyche. |
| GALLES owned 122 cars, including certain high-end luxury vehicles, which he stored in a fortified warehouse he owned in Florida. | GALLES does not own any cars registered in Florida, but he spent approximately $48,000 on luxury car rentals with company based in Florida. |

*Lies to Regulator*

24.    Despite the conduct and representations described above, in approximately seven quarterly reports filed with the National Futures Association ("NFA")—a self-regulatory organization for the United States derivatives industry—Tyche claimed that it did not possess any assets under management.

25.    Moreover, on or about April 3, 2023, GALLES falsely told the NFA on a telephone call that Tyche did not have any outside customers, and that neither he nor anyone else at Tyche were soliciting customers.

8

2023R00304CS

**FILED**

FEB 1 6 2024

AT 8:30
CLERK, U.S. DISTRICT COURT - DNJ

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Esther Salas |
| | : | |
| v. | : | Crim. No. 24-98 (ES) |
| | : | |
| PHILLIP GALLES | : | **Count One** |
| | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 2 |
| | : | (Wire Fraud) |
| | : | |
| | : | **Count Two** |
| | : | 18 U.S.C. § 1348 |
| | : | 18 U.S.C. § 2 |
| | : | (Commodities Fraud) |

### INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges as follows:

### INTRODUCTION

1. From at least in or around October 2019 through in or around September 2023, the defendant PHILLIP GALLES ("GALLES") defrauded multiple victims by falsely claiming that he would invest their money in commodity futures through his Chicago-based investment company Tyche Asset Management ("Tyche"). GALLES's fraud included false statements about his purported history of investment success and Tyche's outsized annual rates of return. In fact, GALLES made virtually no real investments, spent part of 2019 and 2020 working as a dog walker and not a fund manager, and misappropriated over $3.7 million in victims' money, which he used, among things, to support his lavish lifestyle.


PLAINTIFF'S
EXHIBIT

**C**

# COUNT ONE
### (Wire Fraud)

2.    At all times relevant to this Indictment:

    a.    GALLES resided in Chicago, Illinois, and owned and operated Tyche, which GALLES claimed was an investment company with a history of success using proprietary strategies to trade commodity futures.

    b.    Victim-1 and Victim-2 were each residents of Texas.

    c.    UC-1 and UC-2 were undercover law enforcement agents based in New Jersey.

## The Scheme to Defraud

3.    From at least in or around October 2019 through in or around September 2023, in the District of New Jersey and elsewhere, the defendant,

**PHILLIP GALLES,**

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as set forth below.

## Goal of the Scheme to Defraud

4.    The goal of the scheme was for GALLES to use material misrepresentations and omissions to fraudulently induce victims to invest money through Tyche and to then misappropriate victim funds, including on personal expenses and a luxury lifestyle.

## Manner and Means of the Scheme to Defraud

5.    It was part of the scheme to defraud that:

a. GALLES induced victim investors to send him funds by falsely representing that he would, and did, invest their money through Tyche using a tested and proprietary trading strategy that had resulted, and would continue to result, in large profits.

b. Instead of investing the money as he promised, GALLES diverted the victims' funds, which he used to pay his personal credit card bills and support his lavish lifestyle that included a luxury Chicago apartment, high-end clothing and jewelry, and luxury automobile payments.

c. GALLES touted his lavish lifestyle when inducing and attempting to induce victim investors to believe that GALLES owned and operated a highly profitable investment company.

d. GALLES also falsely claimed to have a long track record of successful commodities trading and failed to disclose to victim investors and potential investors that, in actuality, in and around 2019 and 2020, he worked as a part-time dog walker paid on a per-walk basis.

e. As a result of his material misrepresentations and omissions, GALLES obtained more than approximately $3.7 million from numerous victims, including Victim-1 and Victim-2.

*Victim-1*

f. On or about January 28, 2021, after being referred to Tyche by a friend, Victim-1 received an "Executive Summary" from Tyche's Client Relations Manager ("Individual-1"), which falsely claimed, among other things, that Tyche: (i) was a "Fin-Tech company" that executed commodities trades using a "proven

3

algorithmically driven model-based methodology"; (ii) sought to help "retirees" by generating "additional income" for them; and (iii) achieved 237% in annual returns in 2020.

g. Victim-1 subsequently met with GALLES, who made additional misrepresentations, including that: (i) GALLES would be investing Victim-1's money through Tyche in commodity futures and options; (ii) Tyche achieved 100% in annual returns in 2021; (iii) Tyche used a low-risk investment strategy; and (iv) the fund was "liquid" such that Victim-1 could get her money back in 30 to 60 days if requested.

h. Based on GALLES's misrepresentations and omissions, on or about February 2, 2021, Victim-1 wired approximately $20,000 to a Tyche checking account. In or around 2021 and 2022, Victim-1 made additional investments in Tyche, totaling approximately $240,000.

i. Victim-1 periodically received emails and documents from Tyche purporting to show substantial returns on her investments. In or around January 2023, after requesting a redemption on her investment, Victim-1 received approximately two wires from Tyche, for a total of approximately $20,000. GALLES used funds that had been wired into Tyche's account from other victims to make these Ponzi-like payments to Victim-1.

j. Also in or around January 2023, Victim-1 received a check for $150,000, but when she attempted to cash it, the check bounced due to insufficient funds. Victim-1 received a third wire from Tyche, in or around February 2023, for approximately $10,000.

4

k.     As Victim-1 tried to redeem the remaining approximately $190,000 of her investment, GALLES repeatedly provided excuses for why he was not returning Victim-1's money. GALLES claimed, among other things, that he had switched banks, Tyche had been the victim of fraud, banks and wire payments were not working properly, and he was ill.

l.     In response to follow-up texts from Victim-1, GALLES claimed that he had sent Victim-1 two cashier's checks, each for $100,000. But Victim-1 never received any cashier's checks from GALLES. In or around April 2023, after Victim-1 received an unsigned check from Tyche for $100,000, Victim-1 texted GALLES a picture of the check and asked him to just wire the money or send a cashier's check. GALLES replied, "[Expletive] I forgot to sign it for you. I will be back in [C]hicago tomorrow night. In NYC. Damn it."

m.     Victim-1 never received the remainder of her investment from Tyche or GALLES.

*Victim-2*

n.     In or around August 2022, Victim-2 was introduced to Tyche by two other victims who had each previously invested in Tyche.

o.     On or about August 29, 2022, Individual-1 sent Victim-2 a "tear sheet," which claimed to provide information about a Tyche affiliate and described Tyche as "a new venture whose genesis is the vision of founder Phillip Galles." The tear sheet falsely claimed that Tyche experienced outsized annual rates of return of 190.18% in 2020 and 133.22% in 2021, and a six-month rate of return in 2022 of 84.51%.

5

p.     Based on those and other false representations, Victim-2 signed an "Investment Agreement," dated on or about September 1, 2022, which GALLES also signed. On or about September 7, 2022, relying on the same false and fraudulent representations, Victim-2 wired approximately $100,000 into a Tyche bank account (the "Bank-1 Account"). On or about that same day, after receiving Victim-1's money, GALLES misappropriated over $60,000 from the Bank-1 Account to (i) pay GALLES's personal credit card bills; (ii) pay for jewelry, luxury car rentals, and other personal items; (iii) send funds to his romantic partner; and (iv) send funds to another victim of the scheme.

q.     Thereafter, Victim-2 received false and fraudulent quarterly statements from Tyche, claiming to show that Victim-2's investment was steadily growing. For example, Victim-2's earnings statement from the fourth quarter of 2022 falsely showed that Victim-2's investment was up 40%, and that Tyche's annual rate of return was 137.39%.

r.     In or around January 2023, Victim-2 asked to redeem $50,000 from his Tyche investment. In response, GALLES signed a check for $50,000 from Tyche to Victim-2, which bounced due to insufficient funds. GALLES then gave Victim-2 a number of excuses as to why he could not receive his money, including that Tyche was in the process of moving funds to another bank ("Bank 2").

s.     On or about March 24 and 31, 2023, GALLES messaged Victim-2 screenshots purporting to be of a Bank-2 account showing a pending balance of approximately $20 million in one message, and a current balance of approximately $17 million in another message. Those balances were fabricated and forged. As of

6

late April 2023, the only accounts that GALLES and/or Tyche held at Bank-2 contained less than approximately $1,500.

*Undercover Operation*

t.     On or about April 13, 2023, after law enforcement learned about GALLES's scheme, an undercover law enforcement officer ("UC-1") contacted Tyche from New Jersey purporting to be an investment manager looking to make a large investment.

u.     On or about April 18, 2023, during a lawfully recorded videoconference call with UC-1, who was located in New Jersey, GALLES falsely claimed that, among other things: (i) Tyche had over $4.3 billion under management, split among five Tyche-branded entities; (ii) most of the money from those entities was all "pooled" for trading purposes; and (iii) Tyche returns were 137% in 2022 and approximately 29-30% year-to-date in 2023.

v.     GALLES further falsely claimed during the videoconference that he had a meeting the previous day and another meeting planned the following day with a well-known owner of a professional sports team ("Owner-1") who was interested in a potential investment.

w.     Shortly thereafter, GALLES sent UC-1, located in New Jersey, two emails that included copies of a Tyche "pitchbook" and two private placement memoranda for Tyche funds. The pitchbook falsely touted Tyche's "data driven" investment "strategy," resulting in annual returns of 363.29% in 2020 and 238% in 2021. The pitchbook also falsely claimed gross assets under management of $266.2 million at the end of 2020 and $797.9 million at the end of 2021.

7

x.      On or about April 24, 2023, GALLES traveled from Chicago to New Jersey, where he met in-person with UC-1 and a second undercover law enforcement officer ("UC-2") and falsely claimed that from in or around 2020, Tyche had secured exorbitant returns on investment, including approximately 336% returns in 2022. During the same meeting, GALLES made a series of other false and fraudulent representations, including:

i.      To make commodities trades, Tyche used four registered firms that acted as brokers in the purchase or sale of futures contracts or options on futures contracts;

ii.      GALLES held undergraduate and graduate degrees from a prestigious midwestern university;

iii.      GALLES had previously started his own hedge fund in or around 2011, backed by billionaires, and that he sold that fund in 2018;

iv.      Within approximately 60 days of officially beginning Tyche, the fund had approximately $2 billion under management, as a result of, among other things, GALLES investing his own money and funds provided by a Kuwaiti sovereign fund;

v.      Owner-1 planned to invest approximately $15 million in Tyche on or about May 1, 2023; and

vi.      GALLES owned approximately 122 cars, including certain high-end luxury vehicles, which he stored in a fortified warehouse he owned in Florida.

8

*False Statements to Regulator*

y.      The National Futures Association ("NFA") is a self-regulatory organization for the United States derivatives industry. In or around April 2023, the NFA began investigating GALLES and Tyche based on a victim investor complaint, and GALLES provided false information to the NFA in response to that investigation, including as follows:

i.      In or around early April 2023, GALLES falsely told the NFA on a telephone call that Tyche did not have any outside customers, and that neither he nor anyone else at Tyche were soliciting customers;

ii.      On or about September 18, 2023, in an email to the NFA, GALLES falsely claimed, among other things, that: (i) Tyche had never gone "live"; (ii) while working out "registration issues," Tyche kept customer money in a "proprietary firm"; and (iii) GALLES was waiting for his attorney to give him approval to return "all" of the customers' money.

### Execution of the Scheme

6.      On or about September 7, 2022, for the purpose of executing and attempting to execute the scheme and artifice to defraud, in the District of New Jersey and elsewhere, the defendant,

PHILLIP GALLES,

did knowingly transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, that is, an interstate wire transfer of approximately $100,000 from Victim-2 that passed through New Jersey.

9

In violation of Title 18, United States Code, Section 1343, and Section 2.

Case: 2:24-cv-00383-ES Document 1 Filed 04/24/24 Page 102 of 191 PageID: 102

10

## COUNT TWO
(Commodities Fraud)

1. The allegations in Paragraphs 1, 2, 4, and 5 of Count One of this Indictment are realleged here.

2. From at least in or around October 2019 through in or around September 2023, in the District of New Jersey and elsewhere, the defendant,

**PHILLIP GALLES,**

knowingly and with the intent to defraud, executed and attempted to execute a scheme and artifice: (a) to defraud Victim-1, Victim-2, and others, in connection with a commodity for future delivery and an option on a commodity for future delivery, and (b) to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a commodity for future delivery and an option on a commodity for future delivery.

In violation of Title 18, United States Code, Section 1348, and Section 2.

11

## FORFEITURE ALLEGATION

1.      Upon conviction of the offense in violation of 18 U.S.C. § 1343, as charged in Count One of this Indictment, the defendant,

### PHILLIP GALLES,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, the defendant obtained that constitutes or is derived from proceeds traceable to the commission of such offense, and all property traceable to such property.

### Substitute Assets Provision

2.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)  cannot be located upon the exercise of due diligence;

    (b)  has been transferred or sold to, or deposited with, a third person;

    (c)  has been placed beyond the jurisdiction of the Court;

    (d)  has been substantially diminished in value; or

    (e)  has been commingled with other property which cannot be subdivided without difficulty,

12

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated

by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up

to the value of the above forfeitable property.

A TRUE BILL

FOREPERSON

PHILIP R. SELLINGER
United States Attorney

13

CASE NUMBER: 24-98 (ES)

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

v.

## PHILLIP GALLES

## INDICTMENT FOR

18 U.S.C. § 1343
18 U.S.C. § 1348

A True Bill,

████████████████████████

Foreperson

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

CAROLYN SILANE
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
(973) 645-3979

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COMMODITY FUTURES ) TRADING COMMISSION ) ) Plaintiff, ) ) vs. ) ) Phillip Galles, Tyche Asset Management ) LLC, Tyche Master Fund Ltd, Tyche Asset ) Trade LLC, Tyche Offshore Fund Ltd., ) Tyche Onshore Fund LP, Tyche PML ) Master Fund Ltd, Tyche PML Onshore Fund ) LP, and Tyche Onshore Fund GP, LLC, ) ) Defendants. ) ) | Case No: JURY TRIAL DEMANDED |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY**
**PENALTIES, AND OTHER EQUITABLE RELIEF**

The Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through

its attorneys, hereby alleges as follows:

## I.     SUMMARY

1.     Phillip Galles is stealing funds from victims he solicits to participate in what he

describes as a "managed futures fund." Galles has deceived, and is continuing to deceive, participants

into depositing funds with the Tyche entity defendants he owns and controls. Galles has made

grandiose claims that Tyche has "billions" of dollars under management, with yearly investment

returns supposedly exceeding 200%. In fact, Galles is operating a Ponzi scheme. He has comingled

participant funds in various bank and trading accounts, misappropriated a portion of the funds

deposited by participants to fund a lavish lifestyle, and used other participant funds to pay back earlier

participants, having used almost none of the funds received from participants to place any trades.

PLAINTIFF'S EXHIBIT

**D**
_____

COMPLAINT – PAGE: 1

2. Since at least October 2019 and continuing to the present ("Relevant Period"), Galles has fraudulently solicited and accepted at least $6,000,000 from approximately 50 persons throughout the United States to participate in the Tyche entities he owns and controls, and which operate as a common enterprise: Tyche Asset Management LLC, Tyche Master Fund Ltd., Tyche Asset Trade LLC, Tyche Offshore Fund Ltd., Tyche Onshore Fund LP, Tyche PML Master Fund Ltd, and Tyche PML Onshore Fund LP (collectively, "Tyche," or "Tyche entity defendants"). Galles comingled participant funds in various Tyche entity bank and trading accounts in a pooled investment scheme for the purported purpose of trading commodity futures and options, among other investment products.

3. Galles and Tyche made misrepresentations of material fact to actual and prospective participants in the Tyche commodity pools concerning, among other things, his and Tyche's experience and expertise, the profitability of Tyche's trading activity, the use of funds invested with Tyche, and the purported profits participants made on their interests in the Tyche commodity pools.

4. Galles has also lied to regulators. In filings with the National Futures Association ("NFA"), the self-regulatory organization for the U.S. derivatives industry, Galles falsely claimed that the Tyche commodity pools were inactive and were not soliciting participants. Galles repeated this lie to NFA representatives when they later asked him directly whether Tyche was soliciting participants and managing funds for participants.

5. By engaging in this conduct and the conduct further described herein, Galles and Tyche engaged, are engaging, or are about to engage in acts and practices that violate the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26, and Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1-190 (2022). Specifically, Defendants have:

> (a) committed fraud in violation of Sections 4b(a)(2)(A)-(C), 4o(1)(A)-(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6o(1)(A)-(B), 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022);

(b) failed to operate their commodity pools as legal entities separate from the pools' operator, failed to receive pool participants' funds in the name of the pools when funds were deposited funds into Tyche Asset Management LLC's bank accounts, and commingled the property of the pools and pool participants' funds with property of Defendants and others in violation of Regulation 4.20(a)-(c). 17 C.F.R. § 4.20(a)-(c) (2022); and

(c) made false statements to NFA in violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4).

6. Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

7. Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act. In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-l(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

9. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-l(e), because Defendants transacted business in this District, and acts and practices in violation

of the Act have occurred, are occurring, or are about to occur within this District.

### III.    PARTIES

10.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the responsibility for enforcing the provisions of the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2022).

11.    Defendant **Phillip Galles** resides in Chicago, Illinois and is a principal and owner of the Tyche entity defendants.  Galles is registered with NFA as an Associated Person ("AP") of Tyche Asset Management LLC, a CFTC-registered Commodity Pool Operator ("CPO").  Galles operated the Tyche entity defendants, and his fraudulent scheme, primarily from Chicago.

12.    **Tyche Asset Management LLC** is a Delaware limited liability company organized in October 2019, and during the relevant Period maintained offices at One North Wacker Drive and One South Dearborn Street in Chicago, Illinois.  Tyche has been registered with the CFTC as a CPO since March 1, 2021.  Tyche was approved as an NFA Member as of June 7, 2021.  Galles instructed numerous participants to wire funds to bank accounts controlled by Galles in the name of Tyche Asset Management LLC.

13.    **Tyche Master Fund Ltd** is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois.  According to Tyche's filings with NFA, Tyche Master Fund Ltd is a "Master fund (a pool in which its only participants are other pools operated by the same for or an affiliate)."  Galles opened at least two trading accounts in the name of Tyche Master Fund Ltd at registered Futures Commission Merchants ("FCMs").

14.    **Tyche Offshore Fund Ltd** is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois.  According to a private placement memorandum provided by Galles to a registered FCM, this entity "is a collective investment vehicle organized and managed by Tyche Asset Management, LLC."

15. **Tyche Onshore Fund, LP** is a Delaware limited partnership with its principal place of business in Chicago, Illinois. According to a private placement memorandum provided by Galles to a registered FCM, this entity is a "feeder fund" into Tyche Master Fund Ltd, with an investment objective of seeking "superior risk-adjusted rates of return with no significant correlation to any major market index" through the purchase and sale of "futures contracts, options on futures contracts, derivatives, securities, options on securities, foreign exchange contracts, and other financial instruments on domestic and international exchanges and markets." The "investment manager" of the fund is Tyche Asset Management LLC.

16. **Tyche PML Master Fund Ltd** is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois. According to a private placement memorandum Tyche filed with NFA, this fund is a "master" fund commodity pool under the management of Galles and Tyche Asset Management LLC.

17. **Tyche PML Onshore Fund LP** is a Delaware limited partnership with its principal place of business in Chicago, Illinois. According to a private placement memorandum Tyche filed with NFA, this fund is a "feeder" fund into Tyche PML Master Fund, Ltd, with Tyche Asset Management LLC functioning as the "Investment Manager" of both, and Tyche Onshore Fund GP LLC being the fund's "General Partner."

18. **Tyche Onshore Fund GP, LLC** is a Delaware limited liability company with its principal place of business in Chicago, Illinois. It is the "general partner" of Tyche PML Onshore Fund LP.

19. **Tyche Asset Trade LLC** is a Delaware limited liability company with its primary place of business in Chicago, Illinois. In a private placement memorandum Galles provided to a registered FCM, Tyche Asset Trade LLC was described as a "proprietary trading firm" affiliated with Tyche Asset Management LLC. Galles solicited several participants to execute an "investment

agreement" with Tyche Asset Trade LLC, with Galles purportedly acting as the "investment manager."

20.     All of the Tyche entity defendants share a single website: tycheam.com.  Despite being incorporated or organized in various jurisdictions, the Tyche entity defendants' business operations are all conducted from the same offices and through the same employees.  Galles comingled funds received from participants in various Tyche entity bank and trading accounts for the various Tyche entities.  There was no operational distinction between the entities in the overall Tyche business scheme.  The Tyche entity defendants operate as a common enterprise.  Galles controls the operations of the Tyche entity defendants, including their financial activity in bank and trading accounts.

#### IV.     STATUTORY BACKGROUND

21.     Galles and the Tyche entities operate a "Commodity Pool" as defined by the Act. Section 1a(10) of the Act, 7 U.S.C. § 1a(10), defines a "commodity pool" as any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any commodity for future delivery, security futures product, swap, or commodity option.

22.     Tyche Asset Management LLC is a "Commodity Pool Operator" as defined by the Act.  7 U.S.C. § 1a(11)(A)(i), in relevant part, defines a CPO as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including commodities for future delivery, security futures products, and swaps.

23.     The individuals who Galles solicited to invest with Tyche are "participants" in the pool within the meaning of Regulation 4.10(c), 17 C.F.R. § 4.10(c) (2022), which defines a "participant" as any person who "has any direct financial interest in a pool (e.g., a limited partner)."

24.     Galles is an AP of Tyche as defined in Section 4k of the Act, 7 U.S.C. § 6k, and Regulation 1.3, 17 C.F.R. § 1.3 (2022).  Those provisions, with certain qualifications, define an AP as a natural person associated with any CPO as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves: (i) the solicitation of funds, securities, or property for a participation in a commodity pool; or (ii) the supervision of any person or persons so engaged.

## V.     THE TYCHE SCHEME

### A.  Overview of the Scheme

25.     Defendant Galles has received at least $6 million from approximately 50 individuals throughout the United States since October 2019 to invest with Tyche.  Galles described Tyche to prospective participants as a "managed futures" fund that traded futures and options contracts on the Chicago Board of Trade and Chicago Mercantile Exchange.

26.     Galles claims he is a billionaire hedge-fund magnate who oversees Tyche's sprawling trading operation, which he claims has more than 100 employees based in offices in Chicago, Miami, London, and other locations.  Galles further claims to employ sophisticated technology and strategies that have generated returns in excess of 200% in recent years trading commodity futures and options.

27.     Galles boasts to prospective participants of the depth of his experience and expertise trading commodities.  He has bragged about his educational achievements, claiming to be the valedictorian of a prestigious U.S. university.  He has touted his past success as a manager of a hedge fund based in Bermuda, where he supposedly was responsible for managing a portfolio worth billions of dollars.  He claims to have sold a previous fund before launching Tyche in 2019 after awaiting the expiration of a non-compete agreement.  All of these claims were lies or gross exaggerations.

28.     Galles also used Tyche's status as an entity registered with the CFTC to deceive participants into depositing funds with Tyche.  Galles lied to obtain this registration in the first place.

Galles filed documents with NFA to register Tyche Asset Management LLC as a CPO. In filings with NFA, Galles represented that this entity would–in the future–be responsible for operating numerous commodity pools. Significantly, in his applications and in all subsequent filings Galles expressly represented that the Tyche funds were not currently active, and he and Tyche were not soliciting participants.

29.     Galles also bolstered his pitch to prospective participants by cultivating an image of personal wealth and sophistication. For example, in public posts to his "phillip_g724" and "tradeitup" Instagram accounts, Galles:

    a.  boasted about his luxury car collection that supposedly included multiple Lamborghinis and Ferraris;

    b.  bragged about his luxury homes in Miami, Chicago and Palm Beach;

    c.  described his high-end watch collection alongside photos of Rolex and Longines watches;

    d.  claimed to be hanging art by Picasso and Chagall in one of his homes; and

    e.  touted the opening of offices in Chicago, Miami and London in October 2022 ("Chicago office is coming along. Miami's build out is next and then headed to London to open our office there.").

30.     Galles' claims about his personal and business success are lies. In fact, since he first opened a bank account in the name of a Tyche entity in 2019, Galles has used almost none of the funds he received from participants to place any trades. Instead, Galles has used the money he received into Tyche bank accounts from the participants he solicited (or hired others to solicit for Tyche) to fund his lavish lifestyle and to further promote his fabricated image of a hedge fund magnate.

**B. Galles' Fabricates Tyche Operations, Trading Strategies, and Investment Returns**

31.     Galles made a grandiose pitch to prospective participants.  In a "Fire Side Chat" video posted to Youtube in January of 2021, Galles advertised his Tyche fund.  During this public interview, Galles echoed false and misleading statements that he also made directly to prospective participants.  Galles made false claims, including that:

   a. Tyche had "in the U.S. $275 million under management, and $1.7 billion off shore."

   b. "Last year we had a stellar year, a 238% return."

   c. "I've been in hedge fund industry since 2008.  From 2011 to 2018 I was part owner of a company called Peregrine.  We were based in Bermuda.  We were a $3 billion hedge fund, and I've been averaging about 22% return every year since 2010.  Last year's 238% gain brings that average up to over 44%."

   d. "I've got about 30 employees that work for us, and 15 of them are ex-Goldman employees."

   e. "Everything is based off of algorithms and programmers."

   f.  "60% of our trades go through the S&P and NASDAQ.  Another 40% are used in currencies and bonds, depending on how we see the market."

   g. "As of next summer we will be a $5 billion fund, and I just raised $3 billion from a New York Pension group."

   h. "I can do up to $10 billion managed-wise.  After that it gets a little too difficult […] We're small and nimble […] I'm trying to stay under the $10 billion mark."

32.     Galles used a similar pitch in promotional materials provided directly to participants.  For example, Galles and Tyche claimed in promotional materials that:

   a. Tyche is "Committed to delivering Prosperity and Fortune to our clients."

b. "Tyche was founded in late 2018 after analyzing years of model combinations on Long-Term, Intermediate-Term, Short-Term, High-Frequency & Options strategies coordinated to technically drive as one. This strategy has proven the possibility of generating annual returns of 25%+ each year."

c. "Tyche is a new venture whose genesis is the vision of founder Phillip Galles. Galles has 30 years of Stock Options, Futures, Foreign Exchange & Risk Arbitrage experience. Phillip started on the Floors of the CBOT and CBOE as a market maker for Stock Options, Bond Options, Futures, FX Options, and off the floor Risk Arbitrage from 1992-2007. In 2007 Phillip joined the hedge fund world starting at the Pelerine Fund as a FX Forward and FX Options trader. From 2012 to 2019 Phillip joined the Peregrine Fund and became a Senior Asset/Portfolio Manager-Partner and eventual owner of the fund capping off an average return of over 24% every year for that duration. During his time there he developed the use of his highly profitable "Swing Trade" technique which lasts from (1 to 4 day). He also used another profitable technique called "Medium Term" (30, 60 & 240 minute) along with a short term "High Frequency" strategy. During those years Phillip started using a technically based trading concept working with a combination of Futures and Options. Phillip's current model is based on many market momentum concepts while still using his own proprietary Short-Term methodology & Swing Trade concepts. Phillip has been a registered CME Member, CBOE & NFA member as well."

d. "Tyche's current strategy is to filter in low-risk entry to gain access at exactly the precise moment to maximize potential gains. After entry, the model is designed to define risk with each additional position and evaluate levels in real time to establish

COMPLAINT – PAGE: 10

an exit strategy as the market regresses to the mean. We closely monitor open positions to lower our risk, both upside and downside until objectives are achieved."

e.  "Additionally, our Long-Term Model uses longer time frames seeking Undervalued and Overvalued market extremes. We use Call and Put Options to help with fluctuations before the extremes in the market are generated.  This intertwines our short-term approach with our long-term positions. This combination aims to significantly lower the volatility and drawdowns for longer-term positions, while the short-term is actively managed using an intraday strategy. The long-term approach is directional and can be highly correlated together with the short-term."

f.  "In summary: Our risk management techniques are designed to limit daily drawdowns to 5% of margin.  When compounded over time, returns may outperform the Dow Jones Industrial Average, Nasdaq Composite, and the S&P 500 with less downside volatility.  Our non-correlated model-driven approach tempers the downside volatility while aiming to enhance returns during trending markets."

g.  "Tyche is dedicated to 'Prosperity and Fortune.' We have a strategy that focuses on generating consistent income through our proven proprietary trading strategy."

h.  "We're continuously grateful for our success, but we are never fully satisfied. Outperformance is our expectation, and our definition of a meaningful Long-Term Investment is one that stretches far beyond a few weeks, months, or years."

33.     Galles also gave prospective participants promotional materials in which he fabricated trading strategies supposedly employed by Tyche.  For example, in a presentation provided to one participant, Galles described the purported trading strategies employed by Tyche.  Galles described an "Automated Trading Model" with a "Repeatable Strategy."  He claimed that Tyche "continuously evaluates thousands of securities prices for multiple time frames simultaneously."  He went on to

COMPLAINT – PAGE: 11

describe five "automated trading models looking across 11 different time frames for Futures; S&P500, Nasdaq 100; Treasuries, Crude Oil, Gold and FX."

    a. "Model 1: Directionally biased Market Making.  The algorithms mimic an experienced market maker, but with a speed, accuracy no human trader could achieve, over a number of instruments simultaneously.

    b. Model 2: Algorithmically determined 'inflection points' are filtered using order book dynamics/market microstructure analysis to profit from price movements in either direction around these areas.

    c. Model 3: Continuously evaluates thousands of securities prices across multiple time frames simultaneously, referred to as 'local rotation analysis' to determine the rotational direction in the market.

    d. Model 4: Complete 'U' Rotation.  Primarily mean reverting.  However, longer term model instances will not trade against a strong trend.  Directionally biased market making (short term trading) based on 30 years of historical data.  Repeat?

    e. Model 5: Standard Pattern Recognition algorithm with continual optimization based on years of historical data used to make trading decisions without curve fitting."

34.    None of these models had any basis in reality.  Galles and Tyche placed only a few trades in a futures trading account in the name of a Tyche entity, and those futures trades did not occur until January of 2023, well after Galles claimed to have been employing these purported models.

35.    Galles had participants sign agreements with various Tyche entities including Tyche Asset Management LLC and Tyche Asset Trade LLC.  Galles and Tyche made misleading statements and misrepresentations in these participant agreements.  For example,

    a. "The investment manager undertakes to maintain the funds entrusted to it separate from its own assets and away from the claims of creditors."

COMPLAINT – PAGE: 12

b. "The Manager performs investment advisory services for various clients and the investment funds (including the Pooled Funds) that it manages.

c. "The Manager . . . will ensure that all investments and recommendations made on behalf of the Account are suitable for the Client."

36. Galles and Tyche also provided prospective participants and participants with a fictional trading history for Tyche, and specific, false historic trading results. For example, Tyche promotional materials stated that Tyche had no losing months; that Tyche had a 190.18% rate of return for 2020; a 133.22% rate of return for 2021; and a year-to-date rate of return of 84.51% for 2022 as of July 2022. In another presentation to a different participant, Galles and Tyche claimed that Tyche outperformed the S&P 500 by more than 300% in 2020. All of these figures are made up. Tyche did not place any trades in any trading account during this time period.

37. In fact, Tyche did not place any trades at all in 2020, 2021 or 2022. The only trades placed in a Tyche futures trading account occurred in January and February 2023. And those few futures trades were in an account that first received a deposit of $25,000 in September of 2022. Most of the funds in that trading account were withdrawn by Tyche in February 2023, after only a few trades.

38. Galles' and Tyche's claims of massive profitable trading returns in promotional materials, in verbal statements, and in account statements provided to participants, are a complete fabrication.

**C. Galles Misappropriated Tyche Participant Funds to Support a Lavish Lifestyle**

39. Galles used the funds deposited by participants into Tyche's bank accounts to pay his own personal expenses, to repay certain earlier participants, and to pay expenses designed to make Tyche appear to be a legitimate operation.

40.     In general, Galles directed the individuals he solicited to invest with Tyche to deposit their funds into a bank account in the name of Tyche Asset Management LLC.

41.     For example, in February of 2021 Participant A made an initial investment with Tyche, depositing $25,000 into a bank account in the name of Tyche Asset Management LLC.  Those funds were not transferred to any trading account.  Instead, in the days following the deposit of Participant A's funds, Galles used the funds to pay personal expenses including payments to Uber, Macy's and Best Buy.

42.     On September 6, 2022, Participant B deposited $200,000 to a bank account in the name of Tyche Asset Management LLC.  The following day, Participant C deposited $100,000 to that same Tyche bank account.  Only a small portion of the funds received into this Tyche bank account during September 2022 were transferred to a trading account, and ultimately almost none of this money was used for trading activity.

43.     The customer funds deposited to Tyche's bank account in September 2022 were instead used for other purposes, such as the repayment of portions of investments made by certain earlier participants, payments to Tyche employees or contractors, or for personal expenses.  In September 2022, Galles transferred at least $55,000 to employees or contractors for Tyche, made payments of at least $40,000 to law firms, paid $18,790 in rent for his personal residence in a high-end apartment building in Chicago, spent more than $14,000 at a jeweler, paid $6,000 to Dynasty Luxury (a luxury car rental service in Miami), and paid $19,282.80 towards a credit card.

### D.  Galles Controlled the Tyche Entities

44.     Galles controlled the operations of the Tyche entity defendants.  According to a Tyche private placement memorandum, Galles is "the founder and sole owner of the General Partner and Investment Manager and the trading principal of the [Tyche] Master Fund.  […]  In November 2019,

Mr. Galles began forming the Investment Manager and now serves as its Chief Executive Officer, Chief Investment Officer, and Chief Compliance Officer."

45. Galles is identified in filings with the CFTC and NFA as the key point of contact and the executive responsible for various key functions for Tyche.

46. Galles first applied to the CFTC to register Tyche Asset Management LLC as a CPO on March 25, 2020. The application states that it was "submitted by Phillip Galles." Galles is listed as the only point of contact for Tyche Asset Management LLC in this and the other applications filed for Tyche Asset Management LLC to register with the CFTC as a CPO. Galles is identified as the point of contact for Tyche's enforcement, NFA membership, accounting, arbitration, and compliance functions.

47. Galles is also identified as the key point of contact at Tyche in filings with NFA. According to a Pool Quarterly report for CPOs submitted on behalf of Tyche for the quarter ending December 31, 2021, for example, Galles is identified as President, Chief Compliance Officer and the relevant point of contact for Tyche Asset Management LLC.

48. Galles is also a signatory for and an authorized person for all of the Tyche entities' bank and financial accounts. Galles signed account opening documents for Tyche Asset Management LLC in applications for accounts at several banks in Chicago. Galles identified himself as the "Managing Member" of Tyche Asset Management LLC on bank account opening documents.

49. Galles signed corporate resolutions for Tyche entities. For example, Galles signed a December 2020 resolution as the "designated representative" of Tyche Asset Management LLC to authorize his access to and control over a TAM LLC bank account at Chicago-based bank.

50. In an application Galles submitted to an FCM to open a trading account in the name of a Tyche entity, Galles represented that he is the only person authorized to act on behalf of the Tyche Master Fund Ltd.

### E. Tyche Issued False or Misleading Account Statements to Participants

51. During the Relevant Period, Defendants sent periodic account statements to participants that misrepresented the value of their respective interests in the Pool, and falsified returns. The statements reflected that Tyche participants' funds were earning consistent profits with no losses.

52. For example, Participant B received a Tyche "Earnings Statement" for "Fourth Quarter 2022." This document included the following claims: "For the Fourth Quarter of 2022, Tyche Asset Trade generated a Net Return of 25.47%." This statement was false, as Tyche did not place any trades during the fourth quarter of 2022.

53. The Quarterly statement provided to Participant B also represented that Tyche's "Proprietary Model-Driven Performance" outperformed the S&P 500 index in each month of the 4th quarter of 2022. The statement claimed Tyche achieved a return of 11.7% in October 2022; a 7.58% return in November 2022; a 6.19% return in December 2022; and a year-to-date return of 137.39%. These figures were entirely fabricated, as Tyche had no trading activity at all in 2022.

54. In a quarterly account statement issued to Participant B for the period ending March 31, 2023, Tyche valued the participant's account at $354,578.53, and claimed a 25.92% rate of return for the account, with income during the first quarter of 2023 of $72,988.21. These figures were fabricated, and the statement issued to Participant B was false.

### F. Galles Lies to Prolong His Scheme and Delay Return of Funds

55. In late 2022, Galles' scheme began to unravel as several participants sought to withdraw their funds. Galles did not have sufficient funds to meet these customer withdrawal requests. Galles attempted to delay the return of participant funds by lying about, among other things, the location of Tyche funds, and the process he needed to undertake to return investor funds.

56.     For example, on December 12, 2022, Participant C submitted a request to Tyche to withdraw a portion of his invested funds.  Galles did not immediately return any funds, but indicated that he would begin the process of returning this participant's funds.

57.     As of February 6, 2023, Galles and Tyche had not returned the Participant's funds.  On February 6, 2023, Galles told Participant C that he was at the bank, claiming he was on the verge of correcting purported problems sending the participant's funds by wire transfer.  Galles write, "I think everything is cleared up.  I'm just waiting for them to send me this last docusign.  Then I should be good to go."  He added, "Trying to get this out before 4 PM.  If not, you'll get it tomorrow morning for sure I'm gonna be sending you 55,000 to cover the problems that we had in the last few weeks.  I truly apologize that this got so fucked up."

58.     The next day, February 7, 2023, Galles wrote to Participant C:  "Money will coming from Wintrust this morning.  It will come in small amounts because they are limiting me to 100k a day and 25k per customer in transfers.  You will see 25k this morning.  I will be at BMO later this morning to get that solved so that we can wire from multiple accounts.  Finally getting things out.  So sorry for the delay."

59.     When the wire did not immediately arrive, Participant C followed up.  Galles told Participant C that he "just got an email from her You should see it.  In the next half hour they had to ask more questions in the wire department.  So I called them.  I literally just got off the phone with them about pushing us through right now."

60.     Galles was unable to return the full amount of Participant C's funds.  On February 15, 2023, Participant C asked "when do I get rest of distribution?"  Galles responds that he would have sent it, but his daughter had serious medical issues that needed to be addressed that impeded his ability to wire all of the requested funds.

COMPLAINT – PAGE: 17

61.     Galles continued to delay and make additional excuses for his inability to return the participant's funds.  On February 16, 2023, Galles wrote to Participant C that "I am headed back to Chicago later this afternoon.  I have to go to Milwaukee to pick my car then head back home.  The banks do not have us set up to make wires from my online account so I have to go in there and get things set up.  I will text you tomorrow once everything is done"

62.     On February 18, still not having received his funds, Participant C wrote to Galles: "I ended up putting my property taxes on my credit card.  3 properties.  All together it's $50k.  Thought I would have money weeks ago.  Credit cards are at 18% interest.  I'm not worried about a wire fee. I just want to get these damn credit cards paid off.  Please send money!!!!!!!!!!!! No one has replied toot [sic] my email.  I want my entire balance back.  Filled out the form.  When do I get that???"

63.     On March 3, 2023 Galles wrote to Participant C that his money "will go out Monday because [another participant] wanted all of her money now so I had to put everybody else on Monday. I'm still here trying get them to raise the limit so I can go above $500,000.  She said that everybody else needed to wait because she's been on hold the longest."

64.     On March 24, 2023, still making excuses, Galles sends Participant C an image of a purported pending balance of a checking account at BMO Harris for $20,200,000.  Galles claimed he was waiting for the pending funds to clear to the account in order to send funds.

65.     On March 27, 2023, Galles claimed "I talk to the head of compliance and the law department and I wasn't aware that they put a 48 hour hold because it was transferred to a new account which they are holding tomorrow 10% of the total transfer which I already knew of and then I'll be able to transfer Wednesday morning Everything out.  Friggen finally!!! Yay I feel relieved"

66.     On March 29, 2023 Galles continued to make excuses to delay returning funds.  "Ran into a major personal problem which put in the emergency room.  I will be out in a little bit.  A pill

COMPLAINT – PAGE: 18

opened up in my throat by accident and closed my throat for 2 full minutes. I thought that it was an onion and tried to get it back up. It didn't go so well."

67. Galles employed similar delay tactics, and made similar excuses as to his inability to return funds, in communications with other Tyche pool participants who attempted to withdraw funds during the fall of 2022 and spring of 2023.

### G. Galles and Tyche Asset Management LLC Lied in Filings with NFA, and in Response to Questions from NFA Examiners

68. Galles not only lied to participants, he also lied to regulators. Galles' and Tyche Asset Management's misrepresentations began with the applications filed to register Tyche as a CPO, and continued through false statements to NFA staff in April of 2023 after NFA initiated an examination of the Tyche entities following complaints by customers about potential fraud by Galles and Tyche.

69. Galles filed, or caused to be filed, various reports with NFA in order to maintain the registration of Tyche Asset Management LLC as a CPO.

70. As a part of its regulatory duties, NFA requires that member firms including CPOs such as Tyche Asset Management LLC complete and file an Annual Questionnaire. The questionnaire provides NFA with information on a member's activities and operations, serves as a continuous source of data for NFA's risk monitoring systems, and is frequently the first resource that NFA staff reviews when engaging with or performing work related to a Member.

71. Tyche Asset Management LLC, acting through its employees or agents including Galles, filed an Annual Questionnaire with NFA on July 13, 2022 for the annual period ending May 31, 2022. On the questionnaire, the primary contact for Tyche Asset Management LLC was Phillip Galles, and Galles was also identified as the Chief Executive Officer of the firm.

72. The first substantive question on the Annual Questionnaire form asks, "Does the firm currently have customers and/or pools that engage in activity relating to commodity interests?" Tyche Asset Management LLC answered "No." The second question on the form asks, "Does the firm

currently solicit customers to trade commodity interests? Tyche Asset Management LLC answered "No." Tyche Asset Management LLC also represented in this form that while it had three commodity pools, it had "not yet accepted investor funds into the pools." These statements to NFA were false. The Tyche entities had been soliciting and accepting funds from customers to trade commodity interests since at least 2019.

73. NFA also requires CPOs to file quarterly reports. Tyche Asset Management LLC filed at least seven quarterly reports with NFA between June 2021 and December 2022. In each of those quarterly reports, Tyche Asset Management LLC stated that it had no assets under management and no assets or liabilities. These statements were false, as the Tyche entities had accepted funds from participants for the purpose of trading commodity interests, and had substantial liabilities to its participants.

74. In April 2023, in furtherance of its official duties under the Act, NFA staff initiated an examination of the Tyche entities. In connection with that examination, NFA representatives spoke with Phillip Galles.

75. On April 3, 2023, Galles told NFA representatives that the Tyche entities did not have any customers. Galles told NFA representatives that Tyche did engage in trading, but only "proprietary" trading through an affiliated entity. These statements are false and misleading because Galles and the Tyche entities had been soliciting customers and accepting customer deposits since at least 2019 for the purposes of trading commodity interests in a commodity pool.

76. On April 3, 2023 Galles also told NFA representatives that Tyche was engaged in futures trading through a proprietary account at UBS. This statement is false, as the Tyche entities do not have any account at UBS.

## VI.    <u>VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS</u>

### COUNT 1:  FRAUD IN CONNECTION WITH FUTURES IN VIOLATION OF 7 U.S.C. § 6b(a)(1)(A)-(C), AGAINST ALL DEFENDANTS

77.    The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

78.    Section 4b(1)(A)-(C) of the Act, 7 U.S.C. § 6b(1)(A)-(C) makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person
>
> > (A) to cheat or defraud or attempt to cheat or defraud the other person;
> >
> > (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;
> >
> > (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

79.    Defendant Phillip Galles, and the Tyche entity defendants acting together as a common enterprise, in or in connection with commodities for future delivery made, or to be made, on or subject to the rules of a designated contract market,

    a.  knowingly or recklessly cheated or defrauded, or attempted to cheat or defraud Tyche pool participants by, among other things, making material misrepresentations and omissions regarding Defendants' experience and expertise, trading performance, trading track record, the value of their interest in the Pool, and by misappropriating their funds;

    b.   willfully made or caused to be made false reports or statements to Tyche commodity pool participants; and/or

    c.   willfully deceived or attempted to deceive pool participants by, among other things, making material misrepresentations and omissions regarding Defendants' experience and expertise, trading performance, trading track record, the value of their interest in the Pool, and by misappropriating their funds.

80.    By reason of the foregoing, Defendants violated 7 U.S.C. § 6b(a)(1)(A)-(C).

81.    The foregoing acts, omissions, and failures occurred within the scope of Galles' employment or office with Tyche. Therefore, Tyche is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 6b(a)(1)(A)-(C), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

82.    Defendant Galles controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 7 U.S.C. § 6b(a)(1)(A)-(C).

83.    Each fraudulent or deceptive act,, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(1)(A)-(C).

**COUNT 2: FRAUD BY A COMMODITY POOL OPERATOR AND ITS ASSOCIATED PERSON IN VIOLATION OF 7 U.S.C. § 6o(1), AGAINST DEFENDANTS PHILLIP GALLES AND TYCHE ASSET MANAGEMENT LLC**

84.    The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

85.    Section 4o(1) of the Act, 7 U.S.C. § 6o(1) prohibits any CPO, or AP of a CPO, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly:

    (A) to employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or

COMPLAINT – PAGE: 22

(B) to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant.

86.     During the Relevant Period, Tyche Asset Management LLC, a registered CPO, defrauded and deceived participants of the Tyche Pool by using the mails or any other means of interstate commerce in violation of 7 U.S.C. § 6*o*(1) by, among other things:

(a)     misappropriating participant funds;

(b)     fraudulently soliciting participants and prospective participants by making material misrepresentations and omitting material facts regarding Defendants' experience and expertise, trading profits, trading performance track record, and the value of participants' interest in the Pool; and

(c)     causing false account statements to be issued to participants in the Pool.

87.     During the Relevant Period, Galles acted as an AP of Tyche Asset Management LLC by soliciting funds for the pool and handling participant funds while being associated with Tyche as a partner, officer, employee, consultant, or agent.

88.     Galles, while acting as an AP of a CPO, defrauded and deceived participants of the Tyche commodity pool by using the mails or other means of interstate commerce in violation of 7 U.S.C. § 6*o*(1) by, among other things:

(d)     misappropriating participant funds;

(e)     fraudulently soliciting participants and prospective participants by making material misrepresentations and omitting material facts regarding Defendants' experience and expertise, trading profits, trading performance track record, and the value of participants' interest in the Tyche commodity pool; and

(f)     causing false account statements to be issued to participants in the Tyche commodity pool.

89.     Defendants willfully engaged in the acts described in this Count.

90.     The foregoing acts, omissions, and failures occurred within the scope of Galles' employment or office with Tyche.  Therefore, Tyche is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 6*o*(1), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

91.     Defendant Galles controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 7 U.S.C. § 6*o*(1)(A) and (B).

92.     Each fraudulent or deceptive act, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

## COUNT 3:  COMMODITY FRAUD IN VIOLATION OF 7 U.S.C. § 9(1) AND 17 C.F.R § 180.1(a)(1)-(3), AGAINST ALL DEFENDANTS

93.     The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

94.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), provides, in pertinent part, that:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate[.]

95.     The Commission issued CFTC Rule 180.1, 17 C.F.R. § 180.1 (2022), pursuant to this authority.  Rule 180.1(a)(1)-3) state, in pertinent part, that:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to

COMPLAINT – PAGE: 24

make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

96.     Defendant Phillip Galles, and the Tyche entity defendants acting together as a common enterprise, intentionally or recklessly, in connection with contracts of sale of commodities for future delivery on or subject to the rules of a registered entity,

a.  used or employed, or attempted to use or employ, a scheme or artifice to defraud;

b.  made, or attempted to make, in connection with contracts of sale of commodities in interstate commerce, untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading; and/or

c.  engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on Monex's customers.

97.     As a result of the foregoing conduct, Galles' and Tyche's fraudulent conduct violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

98.     The foregoing acts, omissions, and failures occurred within the scope of Galles' employment or office with Tyche.  Therefore, Tyche is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

99.     Defendant Galles controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

100. Each fraudulent or deceptive act, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

**COUNT 4: COMMINGLING OF FUNDS, FAILURE TO RECEIVE FUNDS IN POOLS' NAME, FAILURE TO OPERATE SEPARATELY OPERATE POOL, IN VIOLATION OF 17 C.F.R. § 4.20, AGAISNT TYCHE ASSET MANAGEMENT LLC AND PHILLIP GALLES**

101. The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

102. With certain exemptions not applicable here, 17 C.F.R. § 4.20(a) requires that a CPO must operate its commodity pool as an entity cognizable as a legal entity separate from its operator.

103. 17 C.F.R. § 4.20(b) prohibits CPOs from receiving pool participants' funds in any name other than that of the pool.

104. 17 C.F.R. § 4.20(c) prohibits a CPO from commingling the property of any pool it operates with the property of any other person.

105. Tyche Asset Management LLC, while acting as a CPO, failed to operate its commodity pools as legal entities separate from the pools' operator, failed to receive pool participants' funds in the name of the pools when funds were deposited funds into Tyche Asset Management LLC's bank accounts, and commingled the property of the pools and pool participants' funds with property of Defendants and others.

106. By reason of the foregoing, Defendant Tyche Asset Management LLC violated 17 C.F.R. § 4.20(a)-(c).

107. Defendant Galles controlled Tyche Asset Management LLC directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche Asset Management LLC's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 17 C.F.R. § 4.20(a)-(c).

108. Each act of improperly receiving pool participants' funds and commingling the property of the Tyche pool with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(b)-(c).

**COUNT 5 – MISREPRESENTATIONS TO NATIONAL FUTURES ASSOCIATION IN VIOLATION OF 7 U.S.C. § 13(a)(4), AGAINST TYCHE ASSET MANAGEMENT LLC AND PHILLIP GALLES**

109. The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

110. Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4), makes it unlawful for any person willfully to falsify, conceal, or cover up by trick, scheme or artifice a material fact, or to make any false, fictitious, or fraudulent statements or representations, or to make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, or futures association designated or registered under the Act and acting in furtherance of its official duties under the Act.

111. Tyche Asset Management LLC and Galles violated 7 U.S.C. § 13(a)(4) by willfully:

    a. falsifying, concealing, or covering up by trick, scheme or artifice, material facts about the operations of the Tyche entity defendants in filings with, and in communications with representatives of, NFA, a futures association designated or registered under the Act acting in furtherance of its official duties; and

    b. making false, fictitious, or fraudulent statements or representations to NFA, a futures association registered under the Act, in connection with an examination, in furtherance of National Futures Association's official duties under the Act.

112. The foregoing acts, omissions, and failures occurred within the scope of Galles' employment or office with Tyche Asset Management LLC. Therefore, Tyche Asset Management

COMPLAINT – PAGE: 27

LLC is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 13(a)(4), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

113. Defendant Galles controlled Tyche Asset Management LLC directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche Asset Management LLC's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 7 U.S.C. § 13(a)(4).

114. Each act of willful concealment and/or false, fictitious, or fraudulent statement Galles and/or Tyche Asset Management LLC made to NFA including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 13(a)(4).

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

(a)    An order finding that Defendants violated Sections 4b(a)(1)(A)-(C), 4*o*(1), 6(c)(1) and 9(a)(4) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6*o*(1), 9(1), and 13(a)(4), and Commission Regulations 4.20(a)-(c) and 180.1(a)-(c), 17 C.F.R. §§ 4.20(a)-(c), 180.1(a)-(c) (2022).

(b)    An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

    (i)    engaging in conduct in violation of 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6*o*(1), 9(1), and 13(a)(4), and 17 C.F.R. §§ 4.20(a)-(c) and 180.1(a)-(c);

    (ii)    trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

    (iii)    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for Defendants' own

accounts or for any account in which they have a direct or indirect interest;

(iv)     having any commodity interests traded on Defendants' behalf;

(v)     controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(vi)     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(vii)     applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

(viii)     acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9);

(d)     An order requiring Defendants and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

(e)     An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the pool participants whose funds were received by them as a result of the acts and practices that constituted violations of the Act and Regulations, as described herein;

(f)     An order requiring Defendants to make restitution by making whole each and every pool participant whose funds were received or utilized by them in violation of the provisions of the Act and Regulations as described herein, including pre-judgment interest;

(g)     An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act, as described herein;

(h)     An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

(i)     Such other and further relief as the Court deems proper.

Date:   May 11, 2023

Attorneys for Plaintiff,

Commodity Futures Trading Commission

***/s/ Carlin Metzger***
IL ARDC No. 6275516

Carlin Metzger (cmetzger@cftc.gov) (312) 596-0536
Senior Trial Attorney

David Terrell (dterrell@cftc.gov) (312) 596-0539
Chief Trial Attorney

Scott R. Williamson (SWilliamson@cftc.gov)
Deputy Regional Counsel

Commodity Futures Trading Commission
Ralph Metcalfe Federal Building
77 W. Jackson, Suite 800
Chicago, IL 60604
(312) 596-0700
(312) 596-0714 (fax)

COMPLAINT – PAGE: 30

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

# *CFTC v. Galles*

United States District Court for the Northern District of Illinois

November 8, 2023, Decided; November 8, 2023, Filed

1:23-CV-02970

**Reporter**

2023 U.S. Dist. LEXIS 232915 *; 2023 WL 9189945

COMMODITY FUTURES TRADING COMMISSION, Plaintiff, v. *PHILLIP GALLES*, TYCHE ASSET MANAGEMENT LLC, TYCHE MASTER FUND LTD, TYCHE ASSET TRADE LLC, TYCHE OFFSHORE FUND LTD., TYCHE ONSHORE FUND LP, TYCHE PML MASTER FUND LTD., TYCHE PML ONSHORE FUND L, TYCKE ONSHORE FUND GP LLC, and TYCHE ASSET TRADE LLC, Defendants.

## Core Terms

pool, commodity, funds, entity, trading, registered, Restitution, Monitor, Defendants', indirectly, bank account, soliciting, deposited, futures trading, willfully, Options, Regulation, customers, omissions, interstate commerce, trading account, material fact, misleading, monetary penalty, future delivery, deceive, returns, Notice, misrepresentations, INJUNCTION

**Counsel:** **[*1]** For Commodity Futures Trading Commission, Plaintiff: David A. Terrell, Scott Robert Williamson, U.S. Commodity Futures Trading, Chicago, IL USA; Carlin R Metzger, U.S. Commodity Futures Trading Commission, Chicago, IL USA.

**Judges:** Hon. Elaine Bucklo, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Elaine Bucklo

## Opinion



PLAINTIFF'S EXHIBIT

E
_____

**ORDER FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER STATUTORY AND EQUITABLE RELIEF**

On May 11, 2023, the Commodity Futures Trading Commission ("CFTC" or "Commission" or "Plaintiff") filed a Complaint charging Defendants *Phillip Galles*

("*Galles*"), Tyche Asset Management LLC, Tyche Master Fund Ltd, Tyche Asset Trade LLC, Tyche Offshore Fund Ltd., Tyche Onshore Fund LP, Tyche PML Master Fund Ltd, Tyche PML Onshore Fund LP, and Tyche Onshore Fund GP, LLC (collectively "Defendants," and when the entity defendants are described separately, they are referred to as the "Tyche entity defendants" or "Tyche") with violating Sections 4b(a)(2)(A)-(C), 4o(1)(A)-(B), 6(c)(1), and *9(a)(4) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(2)(A)-(C)*, *6o(1)(A)-(B)*, 9(1), and 13(a)(4), and Commission Regulations ("Regulations") 180.1(a)(1)-(3) and *4.20(a)-(c), 17 C.F.R. Pts. 180.1(a)(1)-(3)* and 4.20(a)-(c) (2022).

On July 7, 2023, Defendants were properly served with the summons and Complaint pursuant to the Court's Order granting Plaintiff's Motion for an Order Allowing Service Upon Defendants by Alternative Means (Dkt. No. 9) **[*2]** by (1) sending the Summons and Complaint via ordinary mail, no signature required, to *Galles* at his residence; (2) sending the Summons and Complaint by email to *Galles*' personal email account; and (3) leaving copies of the Summons and Complaint posted on or at the doorstep of the door to *Galles*' residence.

Defendants have failed to appear or answer the Complaint within the time permitted by *Fed. R. Civ. P. 12(a)(1)*. The Commission filed a motion for entry of a clerk's default against Defendants, and on October 5, 2023, the Court entered a default pursuant to *Federal Rule of Civil Procedure 55(a)* against Defendants. (Dkt. No. 16.)

The Commission has moved this Court to grant final judgment by default against Defendants, including permanent injunctive relief, the imposition of a restitution obligation, and the imposition of a civil monetary penalty.

The Court has carefully considered the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Commission's memorandum in support of its motion for default judgment, the affidavit of CFTC Investigator Joseph Patrick submitted in support of the

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 138 of 191 PageID #:138

Page 2 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

motion, and the record in this case. The Court being advised in the premises, it is hereby:

**ORDERED** that the Plaintiff's Motion for Final **[*3]** Judgment by Default, Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief against Defendants is **GRANTED**. Accordingly, the Court enters findings of fact, conclusions of law, and an Order of Final Judgment by Default for Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief ("Order") pursuant to *Section 6c of the Act, 7 U.S.C. § 13a-1*, as set forth herein.

## I. FINDINGS OF FACT

### A. The Parties

1. Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, *7 U.S.C. §§ 1-26*, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2022).

2. Defendant ***Phillip Galles*** resides in Chicago, Illinois and during the relevant period described by the Complaint of October 2019 to May 2023 (the "Relevant Period"), was a principal and owner of the Tyche entity defendants. ***Galles*** was registered with the National Futures Association ("NFA"), the self-regulatory organization for the U.S. derivatives industry, as an Associated Person ("AP") of Tyche Asset Management LLC, a CFTC-registered Commodity Pool Operator ("CPO").

3. Defendant Tyche Asset Management LLC is a Delaware limited liability company organized in **[*4]** October 2019 that maintained offices at One North Wacker Drive and One South Dearborn Street in Chicago, Illinois. Tyche Asset Management LLC has been registered with the CFTC as a CPO since March 1, 2021.

4. Tyche Master Fund Ltd is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois. According to Defendants' filings with NFA, Tyche Master Fund Ltd is a "Master fund (a pool in which its only participants are other pools operated by the same for or an affiliate)." ***Galles*** opened at least two trading accounts in the name of Tyche Master Fund Ltd at CFTC-registered Futures Commission Merchants ("FCMs").

5. Tyche Offshore Fund Ltd is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois. According to a private placement memorandum provided by ***Galles*** to a registered FCM, this entity "is a collective investment vehicle organized and managed by Tyche Asset Management, LLC."

6. Tyche Onshore Fund, LP is a Delaware limited partnership with its principal place of business in Chicago, Illinois. According to a private placement memorandum provided by ***Galles*** to a registered FCM, this entity is a "feeder **[*5]** fund" into Tyche Master Fund Ltd, with an investment objective of seeking "superior risk-adjusted rates of return with no significant correlation to any major market index" through the purchase and sale of "futures contracts, options on futures contracts, derivatives, securities, options on securities, foreign exchange contracts, and other financial instruments on domestic and international exchanges and markets." The "investment manager" of the fund is Tyche Asset Management LLC.

7. Tyche PML Master Fund Ltd is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois. According to a private placement memorandum Tyche filed with NFA, this fund is a "master" fund commodity pool under the management of ***Galles*** and Tyche Asset Management LLC.

8. Tyche PML Onshore Fund LP is a Delaware limited partnership with its principal place of business in Chicago, Illinois. According to a private placement memorandum Tyche filed with NFA, this fund is a "feeder" fund into Tyche PML Master Fund, Ltd, with Tyche Asset Management LLC functioning as the "Investment Manager" of both, and Tyche Onshore Fund GP LLC being the fund's "General Partner."

9. Tyche Onshore **[*6]** Fund GP, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. It is the "general partner" of Tyche PML Onshore Fund LP.

10. Tyche Asset Trade LLC is a Delaware limited liability company with its primary place of business in Chicago, Illinois. In a private placement memorandum ***Galles*** provided to a CFTC-registered FCM, Tyche Asset Trade LLC was described as a "proprietary trading firm" affiliated with Tyche Asset Management LLC. ***Galles*** solicited several participants to execute an "investment agreement" with Tyche Asset Trade LLC, with ***Galles*** purportedly acting as the "investment manager."

11. During the Relevant Period, the Tyche entity

Joseph Borders

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 139 of 191 PageID #:139

Page 3 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

defendants shared a single website: tycheam.com. Despite being incorporated or organized in various jurisdictions, the Tyche entity defendants' business operations were all conducted from the same offices and through the same employees. **_Galles_** comingled funds received from participants in various Tyche entity bank and trading accounts for the various Tyche entities. There was no operational distinction between the entities in the overall Tyche business scheme. **_Galles_** controlled the operations of the Tyche **[\*7]** entity defendants, including their financial activity in bank and trading accounts.

## B. Overview of the Tyche Scheme

12. **_Galles_** received at least $6 million from approximately 50 individuals throughout the United States since October 2019 to invest with the Tyche entity defendants. **_Galles_** described Tyche to prospective participants as a "managed futures" fund that traded futures and options contracts on the Chicago Board of Trade and Chicago Mercantile Exchange.

13. **_Galles_** claimed he was a billionaire hedge-fund magnate who oversaw Tyche's sprawling trading operation, which he claimed had more than 100 employees based in offices in Chicago, Miami, London, and other locations. **_Galles_** further claimed to employ sophisticated technology and strategies that generated returns in excess of 200% in recent years trading commodity futures and options. All of these claims were false.

14. **_Galles_** told prospective participants of the depth of his experience and expertise trading commodities. He claimed to be the valedictorian of a prestigious U.S. university. He touted his past success as a manager of a hedge fund based in Bermuda, where he supposedly was responsible for managing a portfolio worth billions **[\*8]** of dollars. He claimed to have sold a previous fund before launching Tyche in 2019 after awaiting the expiration of a non-compete agreement. All of these claims were false.

15. **_Galles_** also used Tyche's status as an entity registered with the CFTC to deceive participants into depositing funds with Tyche.

16. **_Galles_** filed documents with NFA to register Tyche Asset Management LLC as a CPO. In filings with NFA, **_Galles_** represented that this entity would — in the future — be responsible for operating numerous commodity pools. In his applications and in all subsequent filings, **_Galles_** represented that the Tyche funds were not currently active, and he and Tyche were not actively soliciting participants.

17. **_Galles_** bolstered his pitch to prospective participants by cultivating an image of personal wealth and sophistication. For example, in public posts to his "**_phillip_** g724" and "tradeitup" Instagram accounts, **_Galles_**:

a. boasted about his luxury car collection that supposedly included multiple Lamborghinis and Ferraris;
b. bragged about his luxury homes in Miami, Chicago and Palm Beach;
c. described his high-end watch collection alongside photos of Rolex and Longines watches;

d. claimed to be hanging **[\*9]** art by Picasso and Chagall in one of his homes; and
e. touted the opening of Tyche offices in Chicago, Miami and London.

18. **_Galles_**' claims about his personal and business success were false. In fact, since he first opened a bank account in the name of a Tyche entity in 2019, **_Galles_** used almost none of the funds he received from participants to place any trades. Instead, **_Galles_** used the money he received into Tyche bank accounts from the participants he solicited (or hired others to solicit for him) to fund his lavish lifestyle and to further promote his fabricated image of a hedge fund magnate.

## C. **_Galles_**' Fabricated Tyche Operations, Trading Strategies, and Investment Returns

19. **_Galles_** made a grandiose pitch to prospective participants. In a "Fire Side Chat" interview video posted to Youtube in January of 2021, **_Galles_** advertised his Tyche fund. During this public interview, **_Galles_** echoed false and misleading statements that he also made directly to prospective participants. **_Galles_** made false claims, including that:

a. Tyche had "in the U.S. $275 million under management, and $1.7 billion off shore."
b. "Last year we had a stellar year, a 238% return."

c. "I've been in hedge fund industry **[\*10]** since 2008. From 2011 to 2018 I was part owner of a company called Peregrine. We were based in Bermuda. We were a $3 billion hedge fund, and I've been averaging about 22% return every year since 2010. Last year's 238% gain brings that average up to over 44%."
d. "I've got about 30 employees that work for us, and 15 of them are ex-Goldman employees."

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 140 of 191 PageID #:140

Page 4 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

e. "Everything is based off of algorithms and programmers."

f. "60% of our trades go through the S&P and NASDAQ. Another 40% are used in currencies and bonds, depending on how we see the market."

g. "As of next summer we will be a $5 billion fund, and I just raised $3 billion from a New York Pension group."

h. "I can do up to $10 billion managed-wise. After that it gets a little too difficult [...] We're small and nimble [...] I'm trying to stay under the $10 billion mark."

20. *Galles* used a similar pitch in promotional materials provided directly to participants. For example, *Galles* and Tyche falsely claimed in promotional materials that:

a. Tyche is "Committed to delivering Prosperity and Fortune to our clients."

b. "Tyche was founded in late 2018 after analyzing years of model combinations on Long-Term, Intermediate-Term, Short-Term, High-Frequency **[*11]** & Options strategies coordinated to technically drive as one. This strategy has proven the possibility of generating annual returns of 25%+ each year."

c. "Tyche is a new venture whose genesis is the vision of founder *Phillip Galles*. *Galles* has 30 years of Stock Options, Futures, Foreign Exchange & Risk Arbitrage experience. *Phillip* started on the Floors of the CBOT and CBOE as a market maker for Stock Options, Bond Options, Futures, FX Options, and off the floor Risk Arbitrage from 1992-2007. In 2007 *Phillip* joined the hedge fund world starting at the Pelerine Fund as a FX Forward and FX Options trader. From 2012 to 2019 *Phillip* joined the Peregrine Fund and became a Senior Asset/Portfolio Manager-Partner and eventual owner of the fund capping off an average return of over 24% every year for that duration. During his time there he developed the use of his highly profitable "Swing Trade" technique which lasts from (1 to 4 day). He also used another profitable technique called "Medium Term" (30, 60 & 240 minute) along with a short term "High Frequency" strategy. During those years *Phillip* started using a technically based trading concept working with a combination of Futures and Options. **[*12]** *Phillip*'s current model is based on many market momentum concepts while still using his own proprietary Short-Term methodology & Swing Trade concepts. *Phillip* has been a registered CME Member, CBOE & NFA member as well."

d. "Tyche's current strategy is to filter in low-risk entry to gain access at exactly the precise moment to maximize potential gains. After entry, the model is designed to define risk with each additional position and evaluate levels in real time to establish an exit strategy as the market regresses to the mean. We closely monitor open positions to lower our risk, both upside and downside until objectives are achieved."

e. "Additionally, our Long-Term Model uses longer time frames seeking Undervalued and Overvalued market extremes. We use Call and Put Options to help with fluctuations before the extremes in the market are generated. This intertwines our short-term approach with our long-term positions. This combination aims to significantly lower the volatility and drawdowns for longer-term positions, while the short-term is actively managed using an intraday strategy. The long-term approach is directional and can be highly correlated together with the short-term."

f. **[*13]** "In summary: Our risk management techniques are designed to limit daily drawdowns to 5% of margin. When compounded over time, returns may outperform the Dow Jones Industrial Average, Nasdaq Composite, and the S&P 500 with less downside volatility. Our non-correlated model-driven approach tempers the downside volatility while aiming to enhance returns during trending markets."

g. "Tyche is dedicated to 'Prosperity and Fortune.' We have a strategy that focuses on generating consistent income through our proven proprietary trading strategy."

h. "We're continuously grateful for our success, but we are never fully satisfied. Outperformance is our expectation, and our definition of a meaningful Long-Term Investment is one that stretches far beyond a few weeks, months, or years."

21. *Galles* also gave prospective participants promotional materials in which he fabricated trading strategies supposedly employed by Tyche. For example, in a presentation provided to one participant, *Galles* described the purported trading strategies employed by Tyche. *Galles* described an "Automated Trading Model" with a "Repeatable Strategy." He claimed that Tyche "continuously evaluates thousands of securities prices **[*14]** for multiple time frames simultaneously." He went on to describe five "automated trading models looking across 11 different time frames for Futures; S&P500, Nasdaq 100; Treasuries, Crude Oil, Gold and FX."

a. "Model 1: Directionally biased Market Making. The

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

algorithms mimic an experienced market maker, but with a speed, accuracy no human trader could achieve, over a number of instruments simultaneously.

b. Model 2: Algorithmically determined 'inflection points' are filtered using order book dynamics/market microstructure analysis to profit from price movements in either direction around these areas.

c. Model 3: Continuously evaluates thousands of securities prices across multiple time frames simultaneously, referred to as 'local rotation analysis' to determine the rotational direction in the market.

d. Model 4: Complete 'U' Rotation. Primarily mean reverting. However, longer term model instances will not trade against a strong trend. Directionally biased market making (short term trading) based on 30 years of historical data. Repeat?

e. Model 5: Standard Pattern Recognition algorithm with continual optimization based on years of historical data used to make trading decisions without curve **[*15]** fitting."

22. In fact, *Galles* and Tyche placed only a few trades in a futures trading account in the name of a Tyche entity, and those futures trades did not occur until January of 2023, well after *Galles* claimed to have been employing these purported models.

23. *Galles* had participants sign agreements with various Tyche entities including Tyche Asset Management LLC and Tyche Asset Trade LLC. *Galles* and Tyche made misleading statements and misrepresentations in these participant agreements. For example,

a. "The investment manager undertakes to maintain the funds entrusted to it separate from its own assets and away from the claims of creditors."

b. "The Manager performs investment advisory services for various clients and the investment funds (including the Pooled Funds) that it manages.

c. "The Manager . . . will ensure that all investments and recommendations made on behalf of the Account are suitable for the Client."

24. *Galles* and Tyche also provided prospective participants and participants with a fictional trading history for Tyche, and specific, false historic trading results. For example, Tyche promotional materials stated that Tyche had no losing months; that Tyche had a 190.18% **[*16]** rate of return for 2020; a 133.22% rate of return for 2021; and a year-to-date rate of return of 84.51% for 2022 as of July 2022. In another presentation to a different participant, *Galles* and Tyche claimed that

Tyche outperformed the S&P 500 by more than 300% in 2020. In fact, Tyche did not place any trades in any trading account during this time period.

25. Tyche did not place any trades at all in 2020, 2021 or 2022. The only trades placed in a Tyche futures trading account occurred in January and February 2023. And those few futures trades were in an account that first received a deposit of $25,000 in September of 2022. Most of the funds in that trading account were withdrawn by Tyche in February 2023, after only a few trades.

26. *Galles*' and Tyche's claims of massive profitable trading returns in promotional materials, in verbal statements, and in account statements provided to participants, are false.

### D. *Galles* Misappropriated Tyche Participant Funds

27. *Galles* used the funds deposited by participants into Tyche's bank accounts to pay his own personal expenses, to repay certain earlier participants, and to pay expenses designed to make Tyche appear to be a legitimate operation.

28. **[*17]** In general, *Galles* directed the individuals he solicited to invest with Tyche to deposit their funds into a bank account in the name of Tyche Asset Management LLC.

29. For example, in February of 2021 a participant made an initial investment with Tyche, depositing $25,000 into a bank account in the name of Tyche Asset Management LLC. Those funds were not transferred to any trading account. Instead, in the days following the deposit of this participant's funds, *Galles* used the funds to pay personal expenses including payments to Uber, Macy's and Best Buy.

30. On September 6, 2022, a second participant deposited $200,000 to a bank account in the name of Tyche Asset Management LLC. The following day, a third participant deposited $100,000 to that same Tyche bank account. Only a small portion of the funds received into this Tyche bank account during September 2022 were transferred to a trading account, and ultimately almost none of this money was used for trading activity.

31. The customer funds deposited to Tyche's bank account in September 2022 were instead used for other purposes, such as the repayment of portions of investments made by certain earlier participants, payments to Tyche employees **[*18]** or contractors, or

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 142 of 191 PageID #:142

Page 6 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

for personal expenses. In September 2022, *Galles* transferred at least $55,000 to employees or contractors for Tyche, made payments of at least $40,000 to law firms, paid $18,790 in rent for his personal residence in a high-end apartment building in Chicago, spent more than $14,000 at a jeweler, paid $6,000 to Dynasty Luxury (a luxury car rental service in Miami), and paid $19,282.80 towards a credit card.

### E. *Galles* Controlled the Tyche Entities

32. *Galles* controlled the operations of the Tyche entity defendants. According to a Tyche private placement memorandum, *Galles* is "the founder and sole owner of the General Partner and Investment Manager and the trading principal of the [Tyche] Master Fund. [...] In November 2019, Mr. *Galles* began forming the Investment Manager and now serves as its Chief Executive Officer, Chief Investment Officer, and Chief Compliance Officer." *Galles* is identified in filings with the CFTC and NFA as the key point of contact and the executive responsible for various key functions for Tyche.

33. *Galles* first applied to the CFTC to register Tyche Asset Management LLC as a CPO on March 25, 2020. The application states that it was "submitted by [*19] *Phillip Galles*." *Galles* is listed as the only point of contact for Tyche Asset Management LLC in this and the other applications filed for Tyche Asset Management LLC to register with the CFTC as a CPO. *Galles* is identified as the point of contact for Tyche's enforcement, NFA membership, accounting, arbitration, and compliance functions.

34. *Galles* is also identified as the key point of contact at Tyche in filings with NFA. According to a Pool Quarterly report for CPOs submitted on behalf of Tyche for the quarter ending December 31, 2021, for example, *Galles* is identified as President, Chief Compliance Officer and the relevant point of contact for Tyche Asset Management LLC.

35. *Galles* is also a signatory for and an authorized person for all of the Tyche entities' bank and financial accounts. *Galles* signed account opening documents for Tyche Asset Management LLC in applications for accounts at several banks in Chicago. *Galles* identified himself as the "Managing Member" of Tyche Asset Management LLC on bank account opening documents.

36. *Galles* signed corporate resolutions for Tyche entities. For example, *Galles* signed a December 2020 resolution as the "designated representative" of Tyche [*20] Asset Management LLC to authorize his access to and control over a TAM LLC bank account at Chicago-based bank.

37. In an application *Galles* submitted to an FCM to open a trading account in the name of a Tyche entity, *Galles* represented that he is the only person authorized to act on behalf of the Tyche Master Fund Ltd.

### F. Tyche Issued False or Misleading Account Statements to Participants

38. During the Relevant Period, Defendants sent periodic account statements to participants that misrepresented the value of their respective interests in the Pool, and falsified returns. The statements reflected that Tyche participants' funds were earning consistent profits with no losses.

39. For example, a participant received a Tyche "Earnings Statement" for "Fourth Quarter 2022" that included the following claims: "For the Fourth Quarter of 2022, Tyche Asset Trade generated a Net Return of 25.47%." This statement was false, as Tyche did not place any trades during the fourth quarter of 2022.

40. The Quarterly statement provided to this participant also represented that Tyche's "Proprietary Model-Driven Performance" outperformed the S&P 500 index in each month of the 4th quarter of 2022. The statement [*21] claimed Tyche achieved a return of 11.7% in October 2022; a 7.58% return in November 2022; a 6.19% return in December 2022; and a year-to-date return of 137.39%. These figures were entirely fabricated, as Tyche had no trading activity at all in 2022.

41. In a quarterly account statement issued to this participant for the period ending March 31, 2023, Tyche valued the participant's account at $354,578.53, and claimed a 25.92% rate of return for the account, with income during the first quarter of 2023 of $72,988.21. These figures were fabricated, and the statement issued to this participant was false.

### G. *Galles* Lied to Prolong His Scheme and Delay Return of Funds

42. In late 2022, *Galles*' scheme began to unravel as several participants sought to withdraw their funds. *Galles* did not have sufficient funds to meet these customer withdrawal requests. *Galles* attempted to delay the return of participant funds by lying about, among

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 143 of 191 PageID #:143

Page 7 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

other things, the location of Tyche funds, and the process he needed to undertake to return investor funds.

43. For example, on December 12, 2022, a participant submitted a request to Tyche to withdraw a portion of his invested funds. *Galles* did not immediately return [*22] any funds, but indicated that he would begin the process of returning this participant's funds.

44. As of February 6, 2023, *Galles* and Tyche had not returned the participant's funds. On February 6, 2023, *Galles* told this participant that he was at the bank, claiming he was on the verge of correcting purported problems sending the participant's funds by wire transfer. *Galles* wrote, "I think everything is cleared up. I'm just waiting for them to send me this last docusign. Then I should be good to go." He added, "Trying to get this out before 4 PM. If not, you'll get it tomorrow morning for sure I'm gonna be sending you 55,000 to cover the problems that we had in the last few weeks. I truly apologize that this got so fucked up."

45. The next day, February 7, 2023, *Galles* wrote: "Money will coming from Wintrust this morning. It will come in small amounts because they are limiting me to 100k a day and 25k per customer in transfers. You will see 25k this morning. I will be at BMO later this morning to get that solved so that we can wire from multiple accounts. Finally getting things out. So sorry for the delay."

46. When the wire did not immediately arrive, the participant followed up. *Galles* [*23] wrote: "You should see it. In the next half hour they had to ask more questions in the wire department. So I called them. I literally just got off the phone with them about pushing us through right now."

47. *Galles* was unable to return the full amount of Participant C's funds. On February 15, 2023, Participant C asked "when do I get rest of distribution?" *Galles* responds that he would have sent it, but his daughter had serious medical issues that needed to be addressed that impeded his ability to wire all of the requested funds.

48. *Galles* continued to delay and make additional excuses for his inability to return the participant's funds. On February 16, 2023, *Galles* wrote "I am headed back to Chicago later this afternoon. I have to go to Milwaukee to pick my car then head back home. The banks do not have us set up to make wires from my online account so I have to go in there and get things set up. I will text you tomorrow once everything is done"

49. On February 18, still not having received his funds, the participant wrote to *Galles*: "I ended up putting my property taxes on my credit card. 3 properties. All together it's $50k. Thought I would have money weeks ago. Credit cards are at [*24] 18% interest. I'm not worried about a wire fee. I just want to get these damn credit cards paid off. Please send money!!!!!!!!!!!! No one has replied toot [sic] my email. I want my entire balance back. Filled out the form. When do I get that???"

50. On March 3, 2023 *Galles* wrote that his money "will go out Monday because [another participant] wanted all of her money now so I had to put everybody else on Monday. I'm still here trying get them to raise the limit so I can go above $500,000. She said that everybody else needed to wait because she's been on hold the longest."

51. On March 24, 2023, *Galles* sent an image of a purported pending balance of a checking account at BMO Harris for $20,200,000. *Galles* claimed he was waiting for the pending funds to clear to the account in order to send funds.

52. On March 27, 2023, *Galles* claimed "I talk to the head of compliance and the law department and I wasn't aware that they put a 48 hour hold because it was transferred to a new account which they are holding tomorrow 10% of the total transfer which I already knew of and then I'll be able to transfer Wednesday morning Everything out. Friggen finally!!! Yay I feel relieved"

53. On March 29, 2023 [*25] *Galles* continued to make excuses to delay returning funds: "Ran into a major personal problem which put in the emergency room. I will be out in a little bit. A pill opened up in my throat by accident and closed my throat for 2 full minutes. I thought that it was an onion and tried to get it back up. It didn't go so well."

54. *Galles* employed similar delay tactics, and made similar excuses as to his inability to return funds, in communications with other Tyche pool participants who attempted to withdraw funds during the fall of 2022 and spring of 2023.

### H. *Galles* and Tyche Asset Management LLC Lied in Filings with NFA, and in Response to Questions from NFA Examiners

55. *Galles*' and Tyche Asset Management's misrepresentations to NFA began with the applications filed to register Tyche as a CPO, and continued through false statements to NFA staff in April of 2023 after NFA

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 144 of 191 PageID #:144

Page 8 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

initiated an examination of the Tyche entities following complaints by customers about potential fraud by *__Galles__* and Tyche.

56. *__Galles__* filed, or caused to be filed, various reports with NFA in order to maintain the registration of Tyche Asset Management LLC as a CPO.

57. As a part of its regulatory duties, NFA requires that **[*26]** member firms including CPOs such as Tyche Asset Management LLC complete and file an Annual Questionnaire. The questionnaire provides NFA with information on a member's activities and operations, serves as a continuous source of data for NFA's risk monitoring systems, and is frequently the first resource that NFA staff reviews when engaging with or performing work related to a Member.

58. Tyche Asset Management LLC, acting through its employees or agents including *__Galles__*, filed an Annual Questionnaire with NFA on July 13, 2022 for the annual period ending May 31, 2022. On the questionnaire, the primary contact for Tyche Asset Management LLC was *__Phillip Galles__*, and *__Galles__* was also identified as the Chief Executive Officer of the firm.

59. The first substantive question on the Annual Questionnaire form asks, "Does the firm currently have customers and/or pools that engage in activity relating to commodity interests?" Tyche Asset Management LLC answered "No." The second question on the form asks, "Does the firm currently solicit customers to trade commodity interests? Tyche Asset Management LLC answered "No." Tyche Asset Management LLC also represented in this form that while it had three **[*27]** commodity pools, it had "not yet accepted investor funds into the pools." These statements to NFA were false. The Tyche entities had been soliciting and accepting funds from customers to trade commodity interests since at least 2019.

60. NFA also requires CPOs to file quarterly reports. Tyche Asset Management LLC filed at least seven quarterly reports with NFA between June 2021 and December 2022. In each of those quarterly reports, Tyche Asset Management LLC stated that it had no assets under management and no assets or liabilities. These statements were false, as the Tyche entities had accepted funds from participants for the purpose of trading commodity interests, and had substantial liabilities to its participants.

61. In April 2023, in furtherance of its official duties under the Act, NFA staff initiated an examination of the Tyche

entities. In connection with that examination, NFA representatives spoke with *__Phillip Galles__*.

62. On April 3, 2023, *__Galles__* told NFA representatives that the Tyche entities did not have any customers. *__Galles__* told NFA representatives that Tyche did engage in trading, but only "proprietary" trading through an affiliated entity. These statements are false and **[*28]** misleading because *__Galles__* and the Tyche entities had been soliciting customers and accepting customer deposits since at least 2019 for the purposes of trading commodity interests in a commodity pool.

63. On April 3, 2023 *__Galles__* also told NFA representatives that Tyche was engaged in futures trading through a proprietary account at UBS. This statement is false, as the Tyche entities do not have any account at UBS.

## I. Losses Suffered by Defendants' Victims, and Gains to Defendants

64. Defendants' victims deposited funds into bank accounts in the names of the Defendants, all controlled by *__Galles__*.

65. During the Relevant Period, Defendants' victims deposited $6,262,673 into Defendants' bank accounts for the purpose of investing in a commodity pool. $935,500 of the pool participant deposits were repaid, leaving an unpaid balance of $5,327,173 still owed to pool participants.

66. Defendants gained an amount equal to the losses suffered by their victims: $5,327,173

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

67. This Court has jurisdiction over this action pursuant to *Section 6c of the Act, 7 U.S.C. § 13a-1*, which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage **[*29]** in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

68. Venue properly lies with this Court pursuant to *7 U.S.C. § 13a-1(e)*, because the Defendants resided or transacted business in this jurisdiction and the acts and practices in violation of the Act and Regulations occurred within this District, among other places.

**B. Defendants' Registrations and Regulatory Status with CFTC and NFA**

69. **_Galles_** and the Tyche entities operated a "Commodity Pool" as defined by the Act. *Section 1a(10) of the Act, 7 U.S.C. § 1a(10)*, defines a "commodity pool" as any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any commodity for future delivery, security futures product, swap, or commodity option.

70. Tyche Asset Management LLC is a "Commodity Pool Operator" as defined by the Act. *7 U.S.C. § 1a(11)(A)(i)*, in relevant part, defines a CPO as any person engaged in a business that is of the nature of a commodity pool, **[*30]** investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including commodities for future delivery, security futures products, and swaps.

71. The individuals who **_Galles_** solicited to invest with Tyche are "participants" in the pool within the meaning of *Regulation 4.10(c), 17 C.F.R. § 4.10(c) (2022)*, which defines a "participant" as any person who "has any direct financial interest in a pool (e.g., a limited partner)."

72. **_Galles_** is an AP of Tyche as defined in *Section 4k of the Act, 7 U.S.C. § 6k*, and Regulation 1.3, *17 C.F.R. § 1.3 (2022)*. Those provisions, with certain qualifications, define an AP as a natural person associated with any CPO as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves: (i) the solicitation of funds, securities, or property for a participation in a commodity pool; or (ii) the supervision of any person or persons so engaged.

**C. Fraud in Violation of _7 U.S.C. § 6b(a)(1)(A)-(C)_: Misrepresentations and Omissions, False [*31] Account Statements, and Misappropriation of Participant Funds**

73. In Count 1 of the Complaint, Plaintiff alleges fraud by all Defendants in violation of Section 4b(1)(A)-(C) of the Act, *7 U.S.C. § 6b(1)(A)-(C)*, which makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person:

a. to cheat or defraud or attempt to cheat or defraud the other person;
b. willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; and/or
c. willfully to deceive or attempt to deceive the other person by any means. 22

74. Defendant **_Phillip Galles_**, and the Tyche entity defendants acting together as a common enterprise, in or in connection with commodities for future delivery made, or to be made, on or subject to the rules of a designated contract market,

a. knowingly cheated or defrauded, or attempted to cheat or defraud Tyche pool participants by, among other things, making material misrepresentations **[*32]** and omissions regarding Defendants' experience and expertise, trading performance, trading track record, the value of their interest in the Pool, and by misappropriating their funds;
b. willfully made or caused to be made false reports or statements to Tyche commodity pool participants; and
c. willfully deceived or attempted to deceive pool participants by, among other things, making material misrepresentations and omissions regarding Defendants' experience and expertise, trading performance, trading track record, the value of their interest in the Pool, and by misappropriating their funds.

75. By reason of the foregoing, Defendants violated *7 U.S.C. § 6b(a)(1)(A)-(C)*.

76. The foregoing acts, omissions, and failures of **_Galles_** described above in the Findings of Fact occurred within the scope of **_Galles_**' employment or office with Tyche. Therefore, Tyche is liable for his acts, omissions, and failures in violation of *7 U.S.C. § 6b(a)(1)(A)-(C)*, pursuant to *Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B)*, and Regulation 1.2, *17 C.F.R. § 1.2 (2022)*.

Joseph Borders

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 146 of 191 PageID #:146

Page 10 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

77. Defendant *Galles* controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's fraudulent conduct. Therefore, under *Section 13(b) of the Act, 7 U.S.C. § 13c(b)*, *Galles* is liable for Tyche's violations of *7 U.S.C. § 6b(a)(1)(A)-(C)*.

**D. Fraud by a Commodity Pool Operator [*33] and its Associated Person in Violation of *7 U.S.C. § 6o(1)*, by *Galles* and Tyche Asset Management LLC**

78. In Count 2 of the Complaint, Plaintiff alleges fraud by *Galles* and Tyche Asset Management LLC in violation of *Section 4o(1) of the Act, 7 U.S.C. § 6o(1)*, which prohibits any CPO, or AP of a CPO, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, to:

    a. employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or

    b. engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant.

79. During the Relevant Period, Tyche Asset Management LLC, a registered CPO, defrauded and deceived participants of the Tyche commodity pool by using the mails and other means of interstate commerce in violation of *7 U.S.C. § 6o(1)* by, among other things:

    a. misappropriating participant funds;

    b. fraudulently soliciting participants and prospective participants by making material misrepresentations and omitting material facts regarding Defendants' experience and expertise, trading profits, trading performance track record, and the value of participants' interest in the commodity pool; and

    c. causing **[*34]** false account statements to be issued to participants in the commodity pool.

80. *Galles*, while acting as an Associated Person of Tyche Asset Management LLC, a Commodity Pool Operator, willfully defrauded and deceived participants of the Tyche commodity pool by using the mails and other means of interstate commerce in violation of *7 U.S.C. § 6o(1)* by, among other things:

    a. misappropriating participant funds;

    b. fraudulently soliciting participants and prospective participants by making material misrepresentations and omitting material facts regarding Defendants' experience and expertise, trading profits, trading performance track record, and the value of

    participants' interest in the Tyche commodity pool; and

    c. causing false account statements to be issued to participants in the Tyche commodity pool.

81. The foregoing acts, omissions, and failures of *Galles* occurred within the scope of *Galles*' employment or office with Tyche. Therefore, Tyche is liable for his acts, omissions, and failures in violation of *7 U.S.C. § 6o(1)*, pursuant to *7 U.S.C. § 2(a)(1)(B)* and *17 C.F.R. § 1.2*.

82. Defendant *Galles* controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's conduct alleged in Count 2 of Plaintiff's **[*35]** Complaint. Therefore, under *7 U.S.C. § 13c(b)*, *Galles* is liable for Tyche's violations of *7 U.S.C. § 6o(1)(A)* and *(B)*.

**E. Commodity Fraud in Violation of *7 U.S.C. § 9(1)* and *17 C.F.R. § 180.1* by all Defendants**

83. In Count 3 of the Complaint, Plaintiff alleges commodity fraud by all Defendants in violation of *Section 6(c)(1) of the Act, 7 U.S.C. § 9(1)*, and Regulation 180.1(a)(1)-(3) (2022).

84. Section *7 U.S.C. § 9(1)* provides, in pertinent part, that: "It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate[.]"

85. The Commission issued *17 C.F.R. § 180.1* pursuant to this authority. Regulation 180.1(a)(1)-(3) states, in pertinent part, that:

    "It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

        (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

        (2) Make, or attempt to make, any **[*36]** untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 147 of 191 PageID #:147

Page 11 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

misleading; [or]

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

86. Defendant **_Phillip Galles_**, and the Tyche entity defendants acting together as a common enterprise, intentionally or recklessly, in connection with contracts of sale of commodities for future delivery on or subject to the rules of a registered entity,

    a. used or employed, or attempted to use or employ, a scheme or artifice to defraud;

    b. made, or attempted to make, in connection with contracts of sale of commodities in interstate commerce, untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading; and

    c. engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on their customers.

87. As a result, **_Galles_**' and Tyche's fraudulent conduct violated _7 U.S.C. § 9(1)_ and _17 C.F.R. § 180.1(a)(1)-(3)_.

88. The foregoing acts, omissions, and failures occurred within the **[*37]** scope of **_Galles_**' employment or office with Tyche. Therefore, Tyche is liable for his acts, omissions, and failures in violation of _7 U.S.C. § 9(1)_ and _17 C.F.R. § 180.1(a)(1)-(3)_, pursuant to _7 U.S.C. § 2(a)(1)(B)_ and _17 C.F.R. § 1.2_.

89. Defendant **_Galles_** controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's conduct alleged in Count 3 of Plaintiff's Complaint. Therefore, under _7 U.S.C. § 13c(b)_, **_Galles_** is liable for Tyche's violations of _7 U.S.C. § 9(1)_ and _17 C.F.R. § 180.1(a)(1)-(3)_.

## F. Commingling of Funds, Failure to Receive Funds in Commodity Pool's Name, Failure to Separately Operate Pool, in Violation of _17 C.F.R. § 4.20_

90. In Count 4 of the Complaint, Plaintiff alleges that Tyche Asset Management LLC violated _Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c) (2022)_.

91. With certain exemptions not applicable here, _17 C.F.R. § 4.20(a)_ requires that a CPO must operate its commodity pool as an entity cognizable as a legal entity

separate from its operator.

92. _17 C.F.R. § 4.20(b)_ prohibits CPOs from receiving pool participants' funds in any name other than that of the pool.

93. _17 C.F.R. § 4.20(c)_ prohibits a CPO from commingling the property of any pool it operates with the property of any other person.

94. Tyche Asset Management LLC, while acting as a CPO, failed to operate its commodity pools as legal entities separate from the pools' operator, failed to receive pool participants' **[*38]** funds in the name of the pools when funds were deposited funds into Tyche Asset Management LLC's bank accounts, and commingled the property of the pools and pool participants' funds with property of Defendants and others.

95. By reason of the foregoing, Defendant Tyche Asset Management LLC violated _17 C.F.R. § 4.20(a)-(c)_.

96. Defendant **_Galles_** controlled Tyche Asset Management LLC directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche Asset Management LLC's conduct alleged in this Count. Therefore, under _7 U.S.C. § 13c(b)_, **_Galles_** is liable for Tyche's violations of _17 C.F.R. § 4.20(a)-(c)_.

## G. Misrepresentations to National Futures Association by Tyche Asset Management LLC and _Galles_ in Violation of _7 U.S.C. § 13(a)(4)_

97. In Count 5 of the Complaint, Plaintiff alleges that Tyche Asset Management LLC violated _Section 9(a)(4)_ of the Act, _7 U.S.C. § 13(a)(4)_.

98. Section _7 U.S.C. § 13(a)(4)_ makes it unlawful for any person willfully to falsify, conceal, or cover up by trick, scheme or artifice a material fact, or to make any false, fictitious, or fraudulent statements or representations, or to make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, **[*39]** or futures association designated or registered under the Act and acting in furtherance of its official duties under the Act.

99. Tyche Asset Management LLC and **_Galles_** violated _7 U.S.C. § 13(a)(4)_ by willfully:

    a. falsifying, concealing, or covering up by trick, scheme or artifice, material facts about the operations of the Tyche entity defendants in filings

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 148 of 191 PageID #:148

Page 12 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

with, and in communications with representatives of, NFA, a futures association designated or registered under the Act acting in furtherance of its official duties; and

b. making false, fictitious, or fraudulent statements or representations to NFA, a futures association registered under the Act, in connection with an examination, in furtherance of National Futures Association's official duties under the Act.

100. These acts, omissions, and failures occurred within the scope of *Galles*' employment or office with Tyche Asset Management LLC. Therefore, Tyche Asset Management LLC is liable for his acts, omissions, and failures in violation of *7 U.S.C. § 13(a)(4)*, pursuant to *7 U.S.C. § 2(a)(1)(B)* and *17 C.F.R. § 1.2*.

101. Defendant *Galles* controlled Tyche Asset Management LLC directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche Asset Management LLC's conduct **[*40]** alleged in this Count. Therefore, under *7 U.S.C. § 13c(b)*, *Galles* is liable for Tyche's violations of *7 U.S.C. § 13(a)(4)*.

### H. Operation of the Tyche Entities as a Common Enterprise

102. *Galles* operated the Tyche entities as a Common Enterprise.

103. During the Relevant Period, the Tyche entity defendants shared a single website: tycheam.com.

104. Despite being incorporated or organized in various jurisdictions, the Tyche entity defendants' business operations were all conducted from the same offices and through the same employees.

105. *Galles* comingled funds received from participants in various Tyche entity bank and trading accounts for the various Tyche entities.

106. There was no operational distinction between the entities in the overall Tyche business scheme. *Galles* controlled the operations of the Tyche entity defendants, including their financial activity in bank and trading accounts.

107. Therefore, the Tyche entity defendants are jointly liable for the violations of the CEA and Regulations described in this order as a Common Enterprise.

### I. Need for Injunctive Relief

108. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged **[*41]** in the Complaint and in similar acts and practices in violation of the Act and Regulations.

### III. PERMANENT INJUNCTION

### IT IS HEREBY ORDERED THAT:

109. Based upon and in connection with the foregoing conduct, pursuant to *Section 6c of the Act, 7 U.S.C. § 13a-1*, Defendants are permanently restrained, enjoined and prohibited from directly or indirectly:

a. Cheating or defrauding, or attempting to cheat or defraud, persons; willfully making or causing to be made to other persons any false report or statement or willfully entering or causing to be entered for any person any false record; or willfully deceiving or attempting to deceive a person by any means whatsoever; in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person, in violation of Section 4b(1)(A)-(C) of the Act, *7 U.S.C. § 6b(1)(A)-(C)*;

b. Engaging in conduct as a Commodity Pool Operator, or an Associated Person of a Commodity Pool Operator, and using the mails or any means or instrumentality of interstate commerce, directly or indirectly, to employ any device, scheme or artifice to defraud any client or participant **[*42]** or prospective client or participant of a commodity pool; or engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant of a commodity pool, in violation of *Section 4o(1) of the Act, 7 U.S.C. § 6o(1)*;

c. Intentionally or recklessly using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud; making, or attempting to make, any untrue or misleading statement of a material fact or failing to state a material fact necessary in order to make the statements made not untrue or misleading; or

Joseph Borders

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 149 of 191 PageID #:149

Page 13 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

engaging, or attempting to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, in violation of Section 6(c)(1) of the Act, *7 U.S.C. § 9(1)*, and *Regulation 180.1(a)-(c), 17 C.F.R. § 180.1(a)(1)-(3) (2022)*;

d. Failing to operate a commodity pool as a legal entity separate from the pools' operator, failing to receive commodity pool participants' funds in the name of the commodity pools' bank accounts, and commingling the property of the pools and pool participants' **[*43]** funds with property of pool operator, in violation of *Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c) (2022)*; and

e. willfully falsifying, concealing, or covering up by trick, scheme or artifice a material fact, or making any false, fictitious, or fraudulent statements or representations, or making or using any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, or futures association designated or registered under the Act and acting in furtherance of its official duties under the Act, in violation of *Section 9(a)(4)* of the Act, *7 U.S.C. § 13(a)(4)*.

110. Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly:

a. Trading on or subject to the rules of any registered entity (as that term is defined in *Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2022)*);

b. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, *17 C.F.R. § 1.3 (2022)*), their own personal accounts or for any account in which they have a direct or indirect interest;

c. Having any commodity interests traded on their behalf;

d. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving **[*44]** commodity interests;

e. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in *Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022)*; and/or

g. Acting as a principal (as that term is defined in Regulation 3.1(a), *17 C.F.R. § 3.1(a) (2022)*), agent or any other officer or employee of any person (as that term is defined in *7 U.S.C. § 1a(38)*), registered, exempted from registration or required to be registered with the Commission except as provided for in *17 C.F.R. § 4.14(a)(9)*.

## IV. RESTITUTION, DISGORGEMENT, AND CIVIL MONETARY PENALTY

### A. Restitution

111. Defendants shall pay, jointly and severally, restitution in the amount of **Five Million Three Hundred Twenty-Seven Thousand One Hundred Seventy-Three dollars ($5,327,173)** ("Restitution Obligation"). If the Restitution Obligation is not paid immediately, post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry **[*45]** of this Order pursuant to *28 U.S.C. § 1961*.

112. *Galles* is currently the defendant in a criminal action charging him, in part, for the misconduct that is at issue in this matter. *See United States v. Phillip Galles*, Mag. No. 23-8076 (District of New Jersey, filed May 10, 2023) ("Criminal Action"). For amounts disbursed to Defendants' pool participants as a result of satisfaction of any restitution ordered in the Criminal Action, the Defendants shall receive a dollar-for-dollar credit against the Restitution Obligation. Within ten days of disbursement in the Criminal Action to Defendants' pool participants, Defendant *Galles* shall, under a cover letter that identifies the name and docket number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures Association, 320 S. Canal St., Suite 2400, Chicago, Illinois 60606, copies of the form of payment to those pool participants.

Joseph Borders

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 150 of 191 PageID #:150

Page 14 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

113. To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' pool participants, the Court appoints National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall receive restitution payments from **[\*46]** Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

114. Defendants shall make Restitution Obligation payments, and any post-judgment interest payments, under this Order to the Monitor in the name "Tyche Asset Management — Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 320 S. Canal St., Suite 2400, Chicago, Illinois 60606 under cover letter that identifies the paying Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

115. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such **[\*47]** funds in an equitable fashion to Defendants' pool participants identified by the CFTC or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part IV.B. below.

116. Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' pool participants to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever

located, in order to make partial or total payment toward the Restitution **[\*48]** Obligation.

117. The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' pool participants during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

118. The amounts payable to each pool participant shall not limit the ability of any pool participant from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law.

119. Pursuant to *Rule 71 of the Federal Rules of Civil Procedure*, each pool participant of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations **[\*49]** of any provision of this Order.

120. To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B. Civil Monetary Penalty**

121. Defendants shall pay, jointly and severally, a civil monetary penalty in the amount of **Fifteen Million Nine Hundred Eighty-One Thousand Five Hundred Nineteen dollars ($15,981,519)** ("CMP Obligation"). If the CMP Obligation is not paid immediately, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to *28 U.S.C. § 1961 (2022)*.

122. Defendants shall pay their CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's

Case: 1:24-cv-03303 Document #: 1 Filed: 04/24/24 Page 151 of 191 PageID #:151

Page 15 of 15

CFTC v. Galles, 2023 U.S. Dist. LEXIS 232915

check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
>
> Division of Enforcement **[\*50]**
> 6500 S. MacArthur Blvd.
> HQ Room 266
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMZ-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Tonia King or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

## C. Provisions Related to Monetary Sanctions

123. Partial Satisfaction: Acceptance by the Commission or the Monitor of any partial payment of Defendants' Restitution Obligation, Disgorgement Obligation, or CMP Obligation shall not be deemed a waiver their obligation to make further payments pursuant to this Order, or a waiver of the Commission/CFTC's right to seek to compel payment of any remaining balance.

## V. MISCELLANEOUS PROVISIONS

124. Notice: All notices required to be given by any provision **[\*51]** in this Order shall be sent by certified mail, return receipt requested, and by email, as follows:

Notice to Commission:
> Robert Howell (RHowell@cftc.gov)
> Deputy Director, Division of Enforcement
> Commodity Futures Trading Commission
> Ralph H. Metcalfe Federal Building
> 77 W. Jackson Blvd., Suite 800
> Chicago, IL 60604

Notice to Defendants:

> *Phillip Galles* (philgalles@gmail.com)
> 514 North Peshtigo Court, Apartment 3811
> Chicago, IL 60611

Notice to NFA:
> Daniel Driscoll, Executive Vice President, COO
> (DDriscoll@NFA.Futures.Org)
> National Futures Association
> 320 S. Canal St., Suite 2400
> Chicago, IL 60606

All such notices to the Commission or the NFA shall reference the name and docket number of this action.

125. Change of Address/Phone: Until such time as Defendants satisfy in full their Restitution Obligation and CMP Obligation as set forth in this Order, Defendants shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

126. Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision **[\*52]** to any other person or circumstance shall not be affected by the holding.

127. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order.

128. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person under the authority or control of any of the Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise, insofar as he or she is acting in active concert or participation with Defendants.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Order for Default Judgment* forthwith and without further notice.

**IT IS SO ORDERED** on this 8th day of November, 2023.

/s/ Elaine Bucklo

**Hon. Elaine Bucklo**

**UNITED STATES DISTRICT JUDGE**

---

Joseph Borders

## Carolyn Guy

| | |
|---|---|
| **From:** | Adam Pacha <adampacha@ymail.com> |
| **Sent:** | Friday, May 19, 2023 11:58 AM |
| **To:** | Carolyn Guy; First Reports @ Lancerclaims |
| **Cc:** | julanski@pennmutualus.com |
| **Subject:** | Fwd: Tyche documents for Adam Pacha |
| **Attachments:** | Latest Adam's FILE_4242.docx; Tyche 2023 first quarter Investor Statement TAM-NO-1062 Pacha, Adam 3.31.23.pdf; Adam Tyche 4th quarter 2022.pdf; Adam 09.30.22 Tyche 3rd quarter 2022.pdf; Withdrawal Request.docx.pdf; Tyche Asset Investment Agreement.pdf |

[External]

final copy.  Disregard previous email.

Adam Pacha
President
Mi&T Mold Inspection and Testing USA
(855) 600-MOLD (6653)
Adam@MITmold.com

here you go

Thank you

Adam 630-788-9415 cell



1

Agent Name: Jason Ulanski
Address: 3551 W 111th Street Chicago, IL 60655

Phone number: 773-319-8273

Email address: julanski@pennmutualus.com / julanski10@gmail.com

Client/Customer Name: **Adam Pacha**
Client/Customer Address: **577 W Crockett Elmhurst, IL 60126**

Client/Customer Phone Number: **630-788-9415**

Client/Customer Attorney Name and contact information if applicable:


Is this claim in litigation?  YES or **NO**


Date policy written/product sold:

Type of policy/product: **Hedge Fund**

Brokered or company sponsored policy? **Brokered**


Date of loss: **5/11/2023**

Type of loss: **$500,000.00**


Alleged Error or Omission:

Short summary of events:

**A friend of mine and advisor with Penn Mutual, Jason Ulanski, recommended that I invest in a hedge fund at Tyche Asset Management.   He explained that he, too, had some money in the fund, amongst other clients, and the returns have been consistent every month.   The fund has seen 100% plus returns every year since the inception of the fund based on quarterly reports sent to investors. Jason set up a meeting for me to meet with Nick O'Meara, Tyche's Relationship Manager, and Phillip Galles, Tyche's President and CEO, both of whom were running the fund. O'Meara and Galles explained the trading platform and the proprietary algorithmic software and how it works. Jason explained to me that clients have been easily withdrawing money out of the fund when requested.**

**Based on what I heard, I decided to invest in the Tyche fund.  My decision was also based on Jason Ulanski's affiliation with Penn Mutual, my advisor, and the good relationship we have.**

**Beginning Q3 2022 I received statements showing the returns on my investment and the increase in account value. I was told that after the first of the year, 2023, I would be able to take money out. In**

**January 2023, based on the growth of the account, I decided to pull out half of my cost basis of 250k. I was then told by Phillip Galles that there was a banking issue and that they needed time to process the deposit. Over the next several months of communication with Jason and Phil, I heard every excuse as to why I hadn't received my requested money.  Finally, Nick O'Meara hand-delivered a check to me, drawn on Tyche's bank account at BMO, in the amount of $250,000.  Unfortunately, the check bounced due to insufficient funds.   On Thursday, May 11, 2023, I was notified by an agent from the Department of Justice that Phillip Galles had been arrested for wire fraud.   Currently, Phillip Galles cases are:  US v Galles, 23-mj-08076, US District Court, District of New Jersey; Commodity Futures Trading Commission v Galles, 23-cv-02970, US District Court, Northern District of Illinois (Chicago).**

**I have hired an attorney and I am taking the necessary steps to get back all of my initial investment of $500,000, interest and pain and suffering.**

Date agent was made aware**: 5/11/2023.**

By whom? **Justice Department**

By what method**? Investigation**

Jacob Biros
7316 W.Berwyn Ave
Chicago IL 60656

6 May 2023

Penn Mutual Insurance
P.O. Box 178
Philadelphia, PA 19105

To Whom it may concern,

   My name is Jacob Biros. I was a client of mass mutual for a whole life insurance policy. My insurance agent was Jason Ulanski. I shared all my financial information with Mr.Ulanski. Jason earned my trust for both me, and my wife. We trusted him as he seemed to care about his job, our future and for helping with financial planning. Jason often referred himself to me and my wife as our "financial advisor". Jason stated to me that he was studying for the test to be certified and he would legally be allowed to financially advise us. He implied to us that through Penn mutual and selling insurance, he was qualified to give financial advice.

After a few short years of holding onto our whole life insurance policy, my wife and I decided to start a a family. We were blessed with 2 children, a girl and a boy. Whom we purchased whole life policies through Ulanski as well. After both children being born, my wife and I decided it was the most fitting for her to quit her job and stay home to raise our children before they were School age. I reached out to Ulanski at this time, since he represented himself as our financial advisor, to seek advice on how to manage this since we were going to support our family based off one income. At this time, our whole life insurance policy cash value had grown to just below $20,000 cash value. I told Jason I wanted to cash it out, not necessarily for the cash, but to aleviate the $500 payment. I then withdrew the money and ended the policy. I told Jason, I was going to put the money in my savings account of maybe a CD. Ulanski, advised me that he had a better spot I could invest it. He informed me, that he came in contact with an investor named



PLAINTIFF'S
EXHIBIT

G

Philip Galles, from Tyche Asset Management LLC. He told me that Philip had a very secure and safe operation. He stated that he had above average returns and it was a low risk investment. He claimed that when the market was volatile is when he made the majority of his money. Ulanski stated that he did a full background check on him and he was legal, had a clean background and was secure to trade. I trusted Jason as he once again, stated he was our insurance agent and also our financial advisor. I then placed $20,000 into the investment with Tyche under the guidance and direction of Ulasnki. After a month Ulasnki shared the results of the annual dividends. I was impressed with the returns and he reassured me that Phil was safe and could maintain the returns. Ulanski reminded me of his credentials while working at Penn and also Philips credentials and his investor qualifications. Ulanski then recommend that I invest more into the hedge fund. I had an additional $20,000 in mutual funds which was an subsidiary of Mass mutual. Kevin Burns opened and managed the brokerage accounts. I told Ulanski I was hesitant about investing my children's money, but he reassured me that Phil would protect it and maybe even double it. After investing that $20,000 I spoke with Ulanski again. At this time, He told me that several other firefighters were borrowing from their deferred compensation since Tyche's returns were often higher than the returns in deferred compensation. I was nervous about doing this, but Ulanski reminded me of how much I work and that this would be a great solution to not working so often. (After my wife quit working, I opened a window cleaning service to compensate for the loss of income)

Ulanski, my insurance agent who claimed he was my financial advisor, stated that with investing in Tyche it would eventually build up enough so I could expand the business or I wouldn't need to work a second job anymore. I trusted his advice, being he once again referred to himself as my financial advisor through Penn Mutual.

I had a grand total of $70,000 invested into Tyche. I made a withdrawal of $15,000 with no difficulties. I was indebted to tyche at this time for $55,000. Ulanski would frequently call me and ask me if I knew anyone that was interested in making money and investing. I would often

refer him names and numbers, and he even offered me an incentive of 1-2%. No one I ever referred ever invested.

After an extended period of time, I attempted to make a withdrawal for the purchase of a larger home for my family. I made the request on 1/16/23, with a promised deposit date of 3/17/23. I never received my deposit and I received multiple empty promises of a wire and or a cashiers check. Ulanski reassured me that Phil would get my deposit. Ulanski was so sure, he even offered to make an $1000 bet with me that I would receive it by 3/17/23. I declined the bet.

The reason I am writing this letter, is your employee Jason Ulanski who represented your agency Penn Mutual gave me financial advice which resulted in me investing into a Ponzi scheme, which was devastating and resulted in me loosing my life savings and my children life savings. If it were not for your employee, who stated he was qualified to invest by Penn Mutual I would have never invested in anything like this.

2023R00304 - 030

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
### for the
District of New Jersey

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To: Jason Ulanski

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Peter W. Rodino Federal Building 970 Broad Street, 2nd Floor - Room 2075 Newark, NJ 07102 | Date and Time: 05/31/2023 9:30 am |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Produce the records listed on Attachment A for the attached identifiers and date ranges. Any records sent electronically or by mail must be sent to the agents listed below.

Special Agent Pankaj Sharma (973-220-7748, pankaj.sharma@usdoj.gov), and US Postal Inspector Darryl Williams, (732-819-3601, dwilliams@uspis.gov).

Date: 05/10/2023



CLERK OF COURT

**Melissa E. Rhoads**

Signature of Clerk or Deputy Clerk     Melissa E. Rhoads, Clerk of Court

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

Carolyn Silane, AUSA
970 Broad Street Suite 700 Newark, NJ 07102
973-645-3979
carolyn.silane@usdoj.gov

PLAINTIFF'S
EXHIBIT

**H**

2023R00304 - 030

AO 110 (Rev. 06/09) Subpoena to Testify Before Grand Jury (Page 2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)*   Jason Ulanski

was received by me on *(date)*      05/11/2023      ·

☐   I served the subpoena by delivering a copy to the named person as follows: _____

hand delivery _____

_____   on *(date)*    05/11/2023    ; or

☐   I returned the subpoena unexecuted because: _____

_____ ·

I declare under penalty of perjury that this information is true.

Date:      05/11/2023

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc:

2023R00304 - 030



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

## INFORMATION REGARDING SUBPOENA TO PRODUCE RECORDS

Enclosed is a subpoena to testify and produce records before a grand jury of the District of New Jersey.

**YOU MUST PERSONALLY APPEAR BEFORE THE GRAND JURY TO RETURN THE RECORDS CALLED FOR IN PERSON UNLESS YOU CHECK THE BOX BELOW AND COMPLY WITH THE FOLLOWING PROCEDURES.**

In all events, you have an absolute right to personally appear before the grand jury. If you wish to personally appear, please contact the Assistant U.S. Attorney whose name appears in the lower left-hand corner of the subpoena.

Instead of personally appearing, you may, if you wish, return the records called for by the method checked below:

1) Gather the records called for in the subpoena; and

2) Deliver the records in electronic format to the Paralegal whose name appears on the face of the subpoena.

☐ I elect to follow the procedures above instead of personally appearing before the grand jury.

2023R00304 - 030

## List of Identifiers and Date Ranges

**Date Ranges:**

January 1, 2019 - present

**Identifiers:**

All documents and information, in any form, relating to: Tyche Asset Management ("Tyche"), any Tyche-related entities, and/or Phillip Galles, including but not limited to:

- All records of salary, commission, compensation, or benefits paid or provided to you

- All communications (including text messages)

- Documentation, including communications, regarding any Tyche clients, investors, or potential investors

2023R00304 - 030

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:  Jason Ulanski

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: Peter W. Rodino Federal Building 970 Broad Street, 2nd Floor - Room 2075 Newark, NJ 07102 | Date and Time: 05/31/2023 9:30 am |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Produce the records listed on Attachment A for the attached identifiers and date ranges. Any records sent electronically or by mail must be sent to the agents listed below.

Special Agent Pankaj Sharma (973-220-7748, pankaj.sharma@usdoj.gov), and US Postal Inspector Darryl Williams, (732-819-3601, dwilliams@uspis.gov).

Date:  05/10/2023



CLERK OF COURT

**Melissa E. Rhoads**

Signature of Clerk or Deputy Clerk          Melissa E. Rhoads, Clerk of Court

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

Carolyn Silane, AUSA
970 Broad Street Suite 700 Newark, NJ 07102
973-645-3979
carolyn.silane@usdoj.gov

**Carolyn Guy**

| | |
|---|---|
| **From:** | Ulanski, Jason <julanski@pennmutualmidwest.com> |
| **Sent:** | Monday, May 15, 2023 11:59 AM |
| **To:** | First Reports @ Lancerclaims |
| **Subject:** | Re: E & O Claim Submission |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

<mark>[External]</mark>
Caroyln

Here is a start of my clients who will  be making a complaint. Please reach out to me on next steps.

| 11/12/20 | TAM-NO-1004 | Marybeth Zilske | $ 20,000.00 | check |
|---|---|---|---|---|
| 11/19/20 | TAM-NO-1005 | Tim Jarosz | $ 15,000.00 | check |
| 11/24/20 | TAM-NO1006 | Keith & Elina Zilske | $ 11,000.00 | check |
| 12/3/20 | TAM-NO-1007 | Steve Bosniak | $ 20,000.00 | check |
| 12/23/20 | TAM-NO-1011 | Sharon Dober | $ 100,000.00 | check |
| 1/5/21 | TAM-NO-1009 | Jim Parisi | $ 10,000.00 | wire |
| 1/11/21 | TAM-NO-1012 | Paul Bojan | $ 25,000.00 | check |
| 1/25/21 | TAM-NO-1013 | Thom Skowronski | $ 10,000.00 | wire |
| 2/5/21 | TAM-NO-1015 | Cody Connelly | $ 20,000.00 | wire |
| 3/19/21 | TAM-NO-1022 | Christopher Iverson | $ 25,000.00 | wire |
| 3/23/21 | TAM-NO-1023 | Jacob Biro | $ 20,000.00 | wire |
| 3/24/21 | TAM-NO-1024 | David Griggs | $ 15,000.00 | wire |
| 5/5/21 | *TAM-NO-1004 | Marybeth Zilske | $ 20,000.00 | check |
| 5/6/21 | *TAM-NO-1015 | Cody Connelly | $ 20,000.00 | wire |
| 5/11/21 | *TAM-NO-1011 | Sharon Dober | $ 50,000.00 | wire |
| 6/7/21 | TAM-NO-1031 | Kerry O'Boyle | $ 22,000.00 | wire |
| 6/9/21 | *TAM-NO-1007 | Steve Bosniak | $ 20,000.00 | wire |
| 6/14/21 | *TAM-NO-1023 | Jacob Biros | $ 50,000.00 | wire |
| 6/17/21 | *TAM-NO-1005 | Tim Jarosz | $ 30,000.00 | check |
| 7/20/21 | TAM-NO-1038 | Louis Bongiorno | $ 70,000.00 | wire |
| 7/21/21 | TAM-NO-1039 | Anthony Sanders | $ 60,000.00 | wire |
| 7/26/21 | *TAM-NO-1009 | Jim Parisi | $ 64,000.00 | wire |
| 8/13/21 | TAM-NO-1040 | James Lefevour | $ 39,000.00 | wire |
| 9/4/21 | TAM-NO-1041 | Brian Dober | $ 20,000.00 | wire |
| 10/7/21 | TAM-NO-1042 | Eliasard Alcauter | $ 50,000.00 | wire |
| 10/2/21 | *TAM-NO-1011 | Sharon Dober | $ 25,000.00 | wire |
| 10/9/21 | *TAM-NO-1004 | Marybeth Zilske | $ 20,000.00 | check |

1


PLAINTIFF'S
EXHIBIT

I

| | | | | |
|---|---|---|---|---|
| 10/14/21 | TAM-NO-1043 | Sharon Devita | $ 30,000.00 | wire |
| 10/15/21 | TAM-NO-1044 | Clayton Lyons | $ 30,000.00 | wire |
| 11/2/21 | TAM-NO-1045 | Jenny Peters | $ 30,000.00 | wire |
| 12/8/21 | TAM-NO-1049 | Angelica Sanchez | $ 20,000.00 | wire |
| 12/8/21 | TAM-NO-1050 | George Bukowski | $ 20,000.00 | wire |
| 1/11/22 | TAM-NO-1051 | Tom Hollingsworth | $ 20,000.00 | wire |
| 1/11/22 | TAM-NO-1052 | Paul Gesiakowski | $ 50,000.00 | wire |
| 1/15/22 | TAM-1053 | Jennifer Pillon | $ 25,000.00 | wire |
| 1/21/22 | *TAM-NO-1040 | James Lefevour | $ 30,000.00 | wire |
| 1/26/22 | *TAM-NO-1005 | Timothy Jarosz | $ 25,000.00 | wire |
| 2/28/22 | TAM-NO-1054 | Kevin Taylor | $ 50,000.00 | wire |
| 3/1/22 | *TAM-NO-1039 | Anthony Sanders | $ 25,000.00 | wire |
| 3/8/22 | *TAM-NO-1009 | Jim Parisi | $ 25,000.00 | wire |
| 3/10/22 | TAM-NO-1055 | Joseph Hoefling | $ 25,000.00 | wire |
| 3/16/22 | TAM-NO-1057 | John Ernst | $ 25,000.00 | wire |
| 3/18/22 | TAM-NO-1045 | Jenny Peters | $ 130,000.00 | wire |
| 3/25/22 | TAM-NO-1058 | Dawn Wahlgren | $ 60,000.00 | wire |
| 4/8/22 | TAM-NO-1045 | Jenny Peters | $ 25,000.00 | wire |
| | | | | |
| 6/8/22 | TAM-NO-1038 | Louis Bongiorno | $ 30,000.00 | wire |
| 6/18/22 | TAM-NO-1060 | Jose Garcia | $ 25,000.00 | wire |
| 6/23/22 | *TAM-NO-1052 | Paul Gesiakowski | $ 25,000.00 | wire |
| 6/25/22 | TAM-NO-1061 | Michael Griffin | $ 25,000.00 | wire |
| 6/30/22 | TAM-NO-1062 | Adam Pacha | $ 500,000.00 | wire |
| | | | | |
| | | | | |
| 7/14/22 | TAM-NO-1063 | Janice Sinclair | $ 50,000.00 | wire |
| 8/2/22 | *TAM-NO-1057 | John Ernst | $ 20,000.00 | wire |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | $ 2,171,000.00 | |
| YTD: | $ 1,190,000.00 | | | |

Carolyn Guy <cguy@lancerclaims.com> on behalf of First Reports @ Lancerclaims <FirstReports@lancerclaims.com>
**Sent:** Friday, May 12, 2023 11:28 AM
**To:** Ulanski, Jason
**Subject:** E & O Claim Submission

2

**External Email - Think Before You Click**

Hi Jason,

Thank you for your telephone call regarding setting up a claim/potential claim.  In order to set up the claim, please reply to this email with as much information as possible.  Please also attach any documentation you can provide, including a list of clients involved and their contact information.  If you have any questions, please contact me at 714.939.7377.

Submitter Name and Title:

Submitter Phone number:

Agent Name:
Address:
City, State, Zip:

Phone number:

Email address:

Client/Customer Name:
Client/Customer Address:
City, State, Zip:

Client/Customer Phone Number:

Client/Customer Attorney Name and contact information if applicable:

Is this claim in litigation?  YES or NO

Date policy written/product sold:

Type of policy/product:

Brokered or company sponsored policy?

Date of loss:

Type of loss:

Alleged Error or Omission:

Short summary of events:

3

Date agent was made aware:

By whom?

By what method?


If you have any questions, please feel free to contact me at 714-939-7377.

Thank you,


CONFIDENTIALITY NOTICE: This message contains information from Lancer Claims Services and may be privileged and/or confidential. If you are not the intended recipient, you are notified that any dissemination, distribution or copying of this message is strictly prohibited. If you have received this message in error, please notify me immediately by telephone or by electronic mail.

**From:** Laura Packwood <lmpackwood@gmail.com>
**Sent:** Wednesday, June 14, 2023 11:50 AM
**To:** NewClaims <newclaims@markel.com>
**Cc:** Laura Packwood <lmpackwood@gmail.com>; Commie Joe <joe.packwood@gmail.com>
**Subject:** Theft / Fraud Claim for Packwood, Laura M

Policy number and name of insured: MKLM7PLCA00065 - Jason Ulanski of

Penn Mutual Midwest Wealth Strategies

Date of loss : May 11, 2023



4

Location of where the loss happened : Tyche Asset Management LLC, 1 N Upper Wacker Dr Suite 3615, Chicago, IL 60603

Contact information : Laura M Packwood 11209 S Natchez Ave, Worth, IL 60482

Tel: 708-305-4746

Brief description of what you are filing the claim for:

On 8/18/2023 I entered into an investment agreement with Phillip Galles of Tyche Investment Management LLC with the assistance of Jason Ulanski of Penn Mutual Wealth Strategies. My initial investment was $70,000. After several attempts to contact Jason in May, I reached out to a mutual colleague who had also invested through Jason, to find out why he was not returning any phone calls.

I was then given a new number and after texting him, he contacted me immediately as to the arrest and seizure of all records and assets at the Tyche Chicago location, of Phillip Galles and his staff for a very elaborate Ponzi scheme.

I was then notified by Jason that my initial investment of $70,000 was not only NOT worth the $126,702.40 that my Q1 2023 statement stated, but that it was ALL gone. Every dime.

I have attached my initial signed contract and the most recent (and last) account statement I received fromTyche Asset Trade Client Relations.

Please make sure a claim is issued on my behalf to recover damages of $126,702.40.

If you have any further questions, please do not hesitate to contact me at 708-305-4746.

Best regards,
Laura Packwood
*"If you don't think life is a challenge, then you're not living!"*

5



*Via* **Email and USPS**

August 17, 2023

Jason Ulanski
3551 W. 111th Street
Chicago, IL 60655
julanski10@gmail.com

Re:     Insured:                    Jason Ulanski
           Insurer:                   Markel American Insurance Company
           Policy:                   Company Sponsored Life Insurance Agents Professional Liability Policy
           Sponsoring Company:   Penn Mutual Life Insurance Company
           Policy No.:              MKLM7PLCA00065
           Policy period:          August 1, 2022 to August 1, 2023
           Claimant:              Jacob Biros
           Markel Claim No.:       MXXL95133
           Lancer Claim No.:       619221

Dear Mr. Ulanski:

As you are aware, Lancer Claims Services ("Lancer") has been engaged to handle the above-captioned matter on behalf of Markel American Insurance Company ("MAIC").

We wish to acknowledge receipt of the above referenced potential claim involving Jacob Biros ("Claimant"). You have asked that MAIC provide coverage under the above-referenced policy (the "Policy").

Basis of the Potential Claim:

While this letter may refer to certain allegations made by certain parties, we recognize that those allegations are unsubstantiated at this time, and nothing in this letter is intended to suggest or imply that they have any legal or factual merit.

The conclusions of Lancer and Markel are based on the following facts and allegations:

You have advised that beginning November 12, 2020, you referred or recommended many of your clients to Phillip Galles ("Galles") to invest in his hedge fund. According to information you have provided, your clients invested almost $2.7M total funds in the hedge fund. The funds were to be


PLAINTIFF'S EXHIBIT

**K**

Jason Ulanski
August 17, 2023
Page 2

invested through Galles' investment company called Tyche Asset Management ("Tyche") into commodity futures.

On May 11, 2023, you were notified by the Department of Justice ("DOJ") that Galles was arrested and charged with wire fraud in an investment scheme that defrauded victims of over $2M. You were also contacted by potential claimant Jacob Biros ("Biros").

Biros sent a complaint letter to Penn Mutual dated May 6, 2023. The letter was provided to Lancer by you.

According to the letter, the claimant was a client of yours, and you sold him a Mass Mutual whole life insurance policy and also acted as his financial advisor. After having children, the claimant was looking for a different investment for his funds, instead of the life insurance policies, and you recommended that he invest in the Tyche hedge fund. According to the letter, you told the claimant that the investment was very secure and safe and that it had above average returns while being a low-risk investment. The claimant alleges that you told him that you did a full background check on Galles and that he had a clean background and was secure to trade. As a result, the claimant made an initial investment of $20k on or around March 23, 2021, from the life policy proceeds.

After a month, you showed the claimant the results of the annual dividends, and the claimant was impressed with the returns. You recommended that the claimant make additional investments in the hedge fund. The claimant had mutual funds through Mass Mutual that were for his children. Upon hesitation of investing his children's money in the hedge fund, you reassured him that Galles would protect the money and likely even double it. The claimant then invested an additional $50k on or around June 14, 2021.

At some point, the claimant was able to withdraw $15k without any issues. On January 16, 2023, the claimant made a withdrawal request for the purchase of a larger family home. The promised deposit date was March 17, 2023. He never received the funds.

The letter does not request the return of the funds, but does state that you represented Penn Mutual, put yourself out as a qualified financial planner and that if it weren't for your connection with Penn Mutual and your advice, the claimant would never have invested in the hedge fund and would not have lost his and his children's savings.

No demand has been presented to you.

After Galles' arrest, federal agents came to your home and took your phone. You were also served with a subpoena to testify before a grand jury and to provide documents. You have also advised that your involvement with Tyche, Galles and O'Meara is now under investigation. You have confirmed that you have retained counsel to protect your interests and confirmed that no written demand has been presented to you by Biros or any other client.

This matter was reported to Lancer on May 19, 2023.

Jason Ulanski
August 17, 2023
Page 3

**At this time, this does not appear to be a Claim against you as defined by the policy.**

The MAIC Policy:

The Policy is issued to you by MAIC and is effective for the Policy Period of August 1, 2022 to August 1, 2023. The Retroactive Date for the Policy is March 12, 2018.  The Policy provides Limits of Liability of $1,000,000 each Claim subject to an aggregate limit of $1,000,000. The Limits are subject to a Deductible of $1,500 which applies to Loss only. You are responsible for paying your deductible. Under no circumstances shall MAIC be responsible for any amounts in excess of the Limit of Liability.

First, we call your attention to the Insuring Agreement of the Policy, which reads, in relevant part, as follows:

**SECTION I – INSURING AGREEMENTS**

**A.      Professional Liability**

The **Insurer** shall pay, on behalf of an **Insured**, **Damages** which an **Insured** becomes legally obligated to pay because of a **Claim** that is both made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), or as allowed by Section **XI** — Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Insured**, provided:

**1.**      Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**); and

**2.**      As of the inception date of this Policy as shown in the Master Policy Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**.

***

The Policy provides relevant definitions, as follows:

**SECTION IV – DEFINITIONS**

***

Jason Ulanski
August 17, 2023
Page 4

F.  **Claim** means a written demand received by an **Insured** for **Damages** (including pleadings received in a civil litigation or arbitration) because of an actual or alleged **Wrongful Act** or, with respect to Section **I** — Insuring Agreement **B.** Managing Agents Management Liability, an actual or alleged **Management Wrongful Act**.

\*\*\*

A **Claim** does not include the following:

1.  A demand for declaratory, injunctive or other non-monetary relief;

2.  Any form of criminal proceeding; or

3.  Any proceeding commenced by a governmental or quasi-governmental official or agency or any self-regulatory official or agency, except for a **Disciplinary Proceeding**, but only with respect to coverage provided by Section IV. — Coverage Extension **A.** or if the agency or official is a client of the Insured in connection with the rendering of **Professional Services**.

The Policy defines Claim as a written demand received by an Insured for Damages because of a Wrongful Act. It is our understanding that to date, you have not received any written demand for Damages due to a Wrongful Act. **If that is not the case, please notify me immediately.**

\*\*\*

G.  **Claim Expenses** means reasonable and necessary amounts incurred by the **Insurer**, or by the **Insured** with the prior written consent of the **Insurer**, in the defense of a **Claim** that is covered under this Policy, including attorneys' fees, costs of investigation, court or arbitration costs and premiums for appeal, attachment or similar bonds. The **Insurer**, however, is not required to provide such bonds. **Claim Expenses** do not include the wages, salaries, fees or costs of the directors, officers, employees, representatives, in-house counsel, agents or servants of any **Insured**.

You have confirmed that you have retained an attorney. MAIC reserves the right to review any fees or costs to determine whether they were reasonable and necessary.

H.  **Damages** means monetary judgments, settlements or awards resulting from a **Claim**. **Damages** do not include the following:

1.  Taxes, fines or penalties, unless incurred by a claimant and made part of a **Claim** against an **Insured**;

Jason Ulanski
August 17, 2023
Page 5

    **2.**       Punitive or exemplary damages;

    **3.**       The multiplied portion of a multiplied damage award;

    **4.**       The return, restitution, reduction, compromise or refund of commissions, fees or charges;

    **5.**       Costs incurred as a result of non-monetary, declaratory or injunctive relief;

    **6.**       Any matters that are deemed uninsurable under the law; and

    **7.**       **Claim Expenses**.

At this time, there is currently no Claim against you. To the extent that a Claim is made against you, and any Damages requested by the Claimant do not fall within the above referenced definition of Damages, MAIC has no duty to indemnify you and the Policy will not respond.

***

    **N.**       **Interrelated Wrongful Acts** means any **Wrongful Acts** that are:

    **1.**       Similar, repeated or continuous; or

    **2.**       Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

At this time, there is currently no Claim against you. To the extent that a Claim is made against you, MAIC reserves the right to evaluate whether the Claims involve Interrelated Wrongful Acts.

The Policy also contains the following Endorsement:

<strong>PROFESSIONAL SERVICES AMENDMENT ENDORSEMENT</strong>

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that in consideration of the premium charged, and solely with respect to Non Affiliated Horner, Townsend & Kent, Inc./"Life Only" Agents of the **Sponsoring Company**, Section **V**, Paragraph **U**. -- Definition of **Professional Services** -- is deleted in the entirety and replaced with the following:

Jason Ulanski
August 17, 2023
Page 6

**Professional Services** means:

1.      The solicitation, sale or servicing of the following:

      a.      Life insurance, accident and health insurance, workers' compensation insurance as part of a 24-Hour accident and health insurance product, managed care organization contracts, long term care products, disability income insurance and fixed annuities;

      b.      Employee benefit plans, including, but not limited to, **Placement of Coverage with Multiple Employer Welfare Arrangements, Self-Funded Plans**, group plans, group or ordinary pension or profit sharing plans, retirement annuities, KEOGH retirement plans, life, accident and health and/or disability plans;

        However, coverage for **Claims** based upon, arising out of or in any way involving, in whole or in part, **Placement of Coverage with Multiple Employer Welfare Arrangements** is subject to the following Sub-Limits of Liability (which are part of an not in addition to the other Limits of Liability provided by the Policy) and Deductible, unless **Placement of Coverage with Multiple Employer Welfare Arrangements** is made in accordance with the **Sponsoring Company's** written procedures for such placement and same is funded .in whole or in part, by insurance products issued by the **Sponsoring Company**:

        Each **Claim**:              $500,000
        **Agent** Aggregate:         $500,000
        Deductible (**Damages** only):  $5,000

        In addition, coverage for **Claims** based upon, arising out of or in any way involving **Self-Funded Plans** is applicable to **Claims Expenses** only, and not **Damages**; and

      c.      Pharmacy benefit management plans either approved by the Centers for Medicare and Medicaid Services or that are sold in conjunction with a group or individual medical plan;

2.      Providing advice, consultation, administration and/or services in connection with any of the products listed in Paragraph **1.**, above, whether or not a separate fee is charged;

3.      Consultation with participants in an employee benefit plan in order to explain the provisions of such plan and the handling of day-to-day ministerial functions required by such plan including, but not limited to, enrollment, record keeping and filing reports with governmental agencies;

Jason Ulanski
August 17, 2023
Page 7

4.  Provision of financial planning services including, but not limited to, the recommendation or preparation of a financial program for a client involving the client's present and anticipated assets and liabilities, and shall include recommendations regarding savings, investments, insurance, anticipated retirement, estate planning or other employee benefits, whether or not a separate fee is charged;

5.  Notary Public Services; or

6.  The purchase, sale or giving advice regarding life settlements arranged through a provider approved by the **Sponsoring Company** provided:

    a.  On or before the life insurance policy is settled, the **Insured** obtained a signed and dated waiver from all beneficiaries of the life insurance policy acknowledging that the life settlement will occur;

    b.  On or before the life insurance policy is settled, the owner(s) of the life insurance policy has/have signed the provider's life settlement purchase and/or sale agreement;

    c.  The **Insured** was approved in writing by the **Sponsoring Company** or the **Broker/Dealer** to engage in life settlement transactions;

    d.  The life settlement transaction complies with the **Sponsoring Company's** or the **Broker/Dealer's** policies and procedures for life settlement transactions; and

    e.  The life settlement does not involve terminally ill clients in accordance with the definition of "terminally ill" by the relevant state.

**All other terms and conditions remain unchanged.**

At this time, there is currently no Claim against you. If a Claim is made against you, MAIC reserves the right to evaluate whether the Claims involve Professional Services.

The Policy provides the following relevant Exclusions:

**SECTION VI – EXCLUSIONS**

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim**:

*** 

D.  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any:

Jason Ulanski
August 17, 2023
Page 8

1. Actual or alleged dishonest, purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute, by, at the direction of or with the knowledge of any **Insured**; or

2. Gaining of profit, remuneration or monetary advantage to which an **Insured** is not legally entitled.

However, the **Insurer** shall continue to defend a **Claim** alleging any of the foregoing conduct until there is a judgment, final adjudication, adverse admission or finding of fact against any **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for the costs of defending the **Claim**. Moreover, an actual or alleged dishonest, purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute of one **Agent** or **Managing Agent** will not be imputed to another **Agent** or **Managing Agent**;

E. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged conversion, commingling, use, handling, entrustment, safeguarding, inability to pay or failure to pay premiums, funds or any form of money;

\*\*\*

I. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged insolvency, receivership, conservatorship, liquidation, bankruptcy, failure or inability to pay of any company, organization, entity, vehicle or arrangement of any nature in which an **Insured** placed, recommended to be placed or obtained coverage or in which an **Insured** placed, recommended to be placed funds or an investment of any nature; however, this exclusion shall not apply to a **Claim** based upon or arising out of the placement, recommendation for placement or obtaining coverage with an insurance company rated by A .M Best's as B+ or better at the time when coverage is placed, recommended or obtained;

\*\*\*

R. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Securities** (other than variable life insurance, variable annuities and mutual funds) or **Private Placements** that were not authorized or approved by and actually processed through the **Broker/Dealer**;

\*\*\*

U. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

\*\*\*

Jason Ulanski
August 17, 2023
Page 9

    **2.**        Commodities, commodity futures and option contracts, except for option contracts that are covered by ownership of the underlying **Securities**, cash or cash equivalent, not including margin;

***

At this time, there is currently no Claim as defined against you. If a Claim is made against you, MAIC reserves the right to decline to defend and indemnify you if the Claim arises out of Exclusions D, E, I, R or U.

The Policy also includes the following provision:

**SECTION IV – EXTENSIONS OF COVERAGE**

Subject to all other terms, conditions and exclusions stated herein, coverage under the Policy also extends as follows:

***

**B.**      **Subpoena Compliance**

    **1.**        In addition to the applicable Limits of Liability, the **Insurer** shall pay reasonable and necessary attorneys fees and costs only in connection with the receipt of a subpoena by an **Agent** or **Registered Representative** during the **Certificate Period** or Extended Reporting Period, if applicable, for document production or representation in giving sworn testimony related to **Professional Services** that is issued in a lawsuit in which an **Agent** or **Registered Representative** is not a party.

    **2.**        The maximum payment by the **Insurer** pursuant to the Extension of Coverage shall be $25,000 for each **Agent** or **Registered Representative**, regardless of the number of subpoenas.

    **3.**        The Deductible shall not apply to payments under this Extension of Coverage.

In order for the Extension of Coverage – Subpoena Compliance to be triggered, the subpoena must be issued for a lawsuit in which the insured is not a party and must be related to related to Professional Services of the insured. The Policy provides for an Extension of Coverage for Subpoena Compliance, subject to all other terms, conditions and exclusions in the Policy. Professional Services is defined, in relevant part, as the provision of financial planning services including recommendations regarding investments.

Jason Ulanski
August 17, 2023
Page 10

You received a subpoena from the DOJ which requested testimony before a grand jury to provide requested documents and information from January 1, 2019 through the present regarding Tyche including all communications, documentation regarding Tyche clients and all records of any payments you received. You indicated you are now under investigation related to the Ponzi scheme.

You have also advised that you recommended investing in the Tyche hedge fund to numerous clients. You admitted that Tyche does not have any funds to pay claimants, that the hedge fund you recommended to your clients was not authorized by or approved and processed through the Broker/Dealer, and that the hedge fund involved commodity futures. Accordingly, Exclusions E, I, R and U apply and preclude coverage through the Extension of Coverage – Subpoena Compliance. Therefore, MAIC will not provide any fees or costs associated with the DOJ subpoena requesting your testimony before a grand jury.

The Policy provides relevant Conditions, as follows:

**SECTION XI – NOTICE OF CLAIM**

> **A.** As a condition precedent to the obligations of the **Insurer** under this Policy, an **Insured** shall give the **Insurer** written notice of a **Claim** made against the **Insured** as soon as practicable, but in no event later than either:
>
>> **1.** The end of the **Certificate Period** or Extended Reporting Period, if applicable;
>>
>> **2.** 30 days after the end of the **Policy Period**, or Extended Reporting Period, if applicable, as long as such **Claim** is first made within the final 30 days of the **Policy Period** or Extended Reporting Period or;
>>
>> **3.** Notwithstanding the requirements of 1. and 2. above, if continuous coverage is in effect pursuant to consecutive policies issued by the **Insurer**, a **Claim** may be reported to the **Insurer** in writing, as soon as practicable, during the policy period consecutive to and immediately following this **Policy Period** without constituting a violation of this provision. In such condition, the **Claim** will be deemed reported on the last day of the **Policy Period**.
>
> **B.** Written notice of a **Claim** shall be addressed to the **Insurer**.
>
> **C.** A **Claim** shall be deemed reported at the time when the **Insurer** receives written notice.
>
> **D.** The **Insured** shall provide the **Insurer** with copies of all documents received by the **Insured** concerning a **Claim**, including, but not limited to

Jason Ulanski
August 17, 2023
Page 11

a summons, complaint, statement of claim or any other papers served in a civil litigation or arbitration. In addition, the **Insured** shall provide the **Insurer** with the following:

1.     The name of the claimant;

2.     The name of each **Insured** involved in the **Claim**;

3.     A detailed description of the **Wrongful Act** or **Management Wrongful Act** giving rise to the **Claim**;

4.     The **Damages** that may result from the **Claim**; and

5.     The circumstances by which the **Insured** became aware of the **Claim**.

***

**SECTION XII – NOTICE OF A WRONGFUL ACT OR MANAGEMENT WRONGFUL ACT**

A.     An **Insured** may provide the **Insurer** with written notice of a **Wrongful Act** or **Management Wrongful Act** committed during the **Certificate Period** which reasonably may be expected to give rise to a **Claim** as soon as practicable after the **Wrongful Act** or **Management Wrongful Act** becomes known to the **Insured**. Such notice may not be provided after the **Certificate Period** expires, nor during any Extended Reporting Period.

B.     The **Insured** shall provide the **Insurer** with the following concerning any such **Wrongful Act** or **Management Wrongful Act**:

1.     The name of the potential claimant;

2.     The name of each **Insured** allegedly responsible for such **Wrongful Act** or **Management Wrongful Act**;

3.     A detailed description of the fact, allegation, circumstance or situation that could result in a **Claim**;

4.     The **Damages** that may result from the **Wrongful Act** or **Management Wrongful Act**;

5.     The circumstances by which the **Insured** became aware of the **Wrongful Act** or **Management Wrongful Act**; and

Jason Ulanski
August 17, 2023
Page 12

**6.** The reasons for anticipating a **Claim**.

**C.** A **Claim** arising from a **Wrongful Act** or **Management Wrongful Act** and reported in accordance with Paragraphs **A** and **B**. above shall be deemed to have been first reported when the **Insurer** receives written notice of the **Wrongful Act** or **Management Wrongful Act**.

**D.** Such written notice of a **Wrongful Act** or **Management Wrongful Act** which reasonably may be expected to give rise to a **Claim** must be given to the **Insurer**.

The matter you reported does not currently meet the definition of a Claim, as defined above. However, we accept this matter as valid notice of a potential claim under the Notice of a Wrongful Act provision of the Policy. In the event you are served with a written demand or civil complaint or receive any further inquiries with regard to this matter, please notify the undersigned immediately. *Any attorney's fees and costs incurred without the consent of the insurer will be considered voluntarily incurred and fall outside of coverage under this policy.*

If a Claim as defined by the policy is presented against you, MAIC reserves the right to raise coverage defenses related to the representations made in your application for insurance coverage and the reporting requirement provided in the policy.

Please note that it is MAIC's policy to send this letter, which we refer to as a "potential claim" letter, to insureds when they notify us of a potential claim. This "potential claim" letter is not an attempt to avoid any responsibilities under the Policy. Accordingly, if a claim subsequently arises out of the circumstances described above, it will be considered for purposes of evaluating insurance coverage as having been made during the Policy Period of August 1, 2022 to August 1, 2023.

Should a Claim be presented, pursuant to Section **XVI** of the Policy regarding Other Insurance, if you have other valid and collectible insurance that provides coverage for this matter, and if this Policy provides coverage, it shall apply as excess over any such insurance. Please advise us if you have any other applicable insurance. If you do, you must promptly place any other insurer(s) on notice. We also request that you provide us with copies of your notice letter(s).

MAIC reserves the right to evaluate any written demand in this matter with respect to coverage. MAIC reserves the right to seek reimbursement of defense costs paid by MAIC that are attributable to uncovered damages or claims.

By continuing with the investigation or by undertaking any other action that MAIC or Lancer deem necessary, MAIC and Lancer do not waive any defense to coverage that may exist to this claim under the Policy or the law, whether asserted herein or not, and may assert any such defense at any time.

Jason Ulanski
August 17, 2023
Page 13

If you feel that any aspect of this claim has been overlooked, or if you have any additional factual material you wish for us to consider, please do not hesitate to notify the undersigned of your concerns. Lancer and MAIC will be glad to consider any further information you wish to submit.

This letter is based on the information we have received to date and is not intended as an exhaustive recitation of all provisions of the Policy that might apply. Lancer and MAIC specifically reserve the right to amend or supplement the positions taken in this letter based upon information not yet provided to or developed by Lancer or MAIC. All rights in connection with this loss are expressly reserved, whether asserted herein or not.

Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at 122 S. Michigan Ave., 19th Floor, Chicago, Illinois 60603 and in Springfield at 320 West Washington Street, Springfield, Illinois 62767.

Should you have any questions regarding this matter, please do not hesitate to contact me at 714-939-7300 or EMcCusker@lancerclaims.com.

Sincerely,

*Erin McCusker*

Erin McCusker
CA License 4213932
Claims Director
Lancer Claims Services
A Division of Brown & Brown Program Insurance Services
CA License #2B02587
Third Party Administrator for Markel American Insurance Company
P.O. Box 7048 | Orange, CA 92863
714.939.7300 (direct) | 714.978.8023 (fax)



**From:** jason ulanski <julanski10@gmail.com>
**Sent:** Tuesday, December 5, 2023 10:03 AM
**To:** Erin McCusker <EMcCusker@lancerclaims.com>
**Subject:** Complaint letters

[External]

Hey Erin,

Here are two letters I received in the mail from my clients. I talked to Robin the other day, she informed me to send this over to you to start the claim process.  Please advise what we need to do next.

Jason Ulanski



PLAINTIFF'S
EXHIBIT

L

Jennifer Jones
14103 Kostner Ave.
Crestwood, IL 60418
Phone: 319-461-6616
Email: jenniferjones6616@gmail.com
November 20, 2023


Jason Ulanski
9700 Kingsbury Court
Palos Hills, IL 60465

Re: Claim Number 619221

To Whom It May Concern,

On December 6, 2022, Jason Ulanski of Penn Mutual solicited me for an investment opportunity of $125,000.00 USD. He was persistent in soliciting me, explaining this was my best option, and I was missing out.

On May 20, 2023, I was informed that my investment, solicited by Jason Ulanski, was a complete fraud.

Not only am I shocked by this whole ordeal, but because of this incident I suffer from mental stress, anxiety, irritability, and loss of sleep. This has affected every area of my life - my professional performance at work and my personal life.

Without prejudice to my rights of full recovery, I am willing to accept the amount of $125,000.00 USD in forbearance of my right to sue for all damages resulting from the incident if such payment is made within FOURTEEN (14) DAYS from the date of this letter. If I do not receive payment, I will commence legal proceedings.

Please Note: If I must proceed with legal proceedings to obtain compensation for all the damage I suffer, this letter will be tendered in court as evidence of your failure to attempt to resolve this matter. Further, you may be liable for any court costs, attorney fees, and damages.

Thank you,

Jennifer Jones

Clayton Lyons
14103 Kostner Ave.
Crestwood, IL 60418
Phone # 708.372.4317
Email: claylyons007@yahoo.com

November 20, 2023

Jason Ulanski
9700 Kingsbury Court
Palos Hills, IL 60465

Re: Claim Number 619221

To Whom It May Concern,
On May 20th, 2023, I was informed that I was involved in an investment Fraud incident. Jason Ulanski solicited an investment opportunity that was a complete scam. Jason had ignored all the problems, RED FLAGS, and continued to solicit the scam for his own Profit & Gains. He pursued me for well over a year, Bolstering the gains, and letting me know how much I was missing out. On October 6, 2021 Jason Ulanski solicited $30,000.00 USD from me, presenting that the legitimacy of the investment was verified through his financial firm, Penn Mutual.

As a Result of this incident, I have been suffering with mental stress, anxiety, and loss of sleep. This has extremely affected my professional performance at work, along with my personal life.

Without prejudice to my rights of full recovery, I am willing to accept the amount of $30,000.00 USD in forbearance of my right to sue for all damages resulting from the incident on October 6, 2021, if such payment is made within FOURTEEN (14) days from this date of this letter. If I am not contacted within SEVEN (7) days from the date of this letter, I will commence legal proceedings

Please Note: If i must proceed with legal proceedings in order to obtain compensation for my damages suffered, this letter will be tendered in court as evidence of your failure to attempt to resolve this matter. Further, you may be liable for any court costs, attorney fees, and damages

My Phone Number Again: 708.372.4317
Email: claylyons007@yahoo.com

THANK YOU,

*Clayton Lyons*

Clayton Lyons

# Stoltmann Law Offices, P.C.

**161 North Clark Street, Suite 1600, Chicago, Illinois 60601**
**2000 W. Center Drive, Ste. East C218, Hoffman Estates, Illinois 60192**
**Telephone 312-332-4200 Facsimile 312-332-4201**
**www.stoltmannlaw.com**

March 5, 2024

**Via Email and Overnight Delivery**

Ms. Erin McCusker
Lancer Claims Services
681 S. Parker Street., Ste. 300
Orange, CA 92863-7048
EMcCusker@lancerclaims.com

**RE:    Jason Ulanski Policy Limit Demand**
**Lancer Claim No. 619221**
**Markel American Insurance Company**

Dear Ms. McCusker:

Stoltmann Law Offices represents twenty-three Plaintiffs (hereinafter "Stoltmann Claimants") with nearly identical claims against your insured, Jason Ulanski ("Ulanski") arising from the negligent surrender of insurance policies and subsequent investment solicitations. The Stoltmann Claimants individual claims are detailed in the attached spreadsheet incorporated herein as Exhibit "A". Most of the Stoltmann Claimants are either Chicago Firemen, or friends and family of a Chicago Fireman.

As detailed herein, the liability for negligence against your insured cannot be disputed in good faith. Furthermore, the damages suffered by these claimants exceed the $1,000,000 insurance policy limits. Thus, now is the time to settle these claims.

## I.    STOLTMANN CLAIMANTS DEMAND MARKEL TENDER ITS $1,000,000 POLICY TO SETTLE THEIR CLAIMS.

The Stoltmann Claimants have collectively suffered losses of more than $1,700,000 because of your insured's negligence. Plaintiffs' claims exceed the applicable $1,000,000 policy limits. Our clients have authorized us to settle for your policy limits. There is no good faith basis to dispute the liability of your insured or the measure of the Stoltmann Claimants' damages. Should you refuse to tender the policy and this case proceeds to jury trial(s), we will certainly secure a judgment well more than your insured's policy limits. We will withdraw this demand for the policy limit within thirty days (April 5, 2024). After that date, we will file lawsuits stating the twenty-three claims individually in Illinois Circuit Courts.



PLAINTIFF'S
EXHIBIT

**M**
_____

**II.  THE DUTY TO SETTLE IS TRIGGERED WITH THIS DEMAND PRIOR TO SUIT BEING FILED.**

Illinois law sets forth that Markel has a duty of good faith and fair dealing to Ulanski in a case in which recovery may exceed insurance policy limits. *Cernocky v. Indemnity Insurance Company of North American*, 69 Ill. App. 2d 196, 216 N.E.2d 198 (1966). This duty arises in the context of an insurance policy in which the insurer reserves the right to settle claims made under the policy and to conduct settlement negotiations. *Id.* Once there is a demand to settle a case within policy limits, **an insurer must give the interests of the insured at least equal consideration with its own interests. A failure to do so would be bad faith**. *See Adduci v. Vigilant Insurance Company*, 98 Ill. App. 3d 472, 424 N.E.2d 645, 648 (1st Dist. 1981).

Markel's duty to settle arises by making this demand within the policy limits and there is (1) a reasonable probability of recovery in excess of policy limits; and (2) a reasonable probability that the court will find the insured liable for the claim. *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 417, 763 N.E.2d 299, 304 (2001), where the Illinois Supreme Court explained this point as follows:

> An insurer derives the authority to engage in settlement negotiations from the language of the insurance contract. Generally, such language gives the insurer the right to "make such investigation, negotiation, and settlement of any claim or suit as it deems expedient." Therefore, the basis for the duty to settle is the insurer's exclusive control over settlement negotiations and defense of litigation. This exclusive control, however, necessarily results in a conflict of interest between the insurance provider and its insured. We explained in *Cramer* that: "In the typical 'duty to settle' case, the third party has sued the policyholder for an amount in excess of the policy limits but has offered to settle the claim against the policyholder for an amount equal to or less than those policy limits. In this circumstance, the insurer may have an incentive to decline the settlement offer and proceed to trial. The insurer may believe that it can win a verdict in its favor. In contrast, the policyholder may prefer to settle within the policy limits and avoid the risk of trial. The insurer may ignore the policyholder's interest and decline to settle." In such cases, the insurance contract itself does not provide a remedy to the insured faced with a judgment in excess of policy limits; therefore, the law imposes upon the insurer the duty to settle in good faith.

(Internal Citations Omitted)

The duty to settle is triggered with this pre-suit demand. *Haddick*, 198 Ill. 2d at, 413. ("[T]he same threat exists to the policyholder that the insurer will wrongly refuse to settle within the policy limits and a judgment will be entered against him in excess of the policy whether the third party attempted to negotiate a **settlement prior to or after filing suit**." *Id.* (emphasis added)). Furthermore, the Illinois Supreme Court held the plaintiff could maintain her cause of

2

action for bad faith even though she revoked her offer to settle within the policy limits prior to filing suit. *Id.*

With this policy demand issued prior to filing suit, Markel now has a duty to settle the claims presented by the Stoltmann Claimants. If it fails to tender its policy within thirty days we will withdraw the demand, file suit, and pursue excess from Markel.

### III.  MARKEL MUST TENDER ITS $1,000,000 POLICY NOW DESPITE OTHER POTENTIAL CLAIMS.

The potential existence of other outstanding claims does not shield Markel from its duty to settle now. Illinois has adopted a first-come-first-serve approach, where the insurer may settle claims with individual claimants in exhaustion of the policy limits and to the exclusion of other claimants, so long as the insurer acts in good faith to reach a reasonable settlement agreement. *Sampson v. Cape Indus. Lt*d., 185 Ill. App. 3d 83, 86 (4th Dist. 1989); *State Farm Mut. Auto. Ins. Co. v. Murphy*, 38 Ill. App. 3d 709, 712 (2d Dist. 1976); *Haas v. Mid Am. Fire & Marine Ins. Co.*, 35 Ill. App. 3d 993, 995–96 (3d Dist. 1976). Of course, if Markel acts in bad faith in handling this claim it could be exposed to numerous other bad faith claims from other claimants. Settlement with the Stoltmann Claimants is the only way to prevent this sea of litigation.

Markel is at no additional risk of bad faith claims from other potential claimants as a result of tendering its policy to this group of claimants. In *Haas v. Mid America Fire & Marine Insurance Co.*, 35 Ill. App. 3d at 994, the insurer reached settlements with three of four claimants, paying $17,500 of the $20,000 policy. The remaining, non-settling claimant sought to hold the insurer liable for an excess judgment against the insured totaling $26,000, contending that the insurer had a duty to inform that claimant that it was engaged in settlement negotiations with the other claimants. *Id.* at 995. The appellate court disagreed. The Court reasoned, "[i]t is only for action showing bad faith on part of the insurer in making settlement on such conditions, however, that a recovery can be had." Furthermore, there is no duty to settle any other claims currently. Generally, the insurer does not have a duty to initiate negotiations. *Powell v. Prudence Mutual Casualty Co.*, 88 Ill. App. 2d 343, 347, 232 N.E.2d 155 (1st Dist. 1967); *Oda v. Highway Insurance Co.*, 44 Ill. App. 2d 235, 253, 194 N.E.2d 489 (1963).

Accordingly, the law is clear that Markel cannot be liable for bad faith claims by other claimants not included in this demand after it tenders its policy to the Stoltmann Claimants. Markel must tender its policy to the Stoltmann Claimants now or risk an excess judgment from them or other claimants later.

3

IV.     **THE CLAIMS AGAINST ULANSKI ARE INDEFENSIBLE AND REFUSING A POLICY DEMAND WOULD BE AN UNREASONABLE RISK FOR YOUR INSURED.**

1.  **Overview of Liability**

The claims against Ulanski arise from negligence and breach of fiduciary duty. The essential elements of a cause of action based on common law negligence may be stated briefly as follows: the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987). Ulanski had a duty to only recommend insurance related transactions in good faith and in consideration of the best interests of his clients, as defined by various applicable regulations. By recommending that the Claimants surrender insurance policies and otherwise use their capital to invest in an investment offering issued by Tyche Asset Management, he woefully breached that duty.

Tyche Asset Management is a Delaware Limited Liability Company formed in 2019 headquartered in Chicago, Illinois. Tyche was promoted as an algorithmic trading fund that had generated substantial rates of return since 2020. Ulanski uncritically consumed and repeated Tyche Asset Management marketing materials and selling points, encouraging the Stoltmann Claimants to prematurely surrender insurance policies so they could invest in a "better" opportunity. Ulanski specifically referred to the Tyche opportunity as a "low-risk, high-reward" investment that an investor could withdraw their money from with thirty days' notice. Neither of these facts were true, and Ulanski was negligent for making these representations to the Stoltmann Claimants.

On May 11, 2023, the Commodities and Futures Trading Commission ("CFTC") filed a complaint in the United States District Court for the Northern District of Illinois, Case. No. 23-cv-02970 against Tyche, its owner Phillip Galles, and several related entities. The CFTC alleged that Tyche and Galles were running a Ponzi scheme and that Galles "is stealing funds from victims he solicits to participate in what he describes as a "managed futures fund." The CFTC alleges that Galles fraudulently raised approximately $6 million dollars. A default judgment was entered against Galles and Tyche on November 8, 2023.  On May 10, 2023, Galles was indicted for wire fraud by the U.S. Attorney's office for the District of New Jersey. The indictment and the CFTC complaint allege that, notwithstanding representations that he managed billions of investor dollars through his managed futures fund, he only invested $26,000 of investor money in any account, and that didn't occur until 2023.

2.  **Ulanski Owed His clients a duty of care and breached that duty.**

Ulanski owed various duties to his clients, including the fiduciary duty to act in the best interests of his clients, who reposed trust and confidence in his financial advice. Further, making financial planning recommendations without a reasonable basis to do so means Ulanski was negligent. As an experienced and licensed insurance producer and financial planner, Ulanski should have known to be on the lookout for "red flags" of potential misconduct at Tyche.  "Red

4

Flags", often described as "indications of violations" or "suggestions of irregularities", may be viewed as indicators that should alert a person familiar with financial products that further investigation of specific conduct is necessary to protect against the transgression of established standards. Once such an indication or suggestion manifests itself, the need for prompt action arises.

The red flags that existed in connection with the sale of Tyche to investors are numerous, including: (a) outrageous performance representations; (b) unclear and amorphous investment methodology; (c) Misrepresentations of numerous facts to investors; and (d) that Tyche and its owner Phillip Galles actually converted investor funds for his own use.

Each of these red flags are indications of irregularity which required additional due diligence and inquiry by Ulanski. All he had to do was demand to see the Tyche trading records to establish that the entire fund was a fraud, yet Ulanski failed to perform this fundamental and rudimentary review. Further, recommending the surrender of safe insurance products or cash holdings to fund investments in Tyche especially without proper due diligence, was a breach of Ulanski's duty of care owed to the Stoltmann Claimants.

### 3. There is no question of proximate cause.

The Stoltmann Claimants were sold a bogus investment. As a direct and proximate result of Ulanski engaging in Financial Planning Services and recommending policy surrenders and cash liquidations to fund investments, Claimants have lost everything they invested totaling over $1,800,000. The law is clear in Illinois, "criminal conduct is foreseeable" in the financial planning services and insurance services settings and, as a result, such activity by Tyche could not be an intervening act; *Hyatt Johnson USA 2004, LLC v. Goldsmith*, 2016 IL App (1st) 151622-U, P42, 2016 Ill. App. Unpub. LEXIS 1933, *25. When criminal acts should reasonably have been foreseen, they do not relieve Ulanski of negligence. *Neering v. Illinois Central R.R. Co*, 383 Ill. 366, 381, 50 N.E.2d 497 (1943). A foreseeable intervening force does not break the chain of legal causation. *Felty v. New Berlin Transit, Inc*, 71 Ill. 2d 126, 131, 374 N.E.2d 203 (1978). Had Ulanski adequately investigated Tyche, he would have seen it was a scam and not recommended his clients consider investing.

### V.    THE DAMAGES ALLEGED BY THE STOLTMANN CLAIMANTS ARE FAR IN EXCESS OF THE MEAGER POLICY LIMITS.

Tyche and Galles defaulted in the CFTC case. Galles is going to jail.  Investors stand to receive nothing from Galles or Tyche. As such, your insured is the only potential source of recovery for the Stoltmann Claimants, who have suffered a total of $1,730,000 in losses.

### VI.    THE CLAIMS ARE INSURED. NO POLICY EXCLUSION APPLIES TO THE STOLTMANN CLAIMANTS.

There is no legitimate defense to coverage. Ulanski committed this negligence squarely within the definition of providing professional services covered by the policy. Furthermore, even if there were some defense to coverage, Markel would likely spend over $1,000,000 in fees

5

litigating these twenty-four claims spread over several Circuit Courts on a reservation of rights and litigating a complicated declaratory judgment action.

Based on the foregoing, Markel has a duty to tender its policy now. Markel's failure to tender its policy on or before April 5, 2024 will result in the Stoltmann Claimants withdrawing this demand, filing suit in Circuit Court, and pursuing excess whether via an excess judgment or settlement in excess of the policy limits.

Sincerely,


*/s/ Joseph R. Wojciechowski*

STOLTMANN LAW OFFICES, P.C.
Andrew Stoltmann, Esq.
Joseph Wojciechowski, Esq.
Sara Hanley, Esq.
Michael G. Mungovan, Esq.
2000 Center Drive, Ste. East C218
Hoffman Estates, IL 60192
T: (312) 332-4200
E: joe@stoltlaw.com

6

| Last Name | First Name | Alleged Losses |
|---|---|---|
| Alcauter | Eliasard | $50,000.00 |
| Biros | Jacob | $70,000.00 |
| Bojan | Paul | $25,000.00 |
| Bongiorno | Louis | $135,000.00 |
| Bosniack Jr. | Steve | $40,000.00 |
| Connelly | Cody | $40,000.00 |
| DeVita | Sharon | $50,000.00 |
| Dober | Sharon | $170,000.00 |
| Ernst | John | $45,000.00 |
| Griffin | Michael | $50,000.00 |
| Hoefling | Joseph | $25,000.00 |
| Jarosz | Tim | $130,000.00 |
| LeFevour | James | $69,000.00 |
| Oboyle | Kerry | $22,000.00 |
| Pacha | Adam | $500,000.00 |
| Parisi | James | $99,000.00 |
| Peters | Jenny | $30,000.00 |
| Pillen | Jennifer | $25,000.00 |
| Sanders | Tony | $25,000.00 |
| Skowronski | Thomas | $10,000.00 |
| Wahlgren | Dawn | $60,000.00 |
| Zilske | Keith/Elina | $40,000.00 |
| Zilske | Mary Beth | $20,000.00 |

$1,730,000.00

7